1 | **BRIAN T. DUNN, ESQ. (SBN 176502)**
Email: bdunn@cochranfirm.com
2 | **EDWARD M. LYMAN, ESQ. (SBN 248264)**
Email: elyman@cochranfirm.com
3 | **THE COCHRAN FIRM CALIFORNIA**
4929 Wilshire Boulevard, Suite 1010
4 | Los Angeles, California 90010-3856
5 | Telephone: (323) 435-8205
Facsimile: (323) 282-5280
6 | Attorneys for Plaintiff
7 |

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PAULETTE SMITH, individually and as Successor in Interest to ALBERT DORSEY, deceased,

        Plaintiff,

v.

CITY OF LOS ANGELES, a municipal entity, OFFICER EDWARD AGDEPPA, an individual, and DOES 1 through 10, inclusive,

        Defendants.

**CASE NO.: 19-cv-05370-CAS (Jcx)**

[Assigned to the Hon. Christina A. Snyder, United States District Judge]

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT CITY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT MEMORANDUM OF POINTS AND AUTHORITIES**

[Statement of Genuine Issues; Declaration of Brian T. Dunn and Supporting Exhibits; Request for Judicial Notice Submitted in Opposition to Defendants' Motions, Filed Concurrently Herewith Under Separate Cover]

**Hearing:**
Date:      October 19, 2020
Time:     10:00 a.m.
Courtroom: 8D

**TO THIS HONORABLE COURT, AND TO DEFENDANT CITY OF LOS ANGELES AND ITS ATTORNEYS OF RECORD HEREIN:**

PLEASE TAKE NOTICE, that on October 19, 2020, or as soon thereafter as this matter may be heard in Department 8D of the United States District Court, located at 350 W. 1st Street, Los Angeles California, Plaintiff PAULETTE SMITH, will, and hereby does, OPPOSE Defendants' Motion for Summary Judgment, or Alternatively, Summary Adjudication of Issues (Dkt. 37).

This Opposition is based on this Notice, the within Memorandum of Points and Authorities, the file and records of the within action, the Statement of Genuine Issues submitted in Opposition to Defendants' Motion, the Declaration of Brian T. Dunn and Supporting Exhibits submitted in Opposition to Defendants' Motion, Plaintiffs' Objections to Defendants' Proffered Evidence submitted in Opposition to Defendants' Motion; Plaintiffs' Request for Judicial Notice Submitted in Opposition to Defendants' Motions, and any such additional oral or documentary evidence as may be presented at, or evaluated by the Court in association with, the hearing of this matter.

DATED: September 28, 2020     Respectfully submitted,

**THE COCHRAN FIRM CALIFORNIA**


By: /s/ Brian T. Dunn
          BRIAN T. DUNN
          EDWARD M. LYMAN, III.
          Attorneys for Plaintiff

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323) 435-8205

i

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   GENUINE ISSUES OF FACT EXIST ON THE ISSUE OF WHETHER
     OFFICER VIOLATED MR. DORSEY'S RIGHT TO BE FREE FROM
     UNREASONABLE SEARCHES AND SEIZURES IN THE ENCOUNTER
     THAT CULMINATED IN THE DEADLY SHOOTING . . . . . . . . . . . . . . . . 8

II.  GENUINE ISSUES OF FACT EXIST ON THE ISSUE OF WHETHER THE
     OFFICERS' POOR TACTICAL DECISIONS PRIOR TO THE SHOOTING
     RENDERS THE USE OF DEADLY FORCE UNREASONABLE UNDER
     THE TOTALITY OF THE CIRCUMSTANCES THEY FACED . . . . . . . . 11

III. OFFICER AGDEPPA IS NOT ENTITLED TO QUALIFIED IMMUNITY
     BECAUSE PREEXISTING CASE AUTHORITIES CLEARLY
     ESTABLISHED THAT HIS USE OF EXCESSIVE FORCE UNDER THE
     CIRCUMSTANCES THAT HE FACED WAS UNLAWFUL . . . . . . . . . . 12

IV.  THE PLAINTIFF IS ENTITLED TO SURVIVAL DAMAGES BECAUSE
     MR. DORSEY'S DID NOT DIE IMMEDIATELY AFTER
     HE WAS SHOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Chien Van Bui v. City & County of San Francisco*
    61 F. Supp. 3d 877 (N.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . . . 16, 17

*Cruz v. City of Anaheim*
    765 F.3d 1076 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Curnow v. Ridgecrest Police*
    952 F.2d at 321 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Deorle v. Rutherford*
    272 F.3d 1272 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 10, 11, 15

*Drummond v. City of Anaheim*
    343 F.3d 1052 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*George v. Morris*
    724 F.3d 1191 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Glenn v. Washington County*
    673 F.3d 864 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Gonzalez v. City of Anaheim*
    747 F.3d 789 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Graham v. Connor*
    490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Harris v. Roderick*
    126 F.3d 1189 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

*Headwaters Forest Def. v. County of Humboldt*
    240 F.3d 1185 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*Hopkins v. Andaya*
   958 F.2d 881 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*J.A.L. v. Santos*
   2018 U.S. App. LEXIS 2916 (9th Cir. Feb. 6, 2018) . . . . . . . . . . . . 24, 25

*Leslie v. Grupo ICA*
   198 F.3d 1152 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mulligan v. Nichols*
   835 F.3d 983 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nehad v. Zimmerman*
   2017 U.S. Dist. LEXIS 208537 (S.D. Cal. Dec. 18, 2017) . . . . . . . . . . . 24, 25

*Pham v. City of San Jose*
   2013 U.S. Dist. LEXIS 141844 (N.D. Cal. Sept. 30, 2013) . . . . . . . . . . . 24, 25

*Reynolds v. County of San Diego*
   84 F.3d 1162 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Samples v. City of Atlanta*
   846 F.2d 1328 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Santos v. Gates*
   287 F.3d 846 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Scott v. Henrich*
   39 F.3d 912 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Smith v. City of Hemet*
   394 F.3d 689 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Tennessee v. Garner*
   471 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ting v. United States*
   927 F.2d 1504 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

///
///

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

**State Cases**

*Brown v. Ransweiler*
    171 Cal. App. 4th 516 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Grudt v. City of Los Angeles*
    2 Cal. 3d 575 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hayes v. County of San Diego*
    57 Cal. 4th 622 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20, 23

*Munoz v. City of Union City*
    120 Cal. App. 4th 1077 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Nally v. Grace Cmty. Church*
    47 Cal. 3d 278 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

## **INTRODUCTION**

This case arises out of the October 29,2018 fatal shooting of 30 year old Albert Ramon Dorsey, who was undisputedly shot and killed by Defendant Officer Edward Agdeppa of the Los Angeles Police Department. The shooting occurred following a physical altercation in the bathroom of a Hollywood fitness center involving Officer Agdeppa, and his female partner, Officer Perla Rodriguez. Although many aspects of this incident are disputed, this case is like many other officer involved shootings, in that the only version of events available for the Court's review comes from the surviving officers. For these reasons, the analysis of the events surrounding the shooting will seek to evaluate the reasonableness of this shooting with attention to the scientific evidence obtained from Mr. Dorsey's autopsy, the verifiable lack of serious injury to both officers, the audio and visual evidence from the officers' body cameras, as well as the totality of circumstances facing the undisputedly minor offenses which precipitated this fatal encounter.

## **STATEMENT OF FACTS**

### *Officer Agdeppa's Training Regarding the Use of Deadly Force*

Officer Agdeppa has acknowledged that he was trained in, and agrees with, the training directive which holds that deadly force is only to be used in situations involving the immediate threat of death or serious bodily injury. (Ex. 1 - Deposition of Edward Agdeppa, hereinafter "EA" 24:23-25:13) .

### *Height and Weight of Officers Agdeppa and Rodriguez*

At the time of this incident, Officer Agdeppa described his height as 5'1 or 5'2, and his weight at approximately 145 pounds. (EA 16:12-19). Officer Rodriguez described herself as being 5'4, and her weight to have been "145 to 150" pounds.   At the time of autopsy, Decedent Albert Dorsey weighed 280 lbs. (Autopsy Report, p.3).

*The Information Known to Officers Agdeppa and Rodriguez Prior to Their Encounter with Mr. Dorsey Described, At Most, Misdemeanor Offenses and Did Not Give Them the Legal Authority to Arrest Mr. Dorsey*

Prior to their arrival at the fitness center, the totality of information known to Officers Agdeppa and Rodriguez was dispatched to them, and they did not personally witness any of the events giving rise to the call for service that culminated in the death of Albert Dorsey. Concerning this information, Officer Agdeppa testified he had received information that Mr. Dorsey was "refusing to leave" the fitness center, "that he just assaulted patrons or a worker". After arriving at the fitness center, Officer Agdeppa overhead a security guard tell Officer Rodriguez that Mr. Dorsey had "assaulted a security guard". (EA 49:22-53:15) The officers had no information about the facts and circumstances surrounding any of these alleged assaults, had no information that Mr. Dorsey had injured any person, had no information that any weapons were involved, and did not interview any person who was allegedly assaulted by Mr. Dorsey prior to making contact with him. (*Id.*). The crimes described to the officers, at most, would describe misdemeanor crimes sounding in trespass and possibly battery. Significantly, based on the totality of information known to the officers prior to their encounter with Mr. Dorsey, they did not have sufficient information to arrest Mr. Dorsey for any crime; the most they could do was question Mr. Dorsey in the capacity of conducting an investigation. See California Penal Code, Section 836(a)(1), requiring an officer to personally observe conduct that is a misdemeanor to arrest the suspect. *Id.*

*Video and Audio Evidence of the Events Preceding the Shooting Demonstrates The Escalation of Force by Officers Adgeppa and Rodriquez.*

As demonstrated by Exhibit 8, the involved officers angry, condescending, and hostile demeanor, marked by repeated uses of profanity and degrading mannerisms exhibited towards Mr. Dorsey can only be described as escalating, as opposed to de-escalating the situation they confronted. This evidence can only be appreciated by

THE COCHRAN FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

viewing the video. (Exhibit 8) This video is publicly available and can be accessed by the public at the following link:

https://www.youtube.com/watch?v=SW2nTcLjsvY&t=897s

*Without Issuing Any Kind of a Warning Officer Agdeppa Fires Five Rounds, in Defense of Officer Rodriguez from a Distance of Six to Eight Feet*

It is undisputed that Officer Agdeppa fired five rounds total, and does not recall, and can discern no audio evidence depicting, his issuing any kind of a warning to Mr. Dorsey regarding his intent to use deadly force prior to firing. (EA 67:21-68:1; 109:9-20) When he fired his five rounds, Officer Agdeppa estimated his distance from Mr. Dorsey to have been six to eight feet. (EA 73:5-8) As distinguished from firing in self-defense, Officer Agdeppa has always maintained that his primary reason for firing was in defense of Officer Rodriguez. (EA 71:2-10; 73:1-4)

## INJURIES ALLEGEDLY SUSTAINED BY OFFICERS

*Although Officer Agdeppa Purportedly Shot Mr. Dorsey in Defense of His Partner, it Is Undisputed That Officer Rodriguez Did Not Suffer Anything Resembling a "Serious Bodily Injury" as That Term Is Defined by California Law*

Under California law, the term "serious bodily injury" is defined as follows:

(4) "Serious bodily injury" means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.

California Penal Code, Section 243(f)(4)

Officer Rodriguez did not suffer any broken bones in her face, and did not suffer any broken bones in any other part of her body. (PR 20:19-23:23) Officer Rodriguez did not receive any form of a concussion or head fracture. (PR 23:9-20) Officer Rodriguez did not miss a single day of work due to her injuries. (PR 23:18-20). Hence, Officer Agdeppa's purported belief that deadly force was needed because Mr. Dorsey was in the

THE COCHRAN FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

3

1  process of inflicting death or serious bodily injury against her is directly contradicted by

2  the evidence.

3  *Officer Agdeppa's Contradictory Evidence of a "Concussion"*

4  In response to counsel's questioning concerning whether any empirical medical

5  data supported his claim that he suffered a concussion, Officer Adgeppa testified as

6  follows concerning his CAT scan:

7  Q.  Did you ever recall reading anything in a CAT scan that said that you have a

8  concussion?

9  A.  Yes, sir. Not the CAT scan itself, but there is a doctor's note at the end of my

10  interview - - sorry - - my visitation, and that it did state that I had a concussion.

11  Q.  So I just want to get this correct. The CAT scan did not reveal a concussion, but a

12  doctor's not after that did?

13  A.  I don't interpret the CAT scan sir. So I'm saying is, the doctor looked at what the

14  results of the CAT scan were eventually, and then, you now, they type up a

15  doctor's note that you - - that they give to you or that they show you. And one of

16  the diagnoses was a concussion.

17  (EA 57: 2-16)(emphasis added)

18  So, in the span of a mere fourteen lines of testimony, Officer Agdeppa first

19  admitted that the CAT scan did not reveal the presence of a concussion, and then

20  immediately denied this admission with the qualification that "they type up a doctor's

21  note", which, according to Officer Agdeppa, revealed the presence of a concussion. (Id.)

22  One interpretation of this evidence holds that, if Officer Agdeppa's first explanation of

23  the results of his CAT scan were true, a doctor's note provided a diagnosis of a

24  concussion which was unsupported by the results of his CAT scan.

25  *Officer Agdeppa's Contradictory Evidence of a "Broken Nose"*

26  Like his purported "concussion", Officer Agdeppa's claim that he suffered a

27  "broken nose" has never been supported by any empirical medical evidence. (54: 12-13).

28  His attorneys appear to share in his confusion, as defendants' memorandum repeatedly

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

4

1 | argues that Mr. Dorsey broke Officer Agdeppa's nose, when, simply put, this is not so.

2 | (See Defendants' memorandum (Dkt. 37, at p. 3, "breaking his nose", p. 8, "[n]ot only

3 | did he incur a fractured nose . . .") The obvious problem with defendants' repeated

4 | assertions that Mr. Dorsey broke his nose is that the X-ray revealed this did not happen.

5 | This is illustrated by yet another example of Officer Agdeppa's evasive and

6 | contradictory testimony:

7 | Q. | Do you know, medically speaking, what those injuries were?

8 | A. | I do know of some of them. I had approximately 1-1/2 inch to 2 inch laceration on

9 | | the bridge of my nose which I received several sutures for. The initial doctor's

10 | | findings, he said I had a fractured nose. I received a - -

11 | Q. | Let me stop you very briefly. Did you have a fractured nose in fact?

12 | A. | That I don't - - when we did the X-ray, I don't even remember the X-rays. I want

13 | | to say that I did not. It turned out once all the swelling went down, then they did

14 | | the X-ray, it was negative for fracture. But again, a lot was happening during that

15 | | time, so I can't specifically tell you whether or not I did. But I just recall that the

16 | | initial doctor said that I did.

17 | (EA 54:1-16)(emphasis added)

18 |      Another misrepresentation of the evidence lies in Officer Adgeppa's description of

19 | the laceration on his nose, which, as above, he described as 1 ½ to 2 inches in lenth. (EA

20 | 54:4) When compared to an actual ruler, which is set forth in Exhibit 7-4, the laceration

21 | is approximately one quarter of an inch.

22 | *Post-Incident Photographs of Both Officers Reveal No Signs of Significant Injuries*

23 |      As for Officer Rodriquez, she appears virtually unscathed in photographs taken of

24 | her in the immediate aftermath of the incident. *See* Exhibit 5. This supports the fact that

25 | she was never threatened to the extent that Officer Ageppa claims.

26 | **DECEDENT ALBERT DORSEY'S CONFIRMED INJURIES**

27 |      The brutal evidence of Mr. Dorsey's injuries is uncontroverted, and is not subject

28 | to multiple interpretations:

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*Evidence of Recent Blunt Force Trauma*

When asked if she could make any determination as to when Mr. Dorsey suffered these blows to the head, Dr. Ashraf described the blunt force trauma to Mr. Dorsey's head as follows, "They didn't have any evidence of healing that I could tell, so I would say that they were relatively recent, so within hours of death." (ZA 32:7-33:2)

*Two Areas of Blunt Force Trauma to Mr. Dorsey's Head*

The Autopsy Report notes two distinct areas of blunt force trauma to Mr. Dorsey's head, described as (1) "Right temporal subcutaneous and subgaleal hemorrhage extending to the temporal muscle; and (2) "Right occipital subcutaneous and subgaleal hemorrhage." (AR, pp. 2, 8)

*Seven Separate Chest and Neck Injuries Caused By Blunt Force Trauma*

The Autopsy Report reveals the presence of "multiple irregular punctate to linear red-brown abrasions with surrounding purple contusions on the anterior neck ranging from 1/8 to 3/16 inch (4 total)", and "three irregular red abrasions on the left wrist ranging from 1/8 to 1/4 inch". (AR pp. 3, 8).

*Blunt Force Trauma to Mr. Dorsey's Wrist Consistent With Handcuffing*

Dr. Ashraf described two areas of blunt force trauma to each of Mr. Dorsey's wrists, which in her words "could be consistent with handcuffing". (ZA 37:8-12) The right wrist injury was described as an, "[i]rregular 2-1/2 x 2 inch purple contusion on right wrist", the left wrist injuries she described as, "[t]hree irregular red abrasions on the left wrist, ranging from 1/8 to 1/4 inch." (AR, p.2) Dr. Ashraf explained that a "[c]ontusion is a bruise and an abrasion is like a scrape", describing the purple contusion as being "basically like a bruise on the right wrist." (ZA 36:18-25).

*Taser Injuries*

In describing the "Electrical conducting device dart site", which impacted Mr. Dorsey's central back, Dr. Ashraf noted that at the time of the autopsy, the taser dart and wire were still in Mr. Dorsey's body, and noted the location of the puncture wound in the Autopsy Report. (ZA 30:12-31:1; AR, p.2)

*Four Gunshot Wounds Which Did Not Immediately Kill Mr. Dorsey*

Mr. Dorsey sustained a total of four gunshot wounds, described by Dr. Ashraf as follows:

I.    A gunshot wound that entered towards the back of Mr. Dorsey's right neck, which traveled in a downward trajectory, perforating the trachea, aortic arch, right atrium and both lobes of the left lung, resulting in a substantial amount of blood entering Mr. Dorsey's pleural cavity. According to Dr. Ashraf, the wounds associated with this shot resulted in severe injuries which perforated the heart, lungs, trachea, and aorta, which would have directly affected the ability of the heart to pump blood, and would have affected the ability of the lungs to breathe. (ZA 16:11-17:18)(AR pp. 1, 4-5).

II.   A gunshot wound which entered the right side of Mr. Dorsey's chest, traveling at a downward trajectory, which was described as "less severe" than #1, causing primarily skin and soft tissue injuries. (ZA 20:2-5)(AR pp. 5-6)

III.  A gunshot wound which entered the upper part of Mr. Dorsey's right shoulder, traveling at a downward trajectory, which fractured ribs and caused a severe spinal cord injury and associated hemorrhaging around the spinal cord, each of which was described as "severe" by Dr. Ashraf. (ZA 22:8-23:16)

IV.   A gunshot wound which entered Mr. Dorsey's left upper abdomen, traveling in an upward trajectory, and causing extensive injuries, including severe damage to the heart and left lung, causing a significant amount of blood to pour into the chest cavity, irreparably compromising breathing ability. (ZA 26:4-29:20).

In addressing the cumulative effect of all four gunshot wounds, Dr. Ashraf stated that despite the severity of the wounds, Mr. Dorsey would not have died instantly, and Dr. Ashraf estimated the onset of death caused by injuries associated with the four gunshot wounds to have occurred in a period of "seconds to minutes". (ZA 29:22-30:3).

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*The Los Angeles Police Department Board of Police Commissioners Determines Officer*

*Agdeppa's Shooting to Be Out of Policy*

The BOPC determined Officer Agepppa's use of deadly force to be out of policy,

finding in part as follows:

> "In this case, [Officers Agdeppa and Rodriguez] did not formulate a tactical plan
>
> prior to encountering the Subject. Upon arrival at the scene, neither officer
>
> obtained details about the incident or about the Subject from thje staff at the
>
> facility. Upon observing the Subject, the officers did not properly assess the threat
>
> that he posed to them - - i.e., the Subject's size in relation to their own, his non-
>
> compliance with their commands, and his escalating aggressive behavior toward
>
> them.

Additionally the BOPC was critical of the officers' lack of utilizing time in order

to redeploy, their delay in requesting additional resources, and their inadequate

maintenance of lines of communication with the Subject prior to attempting to handcuff

him. By not observing the warning signs of a potentially violent Subject, the officers

acted too quickly and placed themselves at a tactical disadvantage during the incident.

Based on the totality of the circumstances, the BOPC determined that the officers'

actions of not formulating a tactical plan, not assessing the Subject's threat level, not

redeploying, and not utilizing time to wait for additional resources was a substantial

deviation, without justification from approved Department tactical training.

*See* BOPC Findings, Request for Judicial Notice, Exhibit 1.

**I.    GENUINE ISSUES OF FACT EXIST ON THE ISSUE OF WHETHER**

**OFFICER AGDEPPA VIOLATED MR. DORSEY'S RIGHT TO BE FREE**

**FROM UNREASONABLE SEARCHES AND SEIZURES IN THE**

**ENCOUNTER THAT CULMINATED IN THE DEADLY SHOOTING**

An excessive force claim is adjudicated under the Fourth Amendment's "objective

reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 388,(1989). In evaluating

whether officers used excessive force, the court must balance "the nature and quality of

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

8

the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Id. at 396 (internal quotation marks omitted). Among the specific facts a court must consider are "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Id. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9,(1985). Critically, "force must be necessary to be reasonable." *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010). The use of deadly force is justified only where a reasonable officer would have had probable cause to believe that there was a threat of serious injury to himself or others. See Smith, 394 F.3d at 704.  "[W]hether a particular use of force was reasonable is rarely determinable as a matter of law." *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994). This is so because excessive force cases "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Accordingly, the Ninth Circuit has "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Id. In *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) the Ninth Circuit highlighted the difficulty of adjudicating excessive force claims involving the use of deadly force as a matter of law:

> "Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. *Hopkins*, 958 F.2d at 885-88; *Ting v. United States*, 927 F.2d 1504, 1510-11 (9th Cir.1991). In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

THE COCHRAN FIRM CALIFORNIA 4929 Wilshire Bl. Suite 1010 (323)435-8205

1  *Scott v. Henrich,* 39 F.3d 912, at 915.  Summary judgment in excessive force cases

2  should be granted sparingly because the reasonableness of force used is ordinarily a

3  question of fact for the jury. *Hayes v. County of San Diego,* 736 F.3d 1223, 1236 (9th

4  Cir. 2013).

5       As illustrated above, the Plaintiff has submitted an abundance of evidence

6  demonstrating genuine issues of fact, including the lack of injuries to the involved

7  officers, the multiple severe injuries (in addition to gunshot wounds) suffered by Mr.

8  Dorsey, the internal inconsistencies involving Officer Agdeppa's testimony, as well as

9  video evidence of absolutely abysmal police tactics which had the effect of exacerbating

10  and escalating the encounter, independent of any of Mr. Dorsey's actions. Moreover, the

11  BOPC found his use of deadly force, which Officer Agdeppa inflicted without warning,

12  to be out of policy.  Hence, summary judgment is simply not warranted here.

13  **A.**    **The Fact That Officer Agdeppa Failed to Give Any Kind of a Warning**

14         **to Mr. Dorsey Prior to Using Deadly Force Further Evidences Genuine**

15         **Factual Issues Which Should Preclude Judgment as a Matter of Law in**

16         **this Instance.**

17       Both the Ninth Circuit and the Supreme Court have noted that even when

18  circumstances dictate that an officer may use a firearm, "whenever practicable, a warning

19  must be given before deadly force is employed." *Harris v. Roderick* 126 F.3d at 1201

20  (1997) (citing *Tennessee v. Garner,* 471 U.S. 1 at 11-12 (1985)). The Ninth Circuit has

21  defined the warning required before using force—even force that does not qualify as

22  deadly force—as a "warning of the imminent use of such a significant degree of force."

23  *Deorle,* 272 F.3d 1272, 1285 (9th Cir. 2001). Mere commands, absent a statement that

24  force will be used if the command is ignored, have not been found to constitute adequate

25  warning. In *Garner* itself, the officer "called out 'police, halt' and took a few steps

26  toward" Decedent Garner, and the Supreme Court nevertheless found it necessary to note

27  that officers must instead give a "warning" before using deadly force. See *Garner,* 471

28  U.S. at 3. Further, in *Lehman v. Robinson,* 228 Fed. Appx. 697 (9th Cir. 2007) (judgment

THE COCHRAN FIRM CALIFORNIA 4929 Wilshire Bl. Suite 1010 (323)435-8205

1 vacated by *Robinson v. Lehman,* 552 U.S. 1172, (2008) reaffirmed by *Lehman v.*
2 *Robinson,* 346 Fed. Appx. 188 (9th Cir. 2009), officers ordered a suspect to drop a knife,
3 without warning him that they would shoot if he did not comply, and he did not do so.
4 The Ninth Circuit found that the officers violated the suspect's Fourth Amendment rights
5 when they then shot him, in part because they fired "without any 'warning of the
6 imminent use of such a significant degree of force.'" *Id.* at 700 (quoting *Deorle,* 272 F.3d
7 at 1285). See also *Daniels v. Cty. of Ventura,* 228 Fed. Appx. 669, 670 (9th Cir. 2007)
8 (holding that a shooting violated the Fourth Amendment when officers ordered man
9 armed with a knife to drop it and he did not, because the officer "did not warn [the
10 victim] that he would shoot"). Here the fact that no such warnings were given provides
11 further evidence supporting the denial of summary judgment.

12 **II.    GENUINE ISSUES OF FACT EXIST ON THE ISSUE OF WHETHER THE**
13 **OFFICERS' POOR TACTICAL DECISIONS PRIOR TO THE SHOOTING**
14 **RENDERS THE USE OF DEADLY FORCE UNREASONABLE UNDER**
15 **THE TOTALITY OF THE CIRCUMSTANCES THEY FACED**

16 The California Supreme Court has "long recognized that peace officers have a
17 duty to act reasonably when using deadly force." *Hayes,* 57 Cal. 4th at 629. Under
18 California law, "liability can arise if the tactical conduct and decisions leading up to the
19 use of deadly force show, as part of the totality of circumstances, that the use of deadly
20 force was unreasonable." Id. at 626. *Mora v. City of Garden Grove,* 2020 U.S. Dist.
21 LEXIS 150562, *29. (Quotng *Hayes v. County of San Diego,* (2013) 57 Cal. 4th 622,
22 626. Hence, where an officer's pre-shooting conduct did not cause the plaintiff any
23 injury independent of the injury resulting from the shooting, negligence "liability can
24 arise if the tactical conduct and decisions leading up to the use of deadly force show, as
25 part of the totality of circumstances, that the use of deadly force was unreasonable."
26 *Hayes,* 57 Cal.4th at 626. *Banks-Reed v. Bay Area Rapid Transit,* 2019 U.S. Dist. LEXIS
27 199603, *25, n. 10. There is a long-established principle of California law that the
28 reasonableness of a peace officer's conduct must be determined in light of the totality of

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

circumstances. There is no sound reason to divide plaintiff's cause of action into a series of decisional moments and then to permit the plaintiff to litigate each decision in isolation, when each is part of a continuum of circumstances surrounding a single use of deadly force. Instead, an officer's pre-shooting conduct is properly included in the totality of circumstances surrounding his use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to pre-shooting conduct. *Hayes v. County of San Diego,* 736 F.3d 1223, 1236 (9th Cir. 2013). For the purposes of this inquiry, claims of "excessive force" under California law are analyzed under the same standard of "objective reasonableness" used in Fourth Amendment claims. In recognizing the identity of these overlapping standards of proof, the Ninth Circuit has repeatedly held that 42 U.S.C. § 1983 is the federal counterpart of state battery or wrongful death actions. *Hayes v. County of San Diego,* 736 F.3d 1223, 1232 (9th Cir. 2013)

**III.    OFFICER AGDEPPA IS NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE PREEXISTING CASE AUTHORITIES CLEARLY ESTABLISHED THAT HIS USE OF EXCESSIVE FORCE UNDER THE CIRCUMSTANCES THAT HE FACED WAS UNLAWFUL**

Defendants argue that they are entitled to summary judgment on Plaintiff's federal claims based on the application of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231,(2009) (citation omitted). An officer will be denied qualified immunity in a § 1983 action if (1) taken in the light most favorable to the party asserting injury, the facts alleged show that the officer's conduct violated a constitutional right, and (2) the right violated was "clearly established" at the time of the incident such that a reasonable officer would have understood his conduct to be unlawful in that situation. *Torres v. City of Madera,* 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Saucier v. Katz,* 533 U.S. 194, 201,(2001)). While qualified immunity

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1  "does not require a case directly on point for a right to be clearly established, existing

2  precedent must have placed the statutory or constitutional question beyond debate." *Id.* at

3  1152. *White v. Pauly*, 137 S. Ct. 548, 551 (2017). In the absence of "a case directly on

4  point," the Ninth Circuit will compare "specific factors" relevant to the excessive force

5  inquiry to determine whether a reasonable officer would have know the conduct in

6  question was unlawful. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th

7  Cir. 2017) (quoting *Bryan v. MacPherson*, 630 F. 3d 805, 826 (9th Cir. 2010) For the

8  purposes of ascertaining the existence of "clearly established" law, the Ninth Circuit has

9  approved of the use of unpublished and district court decisions to inform qualified

10  immunity analysis in conjunction with controlling authority. *Penton v. Johnson*, 2019

11  U.S. Dist. LEXIS 210242, *25. *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)

12  ("We have held that unpublished decisions of district courts may inform our qualified

13  immunity analysis."). *Accord Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d

14  1052, 1060 (2003) (quoting *Sorrels*, 290 F.3d 965, 971 (9th Cir. 2002)).*("[e]ven

15  unpublished decisions of district courts may inform our qualified immunity analysis.")

16       Concerning the use of deadly force, at the time of the incident, it was "clearly

17  established" that "[w]here the suspect poses no immediate threat to the officer and no

18  threat to others, the harm resulting from failing to apprehend him does not justify the use

19  of deadly force to do so." *Bordegaray v. Cnty. of Santa Barbara*, 2016 U.S. Dist. LEXIS

20  172269, **22-23; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

21       Concerning factual similarities to the instant case, section 1983 actions involving

22  (1) claims of unreasonable force against (2) allegedly combative unarmed suspects who

23  (3) are physically strong and difficult for officers to control physically, who (4) have

24  repeatedly ignored police commands have predated the October 29, 2018 shooting with

25  substantial frequency and regularity. A few are discussed herein.

26       In *Rose v. City of Sacramento*, 163 F. Supp. 3d 787, 789 (E.D. Cal. 2016), the

27  court evaluated the lawfulness of an officer's use of deadly force in connection with a

28

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

13

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1  call for service from a residence involving reportedly erratic and behavior from the

2  reporting party's 270 pound adult son with facts similar to the instant case.

3  In denying summary judgment, the *Rose* court recognized that genuine issues of fact

4  which cast doubt on the officer's version of events precluded summary judgment on

5  behalf of the defendant shooting officer. The Rose Court denied summary judgement

6  notwithstanding the fact that the shooting officer , like Officer Agdeppa, claimed that his

7  use of deadly force was his only option in response from a violent attack from the 270

8  pound decedent who, according to the officer, attached with "unrelenting aggression".

9  Id.,  at 790. Also like Officer Agdeppa, the shooting officer in Rose claimed that he

10  received continuous blows to the face, head, and body and began to feel that he was was

11  losing consciousness" prior to discharging his firearm.

12      In *Berger v. Spokane County,* No. 2:15-CV-140 RMP, 2017 WL 579897, at *1

13  (E.D. Wash. Feb. 13, 2017)  deputies responded to a disturbance call from a private gym

14  of "a disorderly subject at a fitness center that was attacking people and destroying

15  things inside. *Id.* at 1.  William Berger, a 34 year old, 6 feet and 1 and a half inches tall,

16  was allegedly having a mental health crisis and was actively resisting the deputies'

17  attempts to restrain him . *Id.* at 1. Mr. Berger irrational and combative behavior was

18  evidenced by his pounding on the hood of the first patrol car that arrived. *Id.* at 2.  The

19  deputy gave Mr. Berger commands to stop and get on the ground, which Mr. Berger

20  ignored. As Berger fled towards a busy street, the deputy tased him. *Id.* at 2.  Berger

21  made it across the street to a vacant parking lot. *Id.* at 2.  The pursuing deputy continued

22  to give Berger commands to stop, which Mr. Berger ignored.  *Id.* at 3.   The deputy tased

23  Berger again. *Id.* at 3.  A paramedic observed Berger "fall to his knees, and stand back

24  up and pull the tasers off of his chest. In denying summary judgment and in determining

25  the plaintiffs' claims of excessive force were inappropriate for resolution as a matter of

26  law, The *Berger* court acknowledged, how the "presence of mental illness may affect the

27  balancing that a court must undertake." Berger at 7. In denying summary judgment, the

28  Berger court explained the significance of the fact that Mr. Berger began his interaction

1  with the deputies in such a state of agitation and potential delusion that he may not have

2  understood what was happening as the incident progressed.   Id. at. 7. In the instant case,

3  footage from the Defendants' body worn cameras reveals Mr. Dorsey in a similar state of

4  apparent agitation and delusion—such that exhibited by Mr. Dorsey, who, based on the

5  video evidence, at times appeared disassociated from the gravity of his situation.

6          In *Lerma v. City of Nogales,* No. CV 12-518-TUC-FRZ, 2014 WL4954421 (D.

7  Ariz. Sept. 30, 2014, a Subway employee called 911 and reported a male customer, later

8  identified as Diego, was on the floor "having like a seizure[ ]" and a few minutes later

9  got up and left Subway and went around to the back of a shopping center. *Id.* at 3.   A

10  responding officer announced "Nogales Police" loudly and ordered anyone inside the

11  Subway restaurant to come out.   Officers drew their firearms and proceeded to search the

12  store where they discovered Mr. Diego partially concealed behind some shelves in the

13  warehouse area. *Id.* Diego was wearing an untucked tank-top shirt that hung over the

14  waistline of his jeans, and officers did not know whether he was armed. *Id.* An officer

15  identified himself to Mr. Diego and ordered him repeatedly to show himself and put his

16  hands up. *Id.* at 4.   Mr. Diego "didn't show a response. He did not talk back to [the

17  officer]. He did not do as [the officer] told, to show [the officer] his hands and to come

18  on out from where he was hiding . . . . he did not show [the officer] a sign. He did not

19  make any attempt at communicating back with [the officer]." *Id.* at 4. Instead, Mr. Diego

20  "continued looking up. He would make eye contact with [the officer], just looking

21  straight ahead . . . and he'd put his head down and he wouldn't show any movement. His

22  hands stayed clenched." *Id.* at 4.   The officer testified Diego's behavior and physical

23  characteristics seemed "out of character . . .", in that [the officer] usually does not see

24  such behavior when effectuating an arrest. *Id.*

25          When the officers made the decision to go "hands on", Mr. Diego, who was

26  significantly larger than the officers, responded aggressively to their efforts to subdue

27  him, and  turned and confronted one of the officers in an aggressive manner, "with a lot

28  of energy" and with fists still clenched. Due to Mr. Diego's size and strength, and his

THE COCHRAN FIRM CALIFORNIA 4929 Wilshire Bl Suite 1010 (323)435-8205

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1  demonstrated refusal to allow himself to be handcuffed, officers feared that if Mr. Diego

2  was not stopped, he was going to seriously injure officers. *Id.* at 4. In response to this

3  threat, Mr. Diego was repeatedly tased during a protracted struggle to get him

4  handcuffed. In recognizing that genuine issues of fact precluded summary judgment as

5  to the plaintiffs' excessive force claims, the Court weighed each of the Graham factors,

6  and found that, among other reasons, because no serious crime had been committed, a

7  jury should be permitted to determine the reasonableness of the officers' uses of force. Id.

8  at 10-14.

9      Hence, qualified immunity must be denied because clearly established laws

10  preceding the subject incident have affirmed the viability of section 1983 actions

11  involving (1) claims of unreasonable force against (2) allegedly combative unarmed

12  suspects who (3) are physically strong and difficult for officers to control physically,

13  who (4) have repeatedly ignored police commands have predated the October 29, 2018

14  shooting with substantial frequency and regularity.

15  **IV.    THE PLAINTIFF IS ENTITLED TO SURVIVAL DAMAGES BECAUSE**

16  **MR. DORSEY'S DID NOT DIE IMMEDIATELY AFTER HE WAS SHOT**

17      Without evidentiary support, Defendants proffer the self-authenticating assertion

18  that Plaintiff's survival damages should be foreclosed as a matter of law because, as

19  Defendants assert, "Dorsey was shot in the chest, causing him instantaneous death." (See

20  Defendants' memorandum (Dkt. 37), at p. 25. Under Chaudhry v. City of Los Angeles,

21  751 F.23d 1096, 1103-1105, (9th Cir. 2014) the Ninth Circuit recognized a decedent's

22  right to recover damages for pre-death pain and suffering through a survival action

23  brought by his heirs. Id., at 1103-1105. Concerning pre-death pain and suffering

24  "Chaudry damages" associated with police homicides brought under § 1983, no fixed

25  standard exists for determining a threshold amount of time in which a decent must

26  survive, rather, the prevailing authority holds that "the policies of compensation and

27  deterrence are furthered by awarding damages for every second a decedent survives

28

1 following a Constitutional violation. Willis v. City of Fresno, 2017 U.S. Dist. LEXIS

2 195321, **18-19.

3    As referenced above, the testimony of Dr. Ashraf belies this assertion, as

4 confirmed by the following verbatim excerpt from the deposition transcript:

5 Q.    Finally, can you make any determination if you look at these wounds collectively,

6    these four wounds collectively, can you make any determination as to how long a

7    person may or may not survive having suffered all of these wounds?

8 A.    So I had said that the interval was rapid, which means seconds to minutes.

9 Q.    And when you say interval was "seconds to minutes," is there any way we could

10    pin that down to how many seconds or how many minutes or anything like that?

11 A.    No. I wouldn't really be able to say. I mean, less than an hour would be - - -

12 Q.    But it wasn't one - - it wasn't, like, right away, that he would have died right

13    away?

14 A.    I don't think so.

15 (ZA 29:22-30:11) Hence, this uncontroverted testimony more than demonstrates

16 Plaintiff's entitlement to Chaudry damages, rendering Defendant's assertion without

17 merit.

18 **V.    CONCLUSION**

19    For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny

20 Defendant City of Los Angeles' Motion for Summary Judgment in its entirety.

21

22 DATED: September 28, 2020    Respectfully submitted,

23    **THE COCHRAN FIRM CALIFORNIA**

24

25    By: /s/ Brian T. Dunn

26    BRIAN T. DUNN
      EDWARD M. LYMAN, III.

27    Attorneys for Plaintiff

28

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205