UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) - DEFENDANT OFFICER EDWARD AGDEPPA'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (Dkt. 37, filed on June 30, 2020)

## I. INTRODUCTION

On June 16, 2019, plaintiff Paulette Smith, individually and as successor in interest to decedent Albert Dorsey, filed a complaint against defendants Officer Edward Agdeppa and the City of Los Angeles ("City"). Dkt. 1 ("Compl."). In her complaint, Smith alleged four claims for relief: (1) violations of 42 U.S.C. § 1983 ("Section 1983") against Officer Agdeppa based on an unreasonable use of deadly force; (2) violations of Section 1983 based on an unconstitutional policy, practice or custom against the City; (3) wrongful death against Agdeppa and the City based on battery, pursuant to Cal. Gov't Code §§ 815.2(a), 820(a) and Cal. Civ. Code § 43; and (4) wrongful death against Agdeppa and the City based on negligence, pursuant to Cal. Gov't Code §§ 815.2(a), 820(a). See Compl.

The City answered on August 8, 2019, Dkt. 10; and on August 16, 2019, Agdeppa answered, Dkt. 15. On May 6, 2020, the parties stipulated to dismiss the City from the case, leaving claims one, three and four as alleged against Agdeppa. See Dkts. 30, 31.

On June 30, 2020, Agdeppa, now the sole defendant, filed the instant motion for summary judgment, or, in the alternative, partial summary judgment. Dkt. 37 ("MSJ"). Plaintiff filed an opposition to Agdeppa's MSJ, Dkt. 45 ("Opp."), a statement of disputed facts, Dkt. 51 ("Opp. SDF"), a request for judicial notice, Dkt. 46, and several exhibits,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

Dkts. 47–50, 53. Agdeppa filed a reply, Dkt. 55 ("Reply"), along with evidentiary objections, Dkt. 55-1 ("Evid. Obj.").[1] The Court held a hearing on October 19, 2020.

Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

### A. Officers' Arrival and Initial Encounter with Dorsey

On the morning of October 29, 2018, the police received multiple calls requesting police assistance at a 24-Hour Fitness gym in the 6300 block of Sunset Boulevard, in Los Angeles, California, where it was reported that a visitor to the gym was engaged in disruptive conduct. Opp. SDF No. 1. Officers Agdeppa and Perla Rodriguez (collectively, "officers"), arrived at the gym at approximately 9:05 a.m. and activated their body-worn cameras ("BWC"). Opp. SDF No. 5; see MSJ Exh. B, Agdeppa's BWC Footage ("Ag. BWC"); MSJ Exh. C, Rodriguez's BWC Footage ("Rod. BWC").

A gym staff member met the officers at the entry door to the gym, and volunteered, "We have a gentleman who is a little bit irate and he's not listening. He's already hurting members [inaudible] and assaulting security as well." Rod. BWC at 04:01;[2] see Opp. SDF No. 6.

The officers immediately proceeded to the men's locker room because, Agdeppa contends, they were concerned Dorsey would imminently assault gym patrons or staff. Opp. SDF No. 6. Plaintiff disputes this, arguing that the officers had no information regarding—and did nothing to investigate—whether Dorsey had a weapon or had injured anyone at the gym. Id. at Nos. 1, 6.

It is undisputed, though, that the entrance to the men's locker room was blocked with a table and yellow caution tape when the officers arrived, and that the locker room was

---

[1] The Court resolves only those evidentiary objections relevant to evidence upon which it relies in this order; any objections to evidence not relied upon in this order are denied as moot.

[2] Plaintiff submits its own transcript of the body-worn camera footage in this case. Opp. Exh. 6. Agdeppa objects to the accuracy and admissibility of the transcript. Evid. Obj. at 2. The Court need not resolve the accuracy or admissibility of the transcript because it does not rely on plaintiff's proffered transcript.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

empty except for Dorsey. Id. at No. 7; Rod. BWC at 05:15. The officers found Dorsey, who was 6' 1" and 280 pounds, wearing no clothes, with a bath towel over his left shoulder, listening to music from his phone. Opp. SDF No. 8; Rod. BWC at 05:15. At the time, Agdeppa was 5' 1" and 145 pounds, and Rodriguez was 5' 5" and 145 pounds. Opp. SDF No. 2.

### B. Officers' Request that Dorsey Leave the Gym

Upon entering the locker room, Agdeppa asked Dorsey what he was doing, and Rodriguez told him, "We want you out. You gotta get out." Rod. BWC at 05:15–05:24. Dorsey looked at the officers, but did not acknowledge them, swaying in time with his music for several seconds. Id. at 05:25–05:37.

Rodriguez again requested that Dorsey leave, stating, "Turn off your music, put on your clothes and get out." Id. at 05:37. Dorsey initially ignored Rodriguez, but then asked in a low volume, "What's the problem?" Id. at 05:41. Agdeppa told Dorsey that he was causing a disturbance. Id. at 05:44. Dorsey replied inaudibly, to which Agdeppa responded, "I don't care, you gotta put on your clothes right now. You're not listening to us." Id. at 05:48. Dorsey nodded his head once, and appears to have said, "Okay, can I just grab some things?" while pointing down and to Agdeppa's right. Id. at 05:51. Agdeppa responded, "No, I have to watch you." Id. at 05:53.

Dorsey proceeded to dry himself with his towel for roughly one minute, before speaking quietly to Agdeppa, who had moved into the shower area several feet from Dorsey. Id. at 05:54–06:54. Agdeppa repeated the officers' request that Dorsey leave, stating, in a somewhat raised voice, "[S]omeone called on you. So you need to hurry up 'cause I'm losing my patience right now." Id. at 06:54. Several seconds later, Rodriguez repeated that Dorsey needed to leave. Id. at 07:10.

Dorsey then walked toward and past Rodriguez, across the locker room and to a mirror at the other end of the room. Id. at 07:17. Agdeppa asked Dorsey what he was doing, to which Dorsey appears to have responded, "I'm about to get my fucking [inaudible]. What the fuck you think I'm about to do?" Id. at 07:21. Agdeppa replied, "Alright," and Rodriguez said, "Go ahead, put on your clothes." Id. at 07:26, 07:31. Dorsey did not immediately put on his clothes, though, but instead continued drying himself. Agdeppa then asked, in a level tone of voice, "You gonna get dressed, or are we going to have to drag you out of here like this?" Id. at 07:47. Rodriguez again told Dorsey to "[j]ust hurry up and put on your clothes. That's all you gotta do." Id. at 07:51.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**  'O'

| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
|---|---|---|---|
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

During this exchange, Dorsey walked slowly around the locker room, and still made no gesture toward putting on his clothes. When Dorsey walked back across the room to the shower stall where the officers initially found him, the officers put on latex gloves. Id. at 08:00–08:11. Agdeppa raised his voice and said, "Are you going to put on your clothes or not?" Id. at 08:12. Dorsey, with his voiced raised, responded, "I am. [Inaudible.]" Id. at 08:14. At this point, both officers raised their voices, saying, among other things, "[S]top walking around," id. at 08:15, and, "I asked you one simple thing: Take your clothes, put them onto your body," id. at 08:19. Dorsey responded in a somewhat raised voice, "Okay, well let me tell you one simple thing: Stop talking to me." Id. at 08:24.

Meanwhile, Dorsey continued drying himself with his towel and slowly rearranging his personal effects on the seat in the shower stall. Id. at 08:37. But Dorsey did not sit, and instead began dancing intermittently for roughly 41 seconds while occasionally drying himself. Ag. BWC at 08:51–08:32; Opp. SDF No. 11. About half a minute later, Rodriguez told Dorsey, in a raised voice, "Hurry up stop dancing, hurry up," but Dorsey continued to dance. Rod. BWC at 09:14. Dorsey raised the middle finger on his right hand and waived it in time with the music for roughly three seconds, directing it at times toward the shower wall in front of him, and at times in the direction of the officers, who were standing to his left. Ag. BWC at 09:24–09:27.

### C. Officers' Physical Engagement with Dorsey

At that point, Agdeppa states that he and Rodriguez decided to go "hands on" in light of Dorsey's refusal to dress and leave. Opp. SDF No. 12. The officers quickly approached Dorsey and grasped his arms; while Agdeppa placed a handcuff on Dorsey's right wrist, Rodriguez attempted to restrain Dorsey's left arm. Id. at No. 13. Dorsey resisted the officers' attempts to handcuff him by "tensing up," and the officers demanded that he stop resisting.[3] Id.

Unable to apply the other handcuff to Dorsey's left arm, the officers applied finger and wrist locks, "bracing maneuvers," and a "double-cuff procedure." Id. at No. 14. The officers repeatedly demanded that Dorsey stop resisting and calm down. Id. at No. 15. Despite both officers' attempts to wrest Dorsey into submission, Dorsey freed his left arm from Rodriguez's grip, at which point the officers attempted to pin Dorsey to the wall. Id. at No. 14. At some point in the struggle, Agdeppa radioed for backup. Id. at No. 18.

---

[3] At this point, although the officers' body-worn cameras remained in place and continued to record, the video image is obscured due to the officers' proximity to Dorsey.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

### D. Agdeppa's Account of the Escalating Struggle and Shooting

The parties dispute certain key facts regarding the physical altercation from this point on. Because the officers' body-worn cameras fell to the floor soon after the initial attempts to handcuff Dorsey, there is no video of the altercation, although the cameras continued to record audio. Id. at No. 16.

According to Agdeppa, during the struggle with the officers, Dorsey struck Rodriguez in the face. Id. at No. 17; MSJ at 6. As the struggle continued, Agdeppa unholstered his Taser, pressed it against Dorsey's chest and warned that, if Dorsey did not desist, he would use his Taser. Opp. SDF No. 19; MSJ at 6. The parties agree that, after issuing the warning, Agdeppa activated his Taser, cycling it two times into Dorsey's chest. Opp. SDF No. 20; MSJ at 6. The parties also agree that around this time, Rodriguez fired the darts from her Taser into Dorsey's back. Opp. SDF No. 20.

Agdeppa contends that, after he and Rodriguez used their Tasers on Dorsey these three times, Dorsey became "even more aggressive and combative," that he "made no move to flee," and that "he advanced upon the officers, punching at their heads and faces while the handcuff, still attached to his wrist, also swung and struck them." Opp. SDF No. 21; MSJ at 6. Agdeppa avers that, while striking him in the face repeatedly with his handcuffed fist, Dorsey struck Agdeppa on the bridge of the nose with such force that the blow knocked him backward into a wall, caused him to drop his Taser, and disoriented him. Opp. SDF No. 22; MSJ at 6.

According to Rodriguez, although Dorsey's body obscured her view, she believed Dorsey was striking Agdeppa based on Dorsey's swinging his arms and the sound of punches. Opp. SDF No. 23. She therefore again activated her Taser. Id.; MSJ at 6. Dorsey responded by turning and striking Rodriguez in the face four times in quick succession, knocking her to the ground. Opp. SDF No. 23; MSJ at 7. Rodriguez recounts that Dorsey attempted to wrest her Taser from her, turning it toward her face, while simultaneously striking her repeatedly with his handcuffed fist. Opp. SDF No. 23; MSJ at 7. Rodriguez does not recall Dorsey's attempting to take control of her gun. Dkt. 48, Opp. Exh. 2 ("Rodriguez Depo."), at 12:15–13:5. According to Agdeppa, Dorsey straddled Rodriguez for approximately 30 to 40 seconds, "continually striking her multiple times on both sides of her face and head, with her head being knocked from side to side." Opp. SDF No. 24; MSJ at 7. Rodriguez believed "Dorsey was attempting to kill her," and that "her life was at risk." Opp. SDF No. 24; Dkt. 37-4, Declaration of Officer Rodriguez ("Rodriguez Decl."), ¶¶ 20–21.

Case 2:19-cv-05370-CAS-JC Document 59 Filed 11/06/20 Page 6 of 19 Page ID #:524

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

Agdeppa recounts being dazed throughout these 30 to 40 seconds. Opp. SDF No. 25; MSJ at 7. When he recovered, he saw Dorsey straddling and "viciously and violently" attacking Rodriguez, "punching her repeatedly in the face with a flurry of punches, hitting her over and over again in the head and face" while she attempted to protect herself in the fetal position on the floor. Opp. SDF No. 25; MSJ at 7. Agdeppa reports believing Dorsey would kill Rodriguez imminently. Opp. SDF No. 25; MSJ at 7.

Although not discernable from the audio portion of the body-worn camera footage, Agdeppa avers that he verbally warned Dorsey to stop his attack, but that Dorsey continued nonetheless. Opp. SDF No. 26; MSJ at 7. (Plaintiff disputes that Agdeppa issued such a warning. Opp. at 3.) At this point, Agdeppa fired five shots in quick succession, four of which hit Dorsey. Opp. SDF No. 26. Agdeppa reports having been six to eight feet from Dorsey when he fired. Dkt. 47, Opp. Exh. 1 ("Agdeppa Depo."), at 73:5–8. Agdeppa contends he drew his weapon "[i]n order to protect both his and his partner's life," MSJ at 7, although he also states that he fired his weapon "[i]n an effort to save Officer Rodriguez's life," id. at 8; Agdeppa Depo. at 73:1–4. According to Agdeppa, Dorsey remained in the same position, "straddling" or "hunched over" Rodriguez, as each shot was fired. SDF Nos. 25, 26; Agdeppa Depo. at 115:15–20. Immediately after the final shot, Dorsey fell backward and off Rodriguez and did not move. Opp. SDF No. 26; MSJ at 8. Dorsey still held Rodriguez's Taser in his hand, and the officers did not approach him. Opp. SDF No. 27; MSJ at 8.

Agdeppa reports Rodriguez was treated at the emergency room for swelling on her left cheek and right jaw, abrasions on her ear and hands, a pulled muscle behind her left knee, and head pain. Opp. SDF No. 28; MSJ at 8; Rodriguez Decl. ¶ 28.

Agdeppa further reports having abrasions on his arms and head, being treated at the emergency room for a fractured nose, and receiving sutures on the bridge of his nose. Opp. SDF No. 29; MSJ at 8; Dkt. 37-3, Declaration of Officer Agdeppa, ¶ 30. The following day, he began experiencing severe headaches, sensitivity to light, and difficulty focusing. Opp. SDF No. 29; MSJ at 8. Agdeppa says he was diagnosed with and experienced ongoing symptoms of a concussion, which prevented him from returning to work for six months. Opp. SDF No. 29; MSJ at 8.

### E. Plaintiff's Dispute of Agdeppa's Account

Plaintiff disputes the officers' account of the physical altercation between the officers' first attempt to handcuff Dorsey and the shooting. The crux of plaintiff's argument is that the medical records and physical evidence are inconsistent with the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     'O'

| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
|---|---|---|---|
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

officers' account of Dorsey overpowering and viciously beating both officers, one to the edge of her life. See Opp. at 3–5. Plaintiff first argues that photographs of Rodriguez, taken shortly after the incident, depict no evidence of being struck in the face—in fact, according to plaintiff, Rodriguez appears "virtually unscathed." Opp. SDF Nos. 17, 21, 23, 24, 25; Opp. at 5; see Opp. Exh. 5 ("Rodriguez Post-Incident Photograph"). Furthermore, Rodriguez suffered no broken bones—in her face or elsewhere—nor a concussion or other head injury, and she did not miss any work due to injury. Opp. SDF No. 17; Opp. at 3.

Plaintiff also contends physical evidence and contradictions in Agdeppa's deposition testimony undermine the credibility of Agdeppa's account that Dorsey struck him with sufficient force to knock him into a wall and daze him for 30 to 40 seconds. Opp. SDF No. 22. Plaintiff cites evidence that, (1) despite Agdeppa's assertion that he fractured his nose, he also provided deposition testimony that the X-ray of his nose showed no fracture; (2) a post-incident photograph shows no evidence of a blow as forceful as that recounted by Agdeppa, except a laceration on his nose; (3) the post-incident photograph also shows Agdeppa overstated the length of the laceration on his nose; and (4) the video evidence shows no sign of "active resistance" to the officers.[4] Opp. SDF No. 22; Opp. at 3–5; see Agdeppa Depo. at 54:1–61:10; Opp. Exh. 7 ("Agdeppa Post-Incident Photograph").

### F. Dorsey's Injuries

The parties do not dispute the injuries suffered by Dorsey, although they do dispute, for purposes of seeking pre-death pain and suffering damages, how quickly Dorsey succumbed to them. Dr. Zuhha Ashraf conducted an autopsy on November 2, 2018. See Dkt. 48, Opp. Exh. 3, Deposition of Dr. Ashraf ("Ashraf Depo."); Dkt. 49, Opp. Exh. 4 "(Autopsy Rpt").[5] She characterized Dorsey's death as a homicide resulting from the four

---

[4] Plaintiff disputes the credibility of Agdeppa's testimony that he suffered a concussion on the ground that Agdeppa admitted he did not review the CAT scan itself. Opp. at 4. But as pointed out by Agdeppa's counsel at oral argument, Agdeppa's testimony nonetheless supports his claim of having suffered a concussion, including by clarifying that he received that diagnosis from the doctor who reviewed the CAT scan.

[5] Agdeppa moves to exclude the autopsy report as inadmissible hearsay pursuant to Fed. R. Evid. 802. Evid. Obj. at 1. To the extent the Court relies on the report, it may do so for the purpose of a motion for summary judgment because the report "could [] be presented in a form admissible at trial" as a public record pursuant to Fed. R. Evid. 803(8). Koho v. Forest Labs., Inc., 17 F. Supp. 3d 1109, 1113 (W.D. Wash. 2014) (citation omitted)

Case 2:19-cv-05370-CAS-JC Document 59 Filed 11/06/20 Page 8 of 19 Page ID #:526

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

gunshot wounds. Autopsy Rpt at 1. Although Agdeppa suggests Dorsey died "immediately after the final shot was fired," plaintiff disputes this account and points to Dr. Ashraf's deposition testimony that Dorsey likely would have died within "seconds to minutes." Opp. SDF Nos. 26, 44.

In addition to the gunshot wounds, Dr. Ashraf observed (1) two areas of blunt force trauma to Dorsey's head, which she concluded occurred "within hours of death"; (2) several abrasions on Dorsey's neck; (3) abrasions and contusions on his wrists, which "could be consistent with handcuffing"; and (4) that the Taser dart and wire remained in Dorsey's back at the time of the autopsy. Id. at No. 44.

Finally, in the October 19, 2020 hearing, plaintiff advanced for the first time the argument that the location and direction of Dorsey's gunshot wounds raise questions as to whether, in fact, Dorsey was standing over Rodriguez until Agdeppa's final shot. See Opp. SDF No. 26; MSJ at 8. Specifically, the autopsy report states that, from their entry point, three of the four bullets travelled downward relative to Dorsey's body, but one travelled upward. Autopsy Rpt at 1–2. Plaintiff argues this evidence suggests Dorsey moved significantly at some point during the shooting. Because there is no evidence regarding the sequence of the gunshots, see Ashraf Depo. at 12:7–11, the court cannot draw any inference as to how Dorsey was positioned relative to each gunshot, such as, for instance, whether he was standing or hunched over when the first bullet struck him.

### G. Board of Police Commissioners Findings

Plaintiff submitted the "Abridged Summary of Categorical Use of Force Incident and Findings by the Los Angeles Board of Police Commissioners, Officer-Involved Shooting – 059-18," which appears to recount the incident at issue here based on, *inter alia*, the number in the title (059-18), which appears in the Los Angeles Police Department video addressing the incident, "Hollywood Division Officer Involved Shooting 10/29/18 (NRF059-18)," see Opp. Exh. 8; the date; and the fact pattern, see Dkt. 46 ("BOPC Findings" or "Findings"). The Findings characterizes itself as "a brief summary designed to enumerate salient points regarding this Categorical Use of Force incident," and does not reflect the entirety of the investigation nor BOPC deliberations. BOPC Findings at 1. It

---

(considering improperly authenticated autopsy report at summary judgment); see U.S. v. Midwest Fireworks Mfg. Co., Inc., 248 F.3d 563, 566 (6th Cir. 2001) ("Opinions, conclusions, and evaluations, as well as facts, fall within the Rule 803(8)[(A)(iii)] exception." (quotation omitted)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

consists of three parts: an incident summary apparently based on interviews of the officers, witness interviews, and footage from the body-worn cameras and available security cameras in the gym; a findings section; and a section on the basis for those findings. See id. The Findings includes no indication that disciplinary actions were taken against the officers, nor does it suggest any such actions.

As a preliminary matter, Agdeppa objects to the admission of the BOPC Findings as, inter alia, a subsequent remedial measure, inadmissible hearsay and lacking authentication. Evid. Obj. at 3; see Fed. R. Evid. 407, 802, 901. Plaintiff, for her part, requests that the Court take judicial notice of the Findings. Dkt. 46; see Fed. R. Evid. 201. With regard to Agdeppa's objections on hearsay and foundation grounds, the Court concludes these objections do not prevent the Court from considering the BOPC Findings for the limited purposes of this motion because the Findings could be admissible at trial pursuant to Fed. R. Evid. 803(8), as discussed in note four, above. See Koho, 17 F. Supp. 3d at 1113; Midwest Fireworks, 248 F.3d at 566.

Turning to Agdeppa's argument that the BOPC Findings is inadmissible as a subsequent remedial measure pursuant to Rule 407, Agdeppa contends Maddox v. City of Los Angeles, 792 F.2d 1408 (9th Cir. 1986), requires its exclusion. In Maddox, the Ninth Circuit found an internal affairs investigation and disciplinary proceeding conducted by the City of Los Angeles following a police officer's fatal use of a prohibited chokehold were subsequent remedial measures inadmissible at trial. Id. at 1417. But Maddox is unavailing here for at least two reasons. First, the BOPC Findings here includes no disciplinary measures against the officers, unlike in Maddox. It is therefore not properly characterized as a "remedial measure." See In re Aircrash in Bali, Indonesia, 871 F.2d 812, 816 n.2 (9th Cir. 1989) ("[S]ubsequent remedial measures include only the actual remedial measures themselves and not the initial steps toward ascertaining whether any remedial measures are called for." (quotation omitted)); Willis v. Vasquez, No. LA CV10-07390 JAK (DTBx), 2014 WL 12596313, at *11 (C.D. Cal. Apr. 1, 2014) (Maddox inapplicable where report "recommended corrective action" but was not, "in and of itself, a remedial measure"), aff'd, 648 F. App'x 720 (9th Cir. 2016). Second, even if the BOPC Findings did include disciplinary measures, Maddox's holding is limited to the admission of reports introduced against municipal defendants, not individual officers. Martinez v. Davis, No. CV 05-5684 ABC (JEMx), 2011 WL 13213962, at *2 (C.D. Cal. Mar. 17, 2011) (admitting internal affairs investigation and disciplinary actions against police officer defendants because "the deputies were not responsible for undertaking the investigation or imposing discipline; the City took these measures"). In any event, courts consider BOPC findings at summary judgment. See, e.g., Garrett v. City of Los Angeles, No. CV 12-1670 FMO

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

(SSX), 2014 WL 11397949, at *7 (C.D. Cal. Mar. 3, 2014). Accordingly, while the Court reserves judgment on both parties' requests, it considers the Findings for the limited purposes of this motion.

Turning to its substance, the course of events presented in the Findings largely conforms to Agdeppa's account. Notably, the Findings includes the accounts of several eyewitnesses to at least portions of the physical altercation between the officers and Dorsey: Witness A, who was an employee of the gym, and Witnesses E and F, who were security guards.[6] BOPC Findings at 2, 3. These witnesses' accounts, as reported in the BOPC Findings, substantiate Agdeppa's version of events at several moments disputed by plaintiff. For instance, Witness F apparently reported that Dorsey[7] struck Officer A—who likely refers to Agdeppa—in the face numerous times, one of which knocked Officer A into the wall, causing him to drop his Taser. Id. at 6. Witness F also believed Dorsey struck Officer B—likely Rodriguez—in the face several times with his "half-opened" hand. Id. Although ambiguous, the Findings can be read to state that Witness F also saw the subject knock Officer B to the ground, then attempt to take her Taser and turn it against her face while hitting her with his right fist; alternatively, the Findings may be simply restating the officers' account. Id. at 6–7.

However, the witnesses' accounts also differ from Agdeppa's in several ways. According to the BOPC Findings, Witness F recalled he and Witness E "attempt[ed] to assist the officers during their struggle with the Subject," and that "the Subject grabbed Witness E by his jacket and grabbed him (Witness F) by the neck." Id. at 7. "The Subject pushed Witness E away from him and choked Witness F." Id. But neither officer recounted any witnesses intervening in the altercation. Moreover, the Findings states that Witness F reported that, "moments prior to the OIS [officer involved shooting], while the Subject was straddling Officer B, the Subject grabbed Officer A's [Agdeppa's] gun and attempted to pull it out of its holster," but that he was "unable to remove the gun because Officer A pushed the Subject away." Id. But the BOPC Findings also reports that "Officer A had no recollection of the subject grabbing his/her service pistol," id., and neither officer's account

---

[6] The parties' filings make no reference to these witnesses, nor did either party mention the witnesses in the October 19, 2020 hearing. The record includes no indication that these witnesses have been deposed or interviewed by the parties. The witnesses remain anonymous.

[7] The BOPC Findings refers to "the Subject," but, assuming the Findings recounts the events at issue here, the Subject is Dorsey.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          'O'

| | | | |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

of the altercation mentioned Dorsey's doing so. Third, according to the BOPC Findings, Witness F reported that, "[a]fter the second round [gunshot], the Subject let go of Officer A's wrist. Witness F believed that the Subject looked at Officer A and then began to walk toward him/her, and that Officer A fired two more rounds." Id. at 8. But Agdeppa states that he was not touching Dorsey at the time of the shooting, but rather was six to eight feet away, and that Dorsey did not move from his position over Rodriguez during the shooting. Agdeppa Depo. at 73:5–8, 115:15–20.

The Findings concludes, among other things, that the officers' use of non-lethal and less-lethal force was reasonable and in policy. BOPC Findings at 14–15. But it also concludes that the officers "did not effectively utilize tactical de-escalation techniques," and that this, along with other tactical failures, amounted to a "substantial deviation, without justification, from approved Department training." Id. at 12. Additionally, while "Officer A's drawing and exhibiting of a firearm [was] in Policy," the "lethal use of force by Officer A was unreasonable." Id. at 13; 16–17.

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must show that a rational trier of fact would not be able to find for the nonmoving party, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and thus bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment, see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." Matsushita, 475 U.S. at 587 (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

## IV. DISCUSSION

Agdeppa moves for summary judgment on each of plaintiff's claims.

### A. Section 1983 Excessive Force Claim

Section 1983 provides for a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the U.S. Constitution. "To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002) (citation omitted). Agdeppa makes two arguments: first, that his use of deadly force was objectively reasonable; second, that even if his use of force was excessive, he is entitled to qualified immunity. The Court addresses each argument in turn.

#### 1. Objectively Reasonable Use of Force

Agdeppa first argues that plaintiff's excessive force claim cannot withstand summary judgment because his use of deadly force was objectively reasonable. MSJ at 10–17.

An excessive force claim is analyzed under the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989). The relevant inquiry is whether officers' actions are "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (quotation and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97. However, "it is equally true that even where some force is justified, the amount actually used may be excessive." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).

Courts apply a balancing test to determine whether force used is reasonable. Graham, 490 U.S. at 396. Courts "must balance [1] the nature and quality of the intrusion on the individual's Fourth Amendment interests against [2] the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 550 U.S. 372, 383 (2007) (quotation omitted). "An officer's use of deadly force," specifically, "is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" Scott v. Henrich, 39 F.3d 912,

Case 2:19-cv-05370-CAS-JC Document 59 Filed 11/06/20 Page 13 of 19 Page ID #:531

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

914 (9th Cir. 1994) (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)) (additional citation omitted). But "[d]eadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness." Id. at 915. Accordingly, "the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." Id. With this admonition in mind, the Court now applies the Graham balancing test to the evidence here.

Courts begin by evaluating "the type and amount of force inflicted." Miller v. Clark Cty., 340 F.3d 959, 964 (9th Cir. 2003). Here, there is no dispute that the use of deadly force was a severe intrusion on Dorsey's Fourth Amendment rights.

Second, courts evaluate the countervailing governmental interests by considering a range of factors, including: (a) whether the suspect was actively resisting or attempting to evade arrest by flight; (b) the severity of the crime at issue; and (c) whether the suspect posed an immediate threat to the safety of the officers or others. Lal v. California, 746 F.3d 1112, 1117 (9th Cir. 2014). This list is not exhaustive, though, and courts also consider whether the officer warned the suspect prior to use of force, Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010); the parties' relative culpability, Espinosa v. City & Cty. of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); and "whether there were less intrusive means of force that might have been used," Glenn v. Washington Cty., 673 F.3d 864, 876 (9th Cir. 2011). Nonetheless, the "most important" factor is whether the suspect posed an "immediate threat to the safety of the officers or others." Bryan, 630 F.3d at 826.

Here, Agdeppa argues that, because Dorsey had already inflicted serious injuries on both officers and was striking Rodriguez with his fist while turning her Taser on her, Dorsey posed an immediate threat to Rodriguez's safety. He therefore fired at Dorsey "[i]n an effort to save Officer Rodriguez's life." MSJ at 8; Agdeppa Depo. at 73:1–4.

But plaintiff disputes Agdeppa's account and whether in fact the circumstances provided probable cause to believe Dorsey posed an immediate and significant threat of death or serious injury to Rodriguez. See Opp. SDF Nos. 17, 21, 23, 24, 25. First, plaintiff argues Rodriguez did not suffer any broken bones in her face or elsewhere, suffered no concussion or head fracture, did not miss work due to her injuries, and appears unscathed in her post-incident photograph. Id. at No. 17; Opp. at 5. Second, plaintiff argues Agdeppa's claim that he suffered a "broken nose" remains unsupported. Opp. at 4–5. Third, in the October 19, 2020 hearing, plaintiff advanced an argument that the trajectory of one of the bullets as it entered Dorsey calls into question Agdeppa's account that Dorsey remained standing over Rodriguez until the final shot. See Autopsy Rpt at 1–2. Finally,

Case 2:19-cv-05370-CAS-JC   Document 59   Filed 11/06/20   Page 14 of 19   Page ID #:532

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

although plaintiff does not raise this argument, according to the BOPC Findings, Witness F's account of the moments before the shooting differed in several significant respects from Agdeppa's: Witness F said he and Witness E were actively intervening in the altercation, and Dorsey was fighting for control of Agdeppa's firearm and holding Agdeppa's arm when he was shot. BOPC Findings at 7. Whether this version of events provides additional support for the reasonableness of Agdeppa's belief that deadly force was necessary is irrelevant—if introduced at trial, this evidence would impeach Agdeppa's credibility because, according to Agdeppa, he fired from six to eight feet away as Dorsey stood or hunched over Rodriguez. SDF Nos. 25, 26; Agdeppa Depo. at 73:1–8; 115:15–20.

Agdeppa's arguments to the contrary are unavailing. Contrary to Agdeppa's characterization of plaintiff's evidence as "mere speculation … or fantasy," Reply at 3, the evidence is specific and exceeds "conclusory allegations," Lujan, 497 U.S. at 888; see Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir. 1992) ("circumstantial evidence can speak clearly and often unequivocally"), as amended (Mar. 5, 1992), overruled on other grounds as recognized by Federman v. Cty. of Kern, 61 F. App'x 438, 440 (9th Cir. 2003). Moreover, Agdeppa's argument that the post-incident photographs cannot depict all the officers' injuries, such as headaches, muscle strains, or even bruises so soon after the altercation, Reply at 3, is a question of the weight of the evidence, which is not for the Court to consider on summary judgment, Benas v. Baca, 159 F. App'x 762, 765 (9th Cir. 2005) (summary judgment inappropriate where "thorough inquiry into the facts, including [decedent's conduct toward officer], is needed"). In any event, the Court must "resolv[e] all factual disputes in favor of the plaintiff" if it is to grant summary judgment for Agdeppa. Henrich, 39 F.3d at 915. Finally, although Agdeppa is correct that an officer has no obligation to wait to suffer serious injury before employing force, he is incorrect in concluding that, therefore, the extent of either officer's injuries is irrelevant. Reply at 1. As mentioned above, the extent of the officers' injuries goes to Agdeppa's account of the events that purportedly gave rise to his belief that Dorsey posed a significant threat. Hopkins, 958 F.2d at 885 (summary judgment inappropriate where "medical evidence in the record undermine[d] [Officer] Andaya's story" and evinced "milder version of the threat Andaya faced"); Newmaker v. City of Fortuna, 842 F.3d 1108 (9th Cir. 2016) (summary judgment inappropriate where credibility of defendant officer in dispute). And not every threat to an officer warrants deadly force as a matter of law, and a rational fact finder could view plaintiff's evidence and conclude that the threat here did not warrant such extreme force. See Santos, 287 F.3d at 853.

Turning to the other factors appropriately considered under Graham, plaintiff argues that the severity of the crime for which the officers initially seized Dorsey weighs heavily

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

against reasonableness. Opp. at 2; Opp. SDF No. 1. Other courts have reasoned that "the severity of the crime was relatively low" even "assum[ing] that [the suspect] had assaulted individuals." Berger v. Spokane Cty., No. 2:15-CV-140-RMP, 2017 WL 579897, at *7 (E.D. Wash. Feb. 13, 2017) (citation omitted); see Smith v. City of Hemet, 394 F.3d 689, 702–03 (9th Cir. 2005) (where suspect is alleged to have committed domestic violence, "the circumstances are not such ... to warrant the conclusion that [the suspect] was a particularly dangerous criminal" and thus "the nature of the crime at issue [provided] little, if any, basis for the officers' use of physical force").

Plaintiff further presents evidence calling into question whether Agdeppa warned Dorsey of his intent to use deadly force. Opp. at 3, 10. Also, although it is undisputed that he resisted arrest when the officers initially attempted to handcuff him, at no point was Dorsey a flight risk. Dorsey was naked and was concealing no weapon. Finally, plaintiff cites to the BOPC Findings, which concludes that the officers' initial approach of Dorsey and failure to use proper de-escalation techniques were a substantial deviation from Department policy, and that, in light of these failures, "the lethal use of force ... was unreasonable."[8] BOPC Findings at 11–12, 16–17. And plaintiff argues a rational fact finder could find both officers' body-worn camera footage consistent with this account, rather than Agdeppa's. Opp. at 10.

Agdeppa responds that Cty. of Los Angeles v. Mendez, 137 S.Ct. 1539 (2017), precludes the Court from considering the officers' pre-shooting tactical decisions. Reply at 7. But Agdeppa's reliance on Mendez is misplaced. Mendez stands for the proposition that once an officer's use of force is judged reasonable under Graham, it does not become unreasonable because a prior Fourth Amendment violation "provoked" the confrontation that ultimately necessitated the use of force. 137 S.Ct. at 1546–47. Here, the question is not whether the officers provoked the confrontation with Dorsey by committing a prior Fourth Amendment violation; rather, the question is whether Agdeppa's use of deadly force was reasonable under Graham in the first instance, which appropriately considers pre-shooting circumstances. Hammer v. Gross, 932 F.2d 842, 846 (9th Cir. 1991) (en banc) ("The question ... is whether the force used was reasonable in light of *all* the relevant circumstances." (emphasis in original)).

Finally, having considered the severity of the intrusion and the importance of the government's interests, the Court must balance these two considerations in order to

---

[8] The BOPC's use of the term "unreasonable" does not necessarily equate to the term as used in the context of the Fourth Amendment.

Case 2:19-cv-05370-CAS-JC   Document 59   Filed 11/06/20   Page 16 of 19   Page ID #:534

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

determine whether the force used was reasonable. Santos, 287 F.3d at 854. Here, a rational fact finder could conclude the countervailing governmental interests do not justify the amount of force used. Critically, there is a genuine dispute over whether plaintiff posed an immediate threat to the officers sufficient to warrant the use of deadly force. Therefore, the Court cannot conclude that Agdeppa's use of force was reasonable as a matter of law. See Chew v. Gates, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law."); Santos, 287 F.3d at 853 (excessive force cases "nearly always require[] a jury to sift through disputed factual contentions, and to draw inferences therefrom").

### 2. Qualified Immunity

Agdeppa also argues that summary judgment is appropriate as to plaintiff's Section 1983 claim because, even if his use of force was excessive, he is entitled to qualified immunity. MSJ at 17–20.

"Qualified immunity is an immunity from suit rather than a mere defense to liability," and therefore must be resolved "at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 231–32 (2009) (quotation omitted). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. at 231. In excessive force cases, it protects officers in the "hazy border between excessive and acceptable force." Saucier v. Katz, 533 U.S. 194, 206 (2001) (quotation omitted). Accordingly, an officer will be denied qualified immunity in a Section 1983 action if, "(1) taken in the light most favorable to the party asserting injury, the facts alleged show that the officer's conduct violated a constitutional right, and (2) the right violated was 'clearly established' at the time of the incident such that a reasonable officer would have understood his conduct to be unlawful in that situation." Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting Saucier, 533 U.S. at 201). Courts may address either prong first. Pearson, 555 U.S. at 236. "'[W]hether the violative nature of particular conduct is clearly established' … must be answered 'not as a broad general proposition,' but with reference to the facts of specific cases." Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 947 (9th Cir. 2017) (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)).

Agdeppa points to several cases which he argues are factually analogous and establish that he is entitled to qualified immunity. See MSJ 12–13. Most analogous is Isayeva. There, construed in favor of the plaintiff, the relevant facts were as follows: After

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**  'O'

| | | | |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

two officers at the scene used escalating measures to subdue the suspect, including physical restraints and multiple Taser deployments, the suspect hit one officer with enough force that the officer fell to the ground. Isayeva, 872 F.3d at 950. The suspect then turned on the second officer, hitting him until he began to lose consciousness. Id. The second officer fell back onto a bed while the suspect approached with balled fists. Id. After shouting "[s]hoot him," the second officer, from his position on the bed, shot and killed the suspect. Id. at 950–51. The Isayeva court found the second officer enjoyed qualified immunity because the suspect did not hold a clearly established right to be free from deadly force in those circumstances. Id. at 951.

Agdeppa argues that, because his account of the events preceding Dorsey's shooting are analogous to those in Isayeva, Isayeva is dispositive. MSJ at 19. But Agdeppa reads Isayeva too broadly; it cannot be read to overturn the principle that "the court may not simply accept what may be a self-serving account by the police officer," but rather "must also look at the circumstantial evidence." Scott, 39 F.3d at 914. To this point, the Isayeva court explicitly stated that the "clearly established" prong of qualified immunity "must be answered … with reference to the facts of specific cases." Isayeva, 872 F.3d at 947.

Turning to the Isayeva court's reasoning, that court was not forced to "simply accept" the officers' account because they were not "the only surviving eyewitness[es]." Scott, 39 F.3d at 915. The plaintiff in Isayeva—the decedent's wife—saw portions of the altercation preceding the shooting; and, although "[f]rom her position outside the room[ she] did not see [the decedent] punch either of the deputies," she could hear the final moments and the shooting itself. 872 F.3d at 943–44. Nevertheless, despite being highly motivated to dispute the officer's account, her testimony largely mirrored that of the officer's, and she did not raise a dispute of fact regarding the officer's claim that he was losing consciousness and that his life was in danger.[9] See id. at 950. Here, by contrast, there is no comparable witness. (Although the BOPC Findings reports that Witness F saw the altercation immediately preceding the shooting, his testimony diverges significantly from Agdeppa's account, as discussed above. See supra Part II.G. In any event, Witness F remains anonymous, provided no declaration, gave no deposition, and was not mentioned

---

[9] The only two disputed facts relevant to the use of deadly force were "whether … [the decedent] had purposely thrown [the second officer] against a wall or merely had inadvertently 'bucked' him into a wall"; and "whether [he] subsequently punched, pushed, or threw" the first officer, although it was undisputed that the decedent used force against the officer. Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 944, 950 (9th Cir. 2017).

Case 2:19-cv-05370-CAS-JC   Document 59   Filed 11/06/20   Page 18 of 19   Page ID #:536

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

in either party's filings.) Furthermore, plaintiff cites circumstantial evidence that undermines Agdeppa's account. By contrast, in Isayeva, the court was able to substantiate the officer's account with circumstantial evidence that he "had visible injuries including bruises and swelling around his eyes, bruising and redness to his left ear, and bruising at the base of his neck," and that he "developed nausea and went to the emergency room, where he was diagnosed with a non-serious head injury." 872 F.3d at 944. Finally, there is a meaningful factual distinction between this case and Isayeva. That court's reasoning relied heavily on the fact that the officer had "beg[un] to pass out when he was being beaten," which would have rendered him completely vulnerable and left his firearm available to the suspect. Id. at 952. Here, although Agdeppa contends he thought Dorsey's next punch would kill Rodriguez, Opp. SDF No. 25; MSJ at 7, plaintiff raises a genuine dispute as to whether that belief was reasonable. The Court must consider "the facts of [this] specific case[]," Isayeva at 947, which, taken in the light most favorable to plaintiff, do not match those in Isayeva such that that case is dispositive.

Having concluded Isayeva is not dispositive, the Court must determine whether Agdeppa violated a clearly established right held by Dorsey. At the time of the incident, it was "clearly established" that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Garner, 471 U.S. at 11; Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001) ("A desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury."). As discussed above, viewing the facts in the light most favorable to plaintiff, a jury could find that a reasonable officer in Agdeppa's position would not have believed that Rodriguez or anyone else was in imminent danger and, thus, would have understood that his use of deadly force violated plaintiff's Fourth Amendment rights. See supra Part IV.A.1. Therefore, Agdeppa is not entitled to qualified immunity as a matter of law. See Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) ("[i]f a genuine issue of fact exists" as to "what the officer and claimant did or failed to do," qualified immunity at summary judgment is inappropriate). Accordingly, the Court **DENIES** Agdeppa's motion for summary judgment on plaintiff's excessive force claim.

### B. State Law Wrongful Death Claims Based on Battery and Negligence

Plaintiff's third and fourth claims allege wrongful death based on battery and negligence, respectively. Compl. ¶¶ 41–56. "Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims." Hayes v. Cty. of San Diego, 736 F.3d 1223, 1232 (9th Cir. 2013)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:19-CV-05370-CAS-JCx | Date | November 6, 2020 |
| Title | PAULETTE SMITH v. CITY OF LOS ANGELES, ET AL. | | |

(applying Graham to negligent wrongful death claim); Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1272–74 (1998) (noting that Section 1983 is "the federal counterpart of state battery or wrongful death actions"). Agdeppa argues that the battery and negligence claims fail as a matter of law because his use of force was reasonable. MSJ at 23. However, the Court has already concluded that there is an issue of disputed fact regarding his use of deadly force and denied summary judgment on plaintiff's excessive force claim. See supra Part IV.A.1. Therefore, the Court also **DENIES** Agdeppa's motion for summary judgment on plaintiff's battery and negligence claims.

### C. Chaudhry Damages

The Ninth Circuit recognizes a decedent's right to recover damages for pre-death pain and suffering through a survival action brought by his heirs, Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1103–105 (9th Cir. 2014), including "for *every second* a decedent survives following a Constitutional violation," Willis v. City of Fresno, No. 1:09-CV-01766-BAM, 2017 WL 5713374, at *7 (E.D. Cal. Nov. 28, 2017) (emphasis in original); Nunez v. Santos, 427 F. Supp. 3d 1165, 1192 (N.D. Cal. 2019) (upholding Chaudhry damages where "jury could have concluded" decedent suffered "for at least [a] few seconds"), appeal dismissed sub nom. Nunez v. City of San Jose, No. 20-15057, 2020 WL 1862133 (9th Cir. Feb. 28, 2020).

Here, Agdeppa argues no jury could award Chaudhry damages because Dorsey's death was "instantaneous." MSJ at 24. But plaintiff has raised a genuine dispute as to whether Dorsey's death was indeed instantaneous, as supported by Dr. Ashraf's deposition testimony that he could have died "seconds to minutes" after being shot. Opp. SDF No. 44; Opp. at 17. Accordingly, the Court also **DENIES** Agdeppa's motion for summary judgment on plaintiff's request for Chaudhry damages.

### V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Agdeppa's motion for summary judgment with respect to all plaintiff's claims.

IT IS SO ORDERED.

|  | 00 : 00 |
|---|---|
| Initials of Preparer | CMJ |