FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAULETTE SMITH, individually and as Successor in Interest to Albert Dorsey, deceased, | No. 20-56254 |
| *Plaintiff-Appellee,* | D.C. No. 2:19-cv-05370-CAS-JC |
| v. | |
| EDWARD AGDEPPA, an individual, | OPINION |
| *Defendant-Appellant,* | |
| and | |
| CITY OF LOS ANGELES, a municipal entity; DOES, 1 through 10, | |
| *Defendants.* | |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted March 16, 2022
San Francisco, California

Filed December 30, 2022

Before:  Morgan Christen and Daniel A. Bress, Circuit
Judges, and Gary Feinerman,[*] District Judge.

Opinion by Judge Christen;
Dissent by Judge Bress

---

**SUMMARY**[**]

---

The panel affirmed the district court's order denying, on
summary judgment, qualified immunity to a police officer in
an action brought pursuant to 42 U.S.C. § 1983 alleging
defendant used unreasonable deadly force when he shot and
killed Albert Dorsey during a failed arrest in the men's
locker room of a gym.

Before the district court, defendant Officer Agdeppa
maintained that he killed Dorsey because Dorsey was
pummeling Agdeppa's partner, and Agdeppa feared
Dorsey's next blow would kill her.  Agdeppa also claimed
that he yelled "stop" before shooting, but no such warning
could be heard on the officers' body-cam recordings.

The district court properly denied Agdeppa's request for
qualified immunity for two reasons.  First, the district court
recognized that a reasonable jury could reject the police
officers' account of the shooting because there were
significant discrepancies between their versions of events

---

[*] The Honorable Gary Feinerman, United States District Judge for the
Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

and other evidence in the record.  Second, this court has long held that the Fourth Amendment requires officers to warn before using deadly force when practicable.  The defense cannot argue that it was not possible for Agdeppa to give Dorsey a deadly force warning because Agdeppa's sworn statements show that he had time to tell Dorsey to "stop."  The encounter lasted approximately four minutes after the officers first attempted to handcuff Dorsey, and the officers tased Dorsey at least five times during that interval.  Agdeppa never claimed that he warned Dorsey that he would switch from using his taser to using his firearm if Dorsey did not submit to being handcuffed, nor did he argue that it was impracticable to do so.  The district court correctly ruled that a jury could decide that Agdeppa's use of deadly force violated clearly established law.

Dissenting, Judge Bress stated that the two police officers in this case found themselves in a violent confrontation with a large, combative suspect, who ignored their repeated orders to stop resisting and failed to respond to numerous taser deployments.  After the suspect's assault on the officers intensified and he wrested one of the officers' tasers into his own hands, one officer shot the suspect to end the aggression. The split-second decision officers made here presented a classic case for qualified immunity.  The majority's decision otherwise was contrary to law and requires officers to hesitate in situations in which decisive action, even if leading to the regrettable loss of human life, can be necessary to protect their own.

## COUNSEL

Kevin E. Gilbert (argued) and Carolyn M. Aguilar, Orbach Huff & Henderson LLP, Pleasanton, California; for Defendants-Appellant.

Edward M. Lyman III (argued), Brian T. Dunn, and James Bryant, The Cochran Firm, Los Angeles, California; Megan R. Gyongyos, Carpenter Zuckerman & Rowley LLP, Beverly Hills, California; for Plaintiff-Appellee.

## OPINION

CHRISTEN, Circuit Judge:

Edward Agdeppa, a police officer in Los Angeles, shot and killed Albert Dorsey during a failed arrest in the men's locker room of a gym. Before the district court, Officer Agdeppa maintained that he killed Dorsey because Dorsey was pummeling Agdeppa's partner, and Agdeppa feared Dorsey's next blow would kill her. Agdeppa also claimed that he yelled "stop" before shooting, but no such warning can be heard on the officers' body-cam recordings. Dorsey's mother, Paulette Smith, sued Agdeppa for his allegedly unreasonable use of deadly force. The district court denied Agdeppa's motion for summary judgment on qualified immunity grounds, and Agdeppa timely appealed.

The district court properly denied Agdeppa's request for qualified immunity for two reasons. First, the district court recognized that a reasonable jury could reject the officers' account of the shooting because there were significant discrepancies between their versions of events and other

evidence in the record. Second, we have long held that the Fourth Amendment requires officers to warn before using deadly force when practicable. *See, e.g.*, *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc); *Harris v. Roderick*, 126 F.3d 1189, 1201, 1204 (9th Cir. 1997). The defense cannot argue that it was not possible for Agdeppa to give Dorsey a deadly force warning because Agdeppa's sworn statements show that he had time to tell Dorsey to "stop." The encounter lasted approximately four minutes after the officers first attempted to handcuff Dorsey, and the officers tased Dorsey at least five times during that interval. Agdeppa never claimed that he warned Dorsey that he would switch from using his taser to using his firearm if Dorsey did not submit to being handcuffed, nor did he argue that it was impracticable to do so. The district court correctly ruled that a jury could decide Agdeppa's use of deadly force violated clearly established law. We therefore affirm the district court's order denying summary judgment.

## I.

On the morning of October 29, 2018, Agdeppa and his partner Officer Perla Rodriguez responded to a Hollywood gym to investigate calls that someone was trespassing and engaging in disruptive conduct. Both officers activated their body-worn cameras, and followed a gym employee into the men's locker room. The staff member who met the officers told them, "We have a gentleman who is a little bit irate and he's not listening. He's already hurting a few members and he's also assaulted security as well."

The officers encountered Dorsey in the shower area of the locker room, where they spent several minutes ordering Dorsey to get dressed, to turn off his music, and to leave the gym. In response, Dorsey ignored the officers, walked back

and forth across the room to look at himself in the mirror, slowly dried his body with a towel, and danced to the music on his phone, raising his middle finger toward Agdeppa.

Agdeppa and Rodriguez then attempted to handcuff still-naked Dorsey, who resisted the officers' attempts by tensing up and pulling his arms away.  Agdeppa managed to place one handcuff onto Dorsey's right wrist, but the body-cam videos show that, for roughly a minute and twenty seconds, Dorsey used his size to thwart the smaller officers' attempts to handcuff him.  As Dorsey resisted, both officers' body-cams were knocked from their uniforms onto the locker-room floor.  While the next three-or-so minutes are not visible on video, the body-cams continued to record audio.

Agdeppa alleges that after the body-cams fell to the floor, the locker room struggle escalated and turned violent. Agdeppa and Rodriguez assert that Dorsey struck Rodriguez in the face with his elbow as he pulled away from the officers, and Agdeppa warned Dorsey that he would tase him if he did not submit to handcuffing.  But Dorsey continued to resist, and in the officers' telling, he began swinging at the officers after Rodriguez fired the darts from her taser at Dorsey's back.[1]  Both officers also attested that they used their tasers in "stun" mode several times as Dorsey became increasingly aggressive.  In his deposition testimony and affidavit submitted in support of his summary judgment motion, Agdeppa alleged that Dorsey repeatedly struck him on the face and knocked him backward into a wall, disorienting him and causing him to drop his taser.

---

[1] The autopsy reported a single taser dart wound in Dorsey's midline central back.

Agdeppa claims that as he recovered from his disorientation, he witnessed Dorsey "straddling" Rodriguez and "pummeling" her head and face with a "flurry of punches" as she lay on the floor in a fetal position. Agdeppa alleged that Dorsey appeared to be trying to kill Rodriguez in a "vicious[] and violent[]" attack and he "believed that the next punch would likely kill her." In his affidavit, Agdeppa stated that he "unholstered and drew [his] service weapon" and "gave Dorsey a verbal warning, stating words to the effect that Dorsey needed to stop." Agdeppa alleged that Dorsey instead "continued to pummel" Rodriguez with her taser in his hand, so from a distance of six-to-eight feet away, Agdeppa fired five shots to stop Dorsey, who "began to fall backwards and away" from Rodriguez as Agdeppa fired the final shot.

Smith disputes Agdeppa's account of the shooting. Dorsey cannot testify because he is dead, but in its decision denying summary judgment, the district court identified several sources of evidence that conflict with the officers' version of events.

The district court explained, "a rational fact finder could find that both officers' body-worn camera footage [is] consistent with [plaintiff's] account, rather than Agdeppa's." Video from the officers' body-cams shows that during the first several minutes of the encounter, Dorsey refused to comply with the officers' instructions to get dressed, leave the locker room, and submit his arms for handcuffing. After the video ends, the audio-only portion of the body-cam recording cannot shed any light on where Agdeppa and Dorsey were standing or what they were doing, but banging

sounds and the sound of tasers deploying are audible.[2] Agdeppa claims that he yelled for Dorsey to "stop" before escalating from his taser to his gun, but as the district court recognized, that warning cannot be heard on the audio.

Bystander-witness statements also contradicted Agdeppa's story. The gym's security guards were present during part of the encounter and they provided statements for the Los Angeles Board of Police Commissioners' internal investigation of the shooting. The Commissioners found the officers' tactics warranted a finding of Administrative Disapproval, and that Agdeppa's use of deadly force was unreasonable. The officers' actions were deemed inconsistent with the Department's deadly force policy because the officers' "inappropriate tactical decision-making" and "series of substandard tactical decisions" prevented the officers from "respond[ing] effectively using non-lethal and less-lethal force." The Commissioners' report did not attach the guards' statements, but the district court correctly recognized from the report's narrative that one of the guards attested that Dorsey was holding Agdeppa's arm when the shots were fired. The district court recognized that "if introduced at trial, this evidence would impeach Agdeppa's credibility because, according to Agdeppa, he fired from six to eight feet away as Dorsey stood or hunched over Rodriguez."

The security guards' accounts differed from the officers' in several respects, including the number of shots that

---

[2] The dissent purports to know what is occurring in the moments leading up to the shooting, attributing "pained groaning" and "grunting" to the officers. The district court made no findings of this sort and, absent speculation, grunting sounds do not tell us what was occurring before Agdeppa drew his firearm.

Agdeppa fired, the number of volleys that Agdeppa fired, whether Dorsey reached for Agdeppa's firearm, and whether Dorsey was holding Agdeppa's wrist until after the second shot was fired.  To be sure, the guards described a struggle between Dorsey and the officers, but the question for the fact-finder will be what happened in the moments before the shooting, and as the Commissioners' report noted, the gym's surveillance video shows that one of the guards was not present in the locker room at the time of the shooting and the other was "in the process of exiting the locker room."[3]

Significantly, the Commissioners recognized that the officers' actions are not to be judged with 20/20 hindsight, their report incorporated the framework for evaluating excessive force cases set out in *Graham v. Connor*, 490 U.S. 386 (1989), along with Departmental policies, and it concluded that Agdeppa's use of lethal force was

---

[3] The Commissioners' report is in summary form and "does not reflect the entirety of the extensive investigation."  It refers to other evidence and witness statements, but they are not attached to the report and do not appear to have been part of the district court's record.  The vantage point from which the guards made their detailed observations cannot be determined on our record.  On remand, the parties will have an opportunity to engage in discovery.  Whether the guards' testimony is ultimately deemed credible will be a question for the fact-finder.

unreasonable.[4]  Dorsey resisted arrest, but nothing suggested
that he had committed a serious crime before the officers
physically engaged with him in an attempt to apply
handcuffs.  The district court recognized that there was no
danger he was concealing a weapon because he was not
wearing any clothing, and he did not present a flight risk.
The Commissioners concluded that Agdeppa's use of deadly
force was unreasonable because after a struggle ensued,
"there was no exigency that required the officers to stay
physically engaged with [Dorsey]":

> Once the officers had initiated physical
> contact with [Dorsey], it was readily apparent
> that [Dorsey's] greater size and strength, in
> concert with his noncompliant behavior,
> would make it difficult, if not impossible, for
> the officers to accomplish their goal of
> handcuffing him.  At that time during the
> incident, there was no exigency that required
> the officers to stay physically engaged with
> [Dorsey]. Nevertheless, the officers did not
> take the opportunity to disengage from their

---

[4] The Commissioners cited an oft-quoted passage from *Graham*:

> The reasonableness of a particular use of force must be
> judged from the perspective of a reasonable officer on
> the scene, rather that with the 20/20 vision of
> hindsight. [. . .] The calculus of reasonableness must
> embody allowance for the fact that police officers are
> often forced to make split-second judgments—in
> circumstances that are tense, uncertain and rapidly
> evolving—about the amount of force that is necessary
> in a particular situation.

*Graham*, 490 U.S. at 396–97.

physical struggle and redeploy in order to allow for the assembly of sufficient resources. Rather, the officers stayed engaged as the situation continued to escalate, culminating in injurious assaults on both officers and the ultimate use of deadly force by Officer [Agdeppa].

The record also contains physical evidence that conflicts with Agdeppa's story. Agdeppa argued that it was necessary to shoot because Dorsey had "inflicted serious injuries on both officers" and he "was striking Rodriguez with his fist while turning her Taser on her." But the district court's order denying summary judgment observed Smith's argument that post-incident photographs showed an "unscathed" Rodriguez and that the officers' medical records reflected only minor injuries very different from the type that one would expect if Dorsey had been pummeling Rodriguez in the way Agdeppa described. The district court correctly rejected Agdeppa's contrary arguments that bruising and other injuries were not visible in the photos as "unavailing" because they impermissibly attacked the weight of the evidence at the summary judgment stage.

An autopsy report's description of the bullet trajectories and the fact that one witness reported Dorsey was holding Agdeppa's arm when he was shot also undermine Agdeppa's description that Dorsey was standing over Rodriguez as she laid on the floor, that he was straddling her and punching her, and that Agdeppa feared the next blow might kill his partner. The autopsy report indicates that several bullets traveled through Dorsey's body from right to left in a downward direction, and one of the bullets traveled through Dorsey's stomach from left to right in an upward direction.

Witness F told the police investigators that after he was shot the second time, Dorsey let go of Agdeppa's wrist, began to walk toward Agdeppa, and that Agdeppa then fired two more times. The dissent decides the Commissioners' report must contain a typo, and that it must have intended to refer to Dorsey holding onto Rodriguez's wrist. But we are not free to speculate about whether there are errors in the record. As the district court correctly determined, if deemed credible by the fact-finder, this evidence would allow a jury to question Agdeppa's credibility because he claimed that he shot Dorsey from a distance of six-to-eight feet while Dorsey was standing over Rodriguez.[5]

On this conflicting record, the district court correctly concluded that "a jury could find that a reasonable officer in Agdeppa's position would not have believed that Rodriguez or anyone else was in imminent danger and, thus, would have understood that his use of deadly force violated plaintiff's Fourth Amendment rights." It remains to be seen whether Smith's claims can be established at trial, but pervasive disputes of material fact make this case a textbook example of an instance in which summary judgment was improper.

## II.

We review de novo the district court's decision on summary judgment that an officer was not entitled to qualified immunity. *Gordon v. Virtumundo, Inc.*, 575 F.3d

---

[5] The dissent mistakenly argues that the district court "discounted this argument earlier in its decision." In fact, the district court observed that it could not make a finding "as to how Dorsey was positioned relative to each gunshot." But the district court recognized that a fact-finder could rely upon inconsistencies between Agdeppa's description and the physical evidence to impeach Agdeppa's credibility.

1040, 1047 (9th Cir. 2009).  We view the facts in the light most favorable to the plaintiff.  *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017).

An order denying summary judgment is not usually an immediately appealable final decision, but "that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity" because "pretrial orders denying qualified immunity generally fall within the collateral order doctrine."  *Plumhoff v. Rickard*, 572 U.S. 765, 771–72 (2014).  The scope of our review in these interlocutory appeals is limited to the "purely legal . . . contention that [an officer's] conduct 'did not violate the [Constitution], and in any event, did not violate clearly established law.'"  *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (quoting *Plumhoff*, 572 U.S. at 773). Accordingly, those portions of the district court's order determining questions of "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial . . . [are] not appealable" until after final judgment. *Johnson v. Jones*, 515 U.S. 304, 313 (1995).  This rule forecloses interlocutory review of any "*fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) (quoting *Foster*, 908 F.3d at 1210).

When the district court denies qualified immunity and "does not explicitly set out the facts that it relied upon, we undertake a review of the pretrial record only to the extent necessary to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Est. of Lopez*, 871 F.3d at 1007–08 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998)).  We then examine: (1) whether the facts, viewed in

the light most favorable to the plaintiff, show that the
officer's conduct violated a constitutional right; and (2)
whether the right in question was "clearly established" at the
time of the officer's action. *Tolan v. Cotton*, 572 U.S. 650,
655–56 (2014). If we answer either question in the negative,
the officer is entitled to qualified immunity.

## III.

### A.

Smith argues that Agdeppa's use of deadly force was
objectively unreasonable and violated Dorsey's clearly
established Fourth Amendment rights. Courts assess
whether an officer's use of force was objectively reasonable
by weighing "the severity of the crime at issue, whether the
suspect poses an immediate threat to the safety of the officers
or others, and whether he is actively resisting arrest or
attempting to evade arrest by flight." *Graham*, 490 U.S. at
396. The *Graham* factors are not "considered in a vacuum,"
but must be weighed "in relation to the amount of force used
to effect [the] particular seizure." *Smith v. City of Hemet*,
394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quoting *Chew
v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). We take the
perspective of the officer on the scene without the benefit of
20/20 hindsight. *Graham*, 490 U.S. at 396–97. Because
deadly force involves a serious intrusion on Fourth
Amendment rights, deadly force is reasonable *only* if the
officer has probable cause to believe the suspect poses an
immediate and significant threat of death or serious physical
injury to the officer or others. *Gonzalez*, 747 F.3d at 793
(quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994));
*see Tennessee v. Garner*, 471 U.S. 1, 11 (1985). We have
also repeatedly stated that an officer must give warning
before using deadly force "whenever practicable."

*Gonzalez*, 747 F.3d at 794 (quoting *Harris*, 126 F.3d at 1201).

Deadly force cases present additional, heightened challenges because defendant officers are often the only surviving eyewitnesses. *See, e.g.*, *Gonzalez*, 747 F.3d at 794; *Scott*, 39 F.3d at 915. For this reason, we have explained that summary judgment should be granted "sparingly" in deadly force cases and courts must take special care to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez*, 747 F.3d at 795 (quoting *Scott*, 39 F.3d at 915); *see Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016) (explaining that summary judgment is not appropriate in a deadly force case if the plaintiff's claim turns on an officer's credibility, and credibility is genuinely in doubt).

When other evidence in the record, "such as medical reports, contemporaneous statements by the officer, the available physical evidence, and any expert testimony proffered by the plaintiff" is inconsistent with material evidence offered by the defendant, "[q]ualified immunity should not be granted." *Newmaker*, 842 F.3d at 1116 (alterations, quotation marks, and citation omitted). In such cases, district courts must allow juries to consider the evidence that contradicted the officers' version of events, and decide whether they were persuaded by the officers' testimony. *See, e.g.*, *Bator v. State of Hawai'i*, 39 F.3d 1021, 1026 (9th Cir. 1994) ("At the summary judgment stage, . . . the district court may not make credibility determinations or weigh conflicting evidence.").

Our case law bears out that we have consistently applied these standards. In *Newmaker*, we rejected a request for qualified immunity based on evidence that contradicted the officers' account of a fatal shooting. 842 F.3d at 1110. There, as here, the crux of the case turned on what the jury would decide about what happened in the moments before the shooting. The lead-up to the shooting in *Newmaker* mirrors this case in pertinent respects: Newmaker was nearly naked when he was shot, he refused to comply with officer instructions, and he physically resisted officers after they tased him in "drive" stun and "dart" mode. *Id.* at 1111–12. The officer who shot and killed Newmaker alleged that Newmaker grabbed another officer's baton, stood up, and swung it "violently" and "aggressively" at the officer's head. *Id.* at 1112. The defendant claimed that he warned Newmaker to drop the baton before shooting him from a standing position. *Id.* According to the officer, Newmaker was also standing, but he shot Newmaker a second time after he fell to the ground because Newmaker rose and began swinging the baton again. *Id.*

We reversed the district court's order granting summary judgment on qualified immunity grounds because the evidence conflicted with the officer's testimony. First, the officer had previously described shooting Newmaker twice in quick succession, failing to mention that Newmaker fell and got back up. *Id.* at 1113, 1116. Second, the autopsy report indicated that Newmaker was shot while he was bending over and low to the ground, not while he was standing. *Id.* at 1114–16. Third, though a car dashboard camera captured only bits and pieces of the scuffle and shooting, there was "nothing clearly visible in [Newmaker's] hands" when he was shot, and contrary to the officer's statement, it appeared that Newmaker was shot after he fell

to the ground. *Id.* at 1115. We concluded that summary judgment was inappropriate because it was disputed "whether the officers were telling the truth about when, why, and how [the officer] shot Newmaker." *Id.* at 1117.

*Gonzalez v. City of Anaheim* is another fatal shooting case in which physical evidence conflicted with the officers' description of events leading up to the shooting. 747 F.3d at 791. The only testimony concerning the minutes leading up to Gonzalez's death came from officers who stopped Gonzalez for a traffic violation. *Id.* at 792. They described that Gonzalez refused to exit the van or turn off its engine and the officers, one standing on each side of the vehicle, reached through the van's driver and passenger windows to open the van's doors. *Id.* They later testified that it appeared Gonzalez had something in his hands and that they struggled to restrain him as they were leaning through the van's windows. *Id.* The officers recounted that Gonzalez managed to shift the van into "drive," and that he "stomped" on the accelerator. *Id.* at 792–93. The officer who shot Gonzalez was still leaning into the van. He stated that he yelled at Gonzalez to stop and then shot him in the head from less than six inches away, killing him. *Id.* at 793.

Our en banc court reasoned that the key issues were whether a jury could decide that an objectively reasonable officer would have perceived an immediate threat of death or serious bodily injury, and whether a jury could decide it was practicable for the defendants to have given Gonzalez a deadly force warning. *Id.* at 794. We reversed the district court's order granting summary judgment because the officers' statements could not be reconciled with the record. By their mutual account, the van accelerated to fifty miles per hour after Gonzalez stomped on the accelerator and they both feared for the safety of the officer who had leaned into

the van's passenger's side and was trapped in the accelerating van. *Id.* at 794. But the defendants also recounted that the van traveled just fifty feet in five to ten seconds. We reasoned that if that had been the case, a jury could decide that the van was not traveling at a high speed and that it was practicable to provide a warning before using deadly force. *Id.* at 797 (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001) ("Shooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable [where] . . . the officer neither orders the individual to stop nor drop the can or bottle . . . .")).

The dissent missteps by conflating the practicability of providing a deadly force warning—which depends on whether the risk of danger was imminent—with whether there was a risk of danger. Our en banc court's decision in *Gonzalez* clearly demonstrates these are two different inquiries. Like the officers in this case, the officers in *Gonzalez* described an "escalating" and "violent" struggle to restrain Gonzalez after a traffic stop, and they recounted that Gonzalez accelerated the van he was in while one officer was trapped inside. We concluded that factual discrepancies in *Gonzalez* would allow a reasonable jury to find that there was time to give a deadly force warning, despite the danger posed by the moving vehicle. Here, depending on what happened in the locker room, a jury could find that Agdeppa had an opportunity to give Dorsey such a warning before escalating to deadly force. Indeed, Agdeppa provided several warnings before using intermediate force, but at no point did Agdeppa warn Dorsey that he was escalating to the use of his firearm.

The dissent engages in its own detailed and elaborate fact-finding and decides that Dorsey presented a significant risk to officer safety.  But all resisting suspects pose some risk to officer safety and our precedent nevertheless provides that an officer may use deadly force only if the officer has probable cause to believe a suspect poses an immediate and significant threat of death or serious physical injury to the officer or others.  *See Gonzalez*, 747 F.3d at 793; *Newmaker*, 842 F.3d at 1116.  It also requires that, if the circumstances permit, an officer must give notice before using deadly force.  *See, e.g.*, *Gonzalez*, 747 F.3d at 794.

**B.**

The district court did not err in denying Agdeppa's request for qualified immunity because "the version of events offered by [Agdeppa was] materially contradicted by the record."  *Newmaker*, 842 F.3d at 1116.  Agdeppa argues that he did not violate Dorsey's clearly established constitutional rights by using "lethal force during hand-to-hand combat," but he attested that he was standing between six and eight feet away from Dorsey when he shot.  Both Agdeppa and the dissent forget the limited scope of our interlocutory jurisdiction and ignore the district court's factual findings, improperly weigh conflicting evidence, assess the sufficiency of the evidence, and make credibility determinations.[6]  The district court construed the evidence

---

[6] For example, the dissent includes a table that selects statements from the audio recording, but draws numerous inferences in favor of the officers; e.g. "pained grunt/groan."  Elsewhere, the dissent decides the security guards' statements thoroughly corroborate the officers' description of events, only to later suggest that the guards were unable to see what was happening prior to the shooting. In fact, the record does not allow us to determine the guards' respective vantage points and we

in the light most favorable to Smith and concluded that a jury could reasonably reject Agdeppa's description of a "deadly fight" in the locker room and find that "a reasonable officer in Agdeppa's position would not have believed that Rodriguez or anyone else was in imminent danger, and thus, would have understood his use of deadly force violated plaintiff's Fourth Amendment rights." *See Scott*, 39 F.3d at 914 ("An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (quoting *Garner*, 471 U.S. at 3)).[7]

It is uncontested that Dorsey posed some danger to the officers' safety by actively resisting arrest, but our case law required Agdeppa to give a deadly force warning if doing so was practicable. *See, e.g.*, *Gonzalez*, 747 F.3d at 794; *Harris*, 126 F.3d at 1201, 1204; *Est. of Lopez*, 871 F.3d at 1011 (holding that an officer's use of deadly force was unreasonable because the officer "indisputably had time to issue a warning, but never notified [the decedent] that he would be fired upon if he either turned or failed to drop the

---

are not allowed to make credibility determinations. This is an issue for the fact-finder on remand.

[7] Agdeppa also argues that the evidence in the record was insufficient to create a dispute of material fact as to whether Dorsey posed an imminent threat to the officers and contends that the district court erred in considering the autopsy and Commission reports because they were inadmissible. We lack jurisdiction to consider Agdeppa's challenges to the sufficiency of the evidence, *see Est. of Anderson*, 985 F.3d at 731, and boiled down, Agdeppa's evidentiary arguments are disguised challenges to the sufficiency of the evidence. In any event, the district court was entitled to consider the report at the summary judgment stage because it could be presented in a form admissible at trial. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988); *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010).

gun"). And as the district court explained, Smith presented evidence calling into question whether Agdeppa warned Dorsey of his intent to use deadly force.

The application of our well-established rule to Agdeppa's conduct is straightforward because Agdeppa never claimed that it was not practicable to give a deadly force warning. On the contrary, when asked at his deposition if he warned Dorsey before using deadly force, Agdeppa said, "I know I said something. . . . I yelled something." In his sworn declaration submitted in support of his summary judgment motion, and in the statement of undisputed material facts he filed in the trial court, Agdeppa alleged that, before shooting, he "gave Dorsey a verbal warning, stating words to the effect that Dorsey needed to stop."[8] If we view the facts in the light most favorable to Smith, we cannot disregard Agdeppa's sworn account: whatever happened in the locker room after the body-cams were knocked off, Agdeppa's statement was that he had time to yell "stop." Setting aside for the moment that no such warning can be heard on the audio recording, Agdeppa never claimed that he warned Dorsey he was going to switch from using his taser to using his firearm if Dorsey did not stop resisting. Because the officers had tased Dorsey at least five times, a

---

[8] Agdeppa's brief to this court recycles a bald assertion that appeared for the first time in his summary judgment brief, that he "warned [Dorsey] that he would shoot." This assertion lacked any evidentiary support and conflicted with Agdeppa's pre-trial statements that he told Dorsey to "stop." Because counsel's argument was not evidence, *see, e.g.*, *Gaines v. Relf*, 53 U.S. 472, 490 (1851), the district court properly ignored it.

Ironically, the unsupported assertion in Agdeppa's brief that he did provide a warning supports Smith's contention that there was time to provide one.

command to "stop" would have done nothing to warn
Dorsey that Agdeppa was preparing to ramp up to use deadly
force. *See, e.g.*, *Gonzalez*, 747 F.3d at 794 ("In general, we
have recognized that an officer must give a warning before
using deadly force 'whenever practicable.'" (quoting *Harris*,
126 F.3d at 1201)); *Harris*, 126 F.3d at 1204 ("Whenever
practicable, a warning must be given *so that the suspect may
end his resistance*." (emphasis added)); *see also S.R. Nehad
v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019) ("Even
assuming Browder did command Nehad to 'Stop, drop it,'
there is no dispute that Browder never warned Nehad that a
failure to comply would result in the use of force, let alone
deadly force.").[9]     Agdeppa's declaration is a sworn
statement by a party opponent and there is no conflicting
evidence on this point.    *Cf.* Fed. R. Evid. 801(d)(2).
Particularly in light of the Commissioners' report, a
reasonable jury could decide that it was practicable for
Agdeppa to give Dorsey a deadly force warning.

Finally, as the district court recognized, no warning, not
even the "stop" that Agdeppa alleges he yelled, can be heard
on the officers' body-cam audio clips.  On that basis alone,
a reasonable jury could find Agdeppa's use of deadly force
was unreasonable and violated clearly established law.

The dissent laments that we do not say more about the
standard for qualified immunity, but our opinion accurately
explains the applicable standard.  It is curious that the dissent
compiles a detailed set of factual findings from contested
evidence, and disregards our limited jurisdiction on

---

[9] *Browder* was published in 2019, after the events at issue in this case,
but we concluded the officer's Fourth Amendment violation in that case
violated law that was clearly established as of April 2015.  *See Browder*,
929 F.3d at 1130, 1141.

interlocutory review: we cannot engage in fact-finding, we cannot make credibility determinations, and we are obliged to view disputed facts in Smith's favor.  From the beginning, the dissent forgets our role.  It first accepts that no warning is audible on the recording, then goes on to assume that Agdeppa told Dorsey to "stop" in the moments before the shooting; it decides that Agdeppa had only a "micro-second interval" to provide a warning and credits Witness F's recollection that "moments prior" to the shooting, Dorsey tried to pull Agdeppa's gun from his holster—even though, according to the Commissioners' report, the gym's security video showed that Witness F had exited the locker room prior to the shooting.  Despite its suggestions to the contrary, body-cam video does not justify appellate fact-finding in this case, because there is no video footage of the moments before the shooting—there are only grunting and banging sounds.

If a fact-finder ultimately rules in Agdeppa's favor regarding the way the events unfolded in the locker room, Agdeppa will likely prevail.  But at this stage, we are not free to overlook the Commissioners' contrary finding that once a struggle ensued, there was "no exigency that required the officers to stay physically engaged with [Dorsey]."  Nor are we free to ignore the factual disputes identified by the district court.  *See, e.g.*, *Est. of Anderson*, 985 F.3d at 731 ("A public official may not immediately appeal 'a fact-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial.'" (alteration omitted) (quoting *Foster*, 908 F.3d at 1210)).  As even the dissent concedes, a factor that can be considered in the excessive force analysis is whether proper warnings were given.

## IV.

It is not our place to step into the jury's shoes and we do not know what happened in the crucial interval before Agdeppa shot Dorsey. Left to assess the evidence and witness credibility, a reasonable fact-finder could decide that Agdeppa's characterization of the events in the locker room was contradicted by other evidence in the record. A reasonable jury could also conclude that Agdeppa had an opportunity to warn Dorsey and did not do so. Both were valid grounds for the district court to properly deny qualified immunity.

**AFFIRMED.**

BRESS, Circuit Judge, dissenting:

The two police officers in this case found themselves in a violent confrontation with a large, combative suspect, who ignored their repeated orders to stop resisting and failed to respond to numerous taser deployments. After the suspect's assault on the officers intensified and he wrested one of the officers' tasers into his own hands, one officer shot the suspect to end the aggression. Two independent witnesses verified the officers' account. Was it clearly established for purposes of overcoming qualified immunity that officers enduring a frenzied onslaught were legally required to call a "time out" and issue another warning before they used deadly force? Remarkably, the majority says yes. That is clearly wrong.

The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S.

Ct. 1148, 1152 (2018) (per curiam) (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)). Our court today repeats that same error, in this case finding it clearly established that officers in the heat of battle must follow a judge-devised warning script when officer safety is most jeopardized. The split-second decision officers made here presents a classic case for qualified immunity. The majority's decision otherwise is contrary to law and requires officers to hesitate in situations in which decisive action, even if leading to the regrettable loss of human life, can be necessary to protect their own.

After repeated verbal commands and efforts to use non-lethal force failed, no clearly established law required these officers to recite magic words of further warning in the highly dangerous situation they confronted. Respectfully, I dissent.

I

In its effort to turn tangential "disputed" facts into supposedly critical ones, the majority fails to provide a full account of the perilous circumstances that produced the events in this case, while glossing over the officers' repeated attempts to avoid resort to deadly force. Though the majority strains to detect inconsistencies in the officers' accounts, the key aspects of this case are undisputed, based largely on video and audio recordings. To be clear, the majority's claimed factual disputes are ultimately beside the point because even accepting them as valid, the majority opinion still commits a fundamental error of law in treating as clearly established a warning rule that operates at too high a level of generality, and that we have never said applies in the throes of a violent altercation. Nevertheless, and although we construe the facts in the light most favorable to

the plaintiff, a more complete retelling of the events is
warranted.

A

Around 9:00 a.m. on the morning of October 29, 2018,
Officers Edward Agdeppa and Perla Rodriguez were called
to a 24-Hour Fitness gym on Sunset Boulevard in
Hollywood to investigate an apparent trespasser who was
causing a disturbance.  Both officers activated their body
cameras before entering the gym.  Once inside, an employee
immediately approached the officers and reported, "We have
a gentleman who's a little bit irate, and he's not listening,
and he's already threatened a few members, and he's
assaulted security as well."  The employee led the officers to
the men's locker room where the suspect, later identified as
Albert Dorsey, was located.

Once inside, the officers encountered Dorsey, who was
standing naked near a shower area and playing music from
his phone aloud.   Dorsey was a very large man,
approximately 6'1" tall and weighing 280 pounds.  Agdeppa
and Rodriguez each weighed approximately 145 pounds and
were 5'1" and 5'5", respectively.  The officers repeatedly
ordered Dorsey to turn off his music, put on his clothes, and
leave the gym.  Dorsey did not comply.

After two minutes had passed, Dorsey walked across the
room, away from his clothes, to look at himself in the mirror.
Both officers again instructed Dorsey to get dressed, but
Dorsey continued to refuse, seemingly taunting the officers.
As the officers waited, Dorsey began dancing to the music
while raising his middle finger in Agdeppa's direction.  At
various points in the videos, two private security guards are
seen in the locker room with the officers.

After more than four minutes had passed since the officers first told Dorsey he needed to leave, Agdeppa approached Dorsey to handcuff him from behind. Dorsey resisted Agdeppa's attempts to control his arms, at which point Rodriguez stepped in to help. Agdeppa eventually managed to place a handcuff on Dorsey's right wrist while Rodriguez attempted to control Dorsey's left wrist and elbow. Dorsey continued to struggle, so the officers tried various tactical maneuvers to secure Dorsey's hands. This included attempting to secure Dorsey against the wall, switching sides, and using arm, finger, and wrist locks. Despite these efforts, the officers could not get Dorsey under control.

During the struggle, Agdeppa and Rodriguez attempted to use Rodriguez's handcuffs to form a "daisy chain," which involves connecting two or more sets of handcuffs together to restrain suspects who are too combative or large to be restrained by a single set of cuffs. As the officers attempted to attach the handcuffs together, Dorsey forcefully pulled his left arm away from Rodriguez and managed to break free of her grip. The officers directed Dorsey to calm down and stop resisting, but he continued to defy them. The officers then maneuvered Dorsey against a wall while using their body weight to force his hands behind his back.

After initially pinning Dorsey to the wall, Agdeppa was able to broadcast a request for additional units. As Dorsey became more combative, Agdeppa radioed in a request for backup units, which is a more urgent call for assistance. Approximately one minute after going "hands on" with Dorsey, Rodriguez's body camera was knocked to the ground in the struggle. Agdeppa's camera was knocked to the ground shortly thereafter, and the cameras captured minimal video of the rest of the events in question. But they

continued to record audio, which included frequent bangs, crashes, shouts of pain, and other indicia of a violent confrontation.

It is undisputed that a violent struggle ensued in the locker room. Despite their further efforts, the officers were unable to get control of Dorsey, who became increasingly aggressive. At multiple points during the audio recordings, the officers are heard yelling at Dorsey to stop resisting. Dorsey eventually managed to break free of the officers' grips, and, in response, Agdeppa unholstered his taser and held it to Dorsey's chest. Agdeppa maintains that he warned Dorsey he would use the taser if Dorsey continued to resist. When Dorsey refused to stop his violent struggling, Agdeppa cycled the taser twice into Dorsey's body. After this failed to subdue Dorsey, Rodriguez fired her taser dart into Dorsey's back and activated it for approximately five seconds. After the first attempt failed, Rodriguez activated her taser twice more without success.

The audio recordings confirm that the struggle escalated after the taser deployments. Rodriguez can be heard repeatedly demanding that Dorsey "turn around" after the tasers were cycled. The officers are then heard groaning and crying out in pain as the sounds of banging and thrashing increase in volume and intensity. Just before Agdeppa fired the fatal shots, we hear the most intense shouts of pain from the officers amidst loud crashing noises.

The officers' accounts of this part of the story are fully consistent with each other. Agdeppa indicated that Dorsey did not attempt to flee but instead "advance[d] upon" the officers, "punching at [their] heads and faces while the handcuff attached to his wrist also swung around and struck" them. During the struggle, Dorsey landed blows on

Agdeppa's head and face area. Agdeppa recalled that one blow was extremely forceful and knocked him backwards into a wall, momentarily disorienting him and causing him to drop his taser to the locker room floor. After Rodriguez fired her taser for the third time, Dorsey pivoted and struck her, knocking her to the ground. The officers claim that Dorsey then straddled Rodriguez, striking her repeatedly and gaining control of her taser.

Agdeppa, still dazed from Dorsey's blow, reoriented himself and looked up to see Dorsey straddling Rodriguez. Agdeppa remembered Dorsey "pummeling . . . Rodriguez with a flurry of punches" as she laid in the fetal position, trying to protect her face and head. Rodriguez believed that her life was at risk, and Agdeppa, too, feared that Dorsey would kill Rodriguez. It was at this point that Agdeppa fired the fatal shots. After he was shot, Dorsey was still holding one of the officers' tasers in his hand. Agdeppa claimed he warned Dorsey before shooting him, but this part of the audio recording is chaotic. One can hear a man's voice shouting something just before the shots were fired, though what is said is unclear. I will assume, as the majority does, that no final warning was given.

But for all its focus on the warning that was allegedly not provided, the majority opinion fails to acknowledge the numerous commands—in word and deed—that the officers gave in trying to halt Dorsey's aggression. Before they went "hands on" with Dorsey, both officers repeatedly urged him to put on his clothes and leave the gym. Once they went "hands on," the recordings confirm that the officers gave repeated verbal directives and used various means of non-lethal force to get Dorsey to stop his assault. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (courts at summary judgment "should . . . view[] the facts in the light depicted

by the videotape").

Reciting only what I can clearly discern after officers
went "hands on," this is what the recordings show about
what officers said to Dorsey during the four minutes of
violent struggle:

| Officer | Command or Sound | Timestamp |
| --- | --- | --- |
| Agdeppa | "Give me your hand."*[1] | 16:09:32[2] |
| Rodriguez | "Put your hands behind your back." | 16:09:33 |
| Rodriguez | "Stop tensing up!" | 16:09:35 |
| Rodriguez | "Stop tensing up!" | 16:09:36 |
| Rodriguez | "Do not tense up on me!" | 16:09:37 |
| Rodriguez | "Do not fucking tense up on me!" | 16:09:38 |
| Agdeppa | "I swear to God, if you fucking tense up, buddy!" | 16:09:39 |
| Rodriguez | "Do not tense up on me." | 16:09:40 |

[1] The commands that I denote with an asterisk can be heard more clearly
in Agdeppa's body camera recording than in Rodriguez's. Gaps in time
without directives or especially loud sounds are filled with other sounds
of struggle, officer-to-officer coordinating communications, and
Dorsey's initial verbal protests, which I do not include. I also do not
include a small number of statements from the officers that are difficult
to make out over the crashes of the altercation and the music still playing
from Dorsey's phone. Contrary to the majority's assertion, I draw no
inferences in favor of the officers, but have simply set forth what is
apparent from the recordings.

[2] Timestamps are displayed in both officers' body camera recordings.
The two recordings' timestamps are consistent with one another.

| Officer | Command or Sound | Timestamp |
|---------|------------------|-----------|
| Agdeppa | "What are you gonna do?" | 16:09:47 |
| Rodriguez | "Do not fucking tense up on me." | 16:09:49 |
| | [Officers continue to struggle with Dorsey as they try to place handcuffs on him] | 16:09:51–16:10:03 |
| Agdeppa | "Calm down." | 16:10:04 |
| Agdeppa | "Calm down." | 16:10:05 |
| Rodriguez | "Give me your fucking hand then!" | 16:10:10 |
| | [Officers continue to struggle with Dorsey in attempting to handcuff him with two sets of cuffs in a "daisy chain"] | 16:10:12–21 |
| Rodriguez | [Pained Exclamation/Grunt]* | 16:10:20 |
| | [Rodriguez's body camera is knocked to the ground as Dorsey escalates his resistance] | 16:10:20 |
| Agdeppa | "Hold on!" | 16:20:21 |
| | [Agdeppa's body camera is knocked to the ground] | 16:10:22 |
| Agdeppa | "Stop resisting!" | 16:10:23 |

| Officer | Command or Sound | Timestamp |
|---------|------------------|-----------|
|  | [Loud Bang] | 16:10:35 |
|  | [Bang] | 16:10:41 |
|  | [Dorsey is briefly visible on Rodriguez's camera wrestling and pushing the officers] | 16:10:45–51 |
|  | [Thud] | 16:11:03 |
| Agdeppa | "Stop." | 16:11:10 |
| Rodriguez | "Give me your fucking hand!" | 16:11:17 |
| Agdeppa | "Give her your hand." | 16:11:18 |
| Rodriguez | "Give me your fucking hand." | 16:11:22 |
| Rodriguez | "Stop fucking resisting!" | 16:11:24 |
| Agdeppa | "Will you relax!" | 16:11:31 |
| Agdeppa | "Get off her."* | 16:11:33 |
|  | [Loud Bang] | 16:11:34 |
|  | [Thud] | 16:11:44 |
| Agdeppa | "Just relax!" | 16:11:54 |
| Agdeppa | "You're alright."* | 16:11:55 |
| Rodriguez | "Stop!" | 16:11:55 |
| Rodriguez | "Stop!" | 16:11:57 |
| Agdeppa | "Relax!" | 16:12:10 |

| Officer | Command or Sound | Timestamp |
|---|---|---|
| Rodriguez | "Stop!" | 16:12:12 |
| Agdeppa | "Relax." | 16:12:20 |
| | [Inaudible Raised Voices] | 16:12:20–25 |
| Rodriguez | "Stop trying to [Inaudible]!" | 16:12:27 |
| | [Audible Taser Deployment] | 16:12:28 |
| Rodriguez | "Turn around or I'm going to tase you again!"* | 16:12:34 |
| Rodriguez | "Turn around!" | 16:12:36 |
| Rodriguez | "Turn around!" | 16:12:39 |
| Rodriguez | "Turn around!" | 16:12:40 |
| Rodriguez | "Turn around!" | 16:12:42 |
| Rodriguez | "Just give me your hand!"* | 16:12:45 |
| | [Repeated and Ongoing Taser Deployments and Crashing Sounds] | 16:12:45–16:13:11 |
| Rodriguez | [Pained Groan/Grunt] | 16:12:55 |
| Rodriguez | [Pained Shout] | 16:12:56 |
| Rodriguez | [Pained Shout and Bang] | 16:12:58 |
| | [Bang and Buzz from Taser] | 16:12:59 |
| Rodriguez | [Pained Grunt/Groan] | 16:13:01 |
| Rodriguez | [Pained Grunt/Groan] | 16:13:02 |
| Agdeppa | [Loud Cry of Pain] | 16:13:04 |

| Officer | Command or Sound | Timestamp |
|---------|------------------|-----------|
| Rodriguez | [Pained Grunt/Groan] | 16:13:05 |
| | [Inaudible Shout (Man's Voice)] | 16:13:11 |
| | [Gunshots] | 16:13:12 |
| Agdeppa | "Are you okay?" | 16:13:15 |
| Rodriguez | "I'm good!" | 16:13:16 |
| Agdeppa | "6A15, shots fired!  Officer needs help!  [Inaudible]" | 16:13:17 |

Agdeppa and Rodriguez were treated at the emergency room following the incident.  Agdeppa was given sutures on the bridge of his nose and later reported being diagnosed with a concussion, which left him unable to work for six months and had further longer-lasting effects.  Rodriguez recalled having a swollen left check and right jaw, abrasions on her ear and hands, and a pulled muscle behind her knee.

The Los Angeles Board of Police Commissioners (BOPC) reviewed the incident and issued written findings.  The findings were based on various accounts, including from the two private security guards who are seen at different points in the bodycam videos.  As the district court noted, "the course of events presented in the Findings largely conform to Agdeppa's account," with other witnesses who were in the locker room substantiating key moments in the encounter.  Although the BOPC faulted the officers for not using greater de-escalation techniques earlier in the encounter, it concluded that "available evidence supports that [Agdeppa's] belief that there was an imminent threat of death or serious bodily injury at the time of the [shooting]

was objectively reasonable."

B

The majority claims there are "significant discrepancies" in the events recounted above. That is simply inaccurate. Based on the reports of the two officers and others, the BOPC report describes the events as I have. Relying on the BOPC report, the majority contends that "[b]ystander-witness statements . . . contradicted Agdeppa's story." The opposite is true. The majority relies on only one alleged contradiction: one witness recalling Agdeppa potentially being closer to Dorsey at the time of the shooting than Agdeppa described. But in fact, the witnesses' accounts in the BOPC findings thoroughly corroborate the officers' descriptions of a violent, escalating struggle in which they faced a grave risk of serious injury, or worse.

For example, as set forth in the BOPC report, Witness F, a security guard, recalled that after Dorsey was tased, Dorsey punched Agdeppa "more than eight times" in the "face and head area with his fist that was handcuffed," with "the force of the punches knock[ing] [Agdeppa] into the lockers and walls."[3] Witness F recalled that "[t]his caused [Agdeppa] to bounce back toward [Dorsey], who then struck [Agdeppa] in the face again." Witness F further described that Dorsey was "striking [Rodriguez] in the face with his half-open hand" and "straddling" her, and that "[Rodriguez] was bleeding from []her mouth as [Dorsey] was hitting []her." The BOPC report states that after Rodriguez was "knocked to the ground by [Dorsey] and was attempting to defend [herself]," Dorsey "grabbed the TASER with his left hand and began to

---

[3] Although the BOPC report refers to Officers "A" and "B," it is apparent that "A" is Agdeppa and "B" is Rodriguez.

push the TASER into [Rodriguez]'s face, simultaneously hitting [Rodriguez] with his right fist, which had the handcuffs attached."

Even the alleged inconsistency the majority relies upon supports Agdeppa because it describes a more desperate situation than even Agdeppa recalled: in Witness F's recollection, "moments prior" to the shooting, and "while [Dorsey] was straddling [Rodriguez], [Dorsey] grabbed [Agdeppa]'s gun and attempted to pull it out of its holster." There is also another problem: the majority opinion is purporting to identify a supposedly critical factual dispute based on what Witness F observed at the exact moment of the shooting, but a careful reading of the BOPC report shows that based on video surveillance, Witness F was no longer even in the locker room at that exact moment, having exited just immediately before.  (There is no suggestion in the BOPC report that Witness F did not see the violent struggle in the moments leading up to the shooting—an account the BOPC report fully credits.)  And for avoidance of doubt, it accomplishes nothing for the majority to poke holes in Witness F's account when it is the majority opinion that is relying on the BOPC report to create a supposed disputed of fact; I am merely showing why that reliance is wholly misplaced.[4]

---

[4] It is worth noting that, in claiming the BOPC report contradicts Agdeppa's account of where he was standing when he fired the fatal shots, the majority relies exclusively on the district court's decision.  But the district court, which acknowledged that "plaintiff does not raise this argument," focused on a line in the BOPC report which stated that, "According to Witness F," after the second shot, "[Dorsey] let go of Officer A's wrist."  In the very next sentence, however, the BOPC report states that "Witness F believed that [Dorsey] looked at *Officer A* and then began to walk toward him/her, and that Officer A fired two more

To this point, the BOPC report specifically found—relying on independent witnesses—that Agdeppa reasonably perceived a risk of death or serious injury to the officers:

> [Agdeppa] used deadly force at a time when, as supported by the accounts of two independent witnesses, he[] and [Rodriguez] were being assaulted by [Dorsey]. At that time, the violence of [Dorsey's] assault relative to the officers' capacities to defend themselves was such that it was objectively reasonable to believe that there was an imminent threat to the officers of death or

---

rounds." (emphasis added). This sequence of events would not be possible if Dorsey were holding Officer A's (Agdeppa's) wrist. The line on which the district court (and the majority) thus rely—referencing Dorsey holding an officer's wrist—should likely be a reference to *Officer B* (Rodriguez). And to the extent this portion of the BOPC report should be read as meaning that Officer A (Agdeppa) had time to move away from Dorsey after Dorsey let go of his wrist, that would allow Agdeppa to be placed several feet from Dorsey when he shot him. Thus, either way the majority is wrong (and thus, contrary to the majority, I do not "decide" that the BOPC report contained a mistake).

Even more critically, however, as I have noted above, the majority purports to base its key identified factual dispute on Witness F's recollection of Agdeppa's positioning at the exact moment of the shooting, *when the BOPC later notes that Witness F was not even present in the locker room at that exact point in time*. That may explain why the BOPC report had no difficulty crediting Agdeppa as having fired "from an approximate distance of 5–7 feet." In fact, the BOPC explained that the investigation into the shooting "revealed that [Agdeppa] fired five rounds at [Dorsey], from an approximate distance of five to seven feet." The supposedly grand inconsistency in the BOPC report on which the majority hangs its hat (which was based on the district court's own independent theorizing) is an inconsistency that the BOPC tellingly did not even acknowledge.

serious bodily injury.

For our purposes, the BOPC report unequivocally supports the officers.   Confusing issues, the majority relies on portions of the BOPC report that criticize the officers for having gotten themselves into this situation and for failing to use de-escalation tactics earlier in the encounter.   But those findings are irrelevant for purposes of this case.   The issue here is not whether the officers could have de-escalated the situation before it grew violent, but whether, at the moment Agdeppa shot Dorsey, the officers faced an imminent threat of death or serious injury.   On this critical point, the BOPC concludes that they did, based on the same undisputed facts I have set forth.

Equally wrong is the majority's assertion that "physical evidence . . . conflicts with Agdeppa's story."   The "evidence" the majority refers to here is the officers' injuries, which the majority (like the district court) believes are too insubstantial.   But as I recounted above, the officers *did* suffer injuries, including Agdeppa sustaining a prominent facial laceration.   The officers never claimed to have suffered the level of injury the majority apparently expects they should have sustained.   And nothing about the officers' account required injuries more severe.   Although it is true, as the district court noted, that neither officer appears to have suffered broken bones or more serious injuries, that fortuity cannot alter the analysis.   The majority suggests that the district court described Rodriguez as "unscathed" following the incident, but the portion of the district court decision the majority cites merely recites this as an argument made by the plaintiff.

The majority is also clearly wrong in asserting that the autopsy report "undermines Agdeppa's description" of the

events.  The district court noted that "from their entry point, three of the four bullets travelled downward relative to Dorsey's body, but one travelled upward."  Based on this, the plaintiff argued that the bullet trajectory raised questions as to whether Dorsey was standing or hunched over Rodriguez at the time he was shot.  This argument—which the district court noted the plaintiff had raised "for the first time" at the summary judgment hearing—is based not on expert analysis, but on the impromptu speculation of counsel.

Nevertheless, the majority claims that "the district court correctly determined this evidence could allow a jury to question Agdeppa's credibility" as inconsistent with Agdeppa's claims about Dorsey's positioning at the time of the shooting.  That is, again, flatly inaccurate.  The district court listed the plaintiff's bullet-trajectory argument as a potential factual dispute that the plaintiff had identified.  But the district court in fact discounted this argument earlier in its decision, recognizing that "[b]ecause there is no evidence regarding the sequence of the gunshots, the court cannot draw any inference as to how Dorsey was positioned relative to each gunshot."

In short, although the majority tries to gin up factual disputes, none are material, or even real.  This confirms the total irrelevancy of the majority's multi-page discussion of *Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir. 2016), and *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) (en banc), two cases that have nothing to do with this one beyond the fact they concerned officer-involved shootings.  In *Newmaker*, two officers provided conflicting testimony about the circumstances of the shooting and arrived at their version of events "[o]nly after receiving suggestions from [an investigator]." 842 F.3d at 1111–13.

Even more significantly, the officers asserted that the suspect was standing and swinging a police baton at them, but the autopsy report and video evidence indicated that the man was shot in the back while lying on the ground. *See id.* at 1111–16. In *Gonzalez*, an officer shot a man in the head at point blank range with no warning and no prior resort to nonlethal force, and the officer's account, which turned on the speed of a moving vehicle, included as to that critical issue a "combination of facts [that] appear[ed] to be physically impossible." 747 F.3d at 794.

These cases involved genuine disputes of *highly material* facts. They provide no license for elevating phantom factual disputes into critical ones, as the majority does here. The implicit suggestion in the majority opinion that these (non-existent) factual disputes provide the linchpin for disbelieving the obvious import of the video and audio recordings, the officers' sworn statements, and the confirmatory bystander recollections, is entirely unfounded. It is therefore completely false for the majority to assert that "the version of events offered by Agdeppa was materially contradicted by the record."

But even granting the majority its claimed factual discrepancies, the key facts here are *undisputed*: officers were engaged in a violent struggle in an enclosed area with a much larger man who fought with the officers and repeatedly resisted arrest, who refused to stop his aggression despite repeated warnings and tasings, and who had taken control of one officer's taser. Just before the fatal shots were fired, the officers can be heard crying out in pain as crashing and thrashing noises intensify. Two independent witnesses corroborated the severity of Dorsey's attack.

The majority's repeated accusation that I have engaged

in fact-finding is baseless. It is the majority that is ignoring the critical and undisputed facts. The question, then, is whether it was clearly established that the officers in this extreme situation were required to give a further warning before using deadly force.

## II

The majority opinion says almost nothing about the rigorous legal standards governing the qualified immunity analysis, but they are central to the proper resolution of this case. Qualified immunity protects government officials from § 1983 suits unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). We need not answer the first question if the law is not clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle*, 566 U.S. at 664). This is a high standard: "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The "rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589–90 (quotations omitted). This "demanding" requirement "protects all but the plainly incompetent or those who knowingly violate the law," and calls for "a high degree of specificity." *Id.* at 589–

91 (quotations omitted); *see also Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam).

It is critical that clearly established law be sufficiently specific. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). This "specificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (alteration in original)).

Because no one suggests this is the rare "obvious case" in which general principles suffice to clearly establish the unlawfulness of Agdeppa's conduct, *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)), Agdeppa is entitled to qualified immunity unless "existing precedent *'squarely governs' the specific facts at issue*." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (emphasis added) (quoting *Mullenix*, 577 U.S. at 13); *see also, e.g.*, *Brosseau*, 543 U.S. at 201; *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020). The critical question is thus "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742).

The plaintiff's theory is that Agdeppa used excessive force when he shot Dorsey. To assess the reasonableness of a particular use of force, we apply the standards from

*Graham v. Connor*, 490 U.S. 386 (1989), and "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'" *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham*, 490 U.S. at 396). In doing so, "[w]e consider 'the type and amount of force inflicted'" in tandem with "'(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (quoting *Miller*, 340 F.3d at 964). Another factor that can be considered is whether proper warnings were or could have been given. *See Isayeva v. Sacramento Sheriff's Department*, 872 F.3d 938, 947 (9th Cir. 2017). In conducting this analysis, we do not "second-guess officers' real-time decisions from the standpoint of perfect hindsight," *O'Doan*, 991 F.3d at 1036, and we must recognize that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397.

Interestingly, the majority opinion does not appear to take issue with Agdeppa's use of force standing alone, much less suggest that Agdeppa violated clearly established law in that regard (this was the basis for the district court's decision denying qualified immunity, which was clearly wrong). Instead, the majority tells us, what makes Agdeppa's use of force violative of clearly established law is that Agdeppa failed to give a special warning before he shot. Although the plaintiff here barely raised this issue in the district court, the majority holds that Ninth Circuit precedent creates a "well-

established rule" that "required Agdeppa to warn before
using deadly force if doing so was practicable," and that
construing the facts in favor of the plaintiff, Agdeppa's
failure to give a pre-shot warning "violated clearly
established law."

The majority thereby contravenes the Supreme Court's
clear directives on qualified immunity. The Supreme Court
has "repeatedly stressed that courts must not define clearly
established law at a high level of generality," explaining that
"[a] rule is too general if the unlawfulness of the officer's
conduct does not *follow immediately* from the conclusion
that the rule was firmly established." *Wesby*, 138 S. Ct. at
590 (emphasis added) (quotation & alteration omitted). The
Supreme Court has told us this again and again, sometimes
even calling our court out by name due to our repeated
infractions in this area. *See Kisela*, 138 S. Ct. at 1152;
*Sheehan*, 575 U.S. at 613; *Lopez v. Smith*, 574 U.S. 1, 6
(2014) (per curiam); *al-Kidd*, 563 U.S. at 742.

The majority opinion repeats our mistakes of the past.
The majority is correct that under Ninth Circuit precedent,
"[i]n general, we have recognized that an officer must give a
warning before using deadly force 'whenever practicable.'"
*Gonzalez*, 747 F.3d at 794 (quoting *Harris v. Roderick*, 126
F.3d 1189, 1201 (9th Cir. 1997)). But this standard is
obviously far, far too general to create clearly established
law for purposes of overcoming qualified immunity. We
need look no further than our articulation of this "warning
rule," which on its face recognizes it is not a one-size-fits-all
proposition. We have stated only that the rule applies "*[i]n
general*," "'*whenever practicabl*e.'" *Gonzalez*, 747 F.3d at
794 (emphasis added) (quoting *Harris*, 126 F.3d at 1201).
We have also specifically emphasized that "[t]he absence of
a warning does *not* necessarily mean that [an officer's] use

of deadly force was unreasonable." *Id.* at 797 (emphasis added).

Standing alone, and outside of an obvious case (this is not one), the warning principle is pitched at a level of generality that is much too high to create clearly established law in "the particular circumstances" that Agdeppa faced. *Wesby*, 138 S. Ct. at 590. Our "warning principle" cases certainly do not clearly establish the types of situations in which a warning is "practicable," what form the warning must take, or how specific it must be. Nor does existing law clearly establish how the lack of a warning is to be balanced against the other *Graham* factors in the context of a case such as this, and, in particular, the type of imminent threat to safety that the officers faced.

The origins of the warning principle only further confirm that it operates at a level of generality that is too elevated for qualified immunity purposes. In *Harris*, we sourced our warning rule to the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), which held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *See Harris*, 126 F.3d at 1201 (citing *Garner*, 471 U.S. at 11–12). But the Supreme Court has been clear that "[t]he standards from *Garner* . . . 'are cast at a high level of generality,' so they ordinarily do not clearly establish rights." *Isayeva*, 872 F.3d at 951 (quoting *Brosseau*, 543 U.S. at 199); *see also Rivas-Villegas*, 142 S. Ct. at 8 (same). When *Garner* is too general to create clearly established law in a particular case, a general warning principle inferred from *Garner* is likewise incapable of serving that function.

The majority was thus required to come forward with "existing precedent" that "squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quotation omitted). But no precedent possibly fits that bill because the cases the majority identifies all involved officers who shot suspects almost immediately after encountering them, where the suspects presented no obvious threat to officer safety. In *Harris*, a police sniper in a hilltop position opened fire on suspects who were exhibiting no immediate signs of aggression, without even announcing that police were present. 126 F.3d at 1193–94, 1202–04. In *Gonzalez*, the officer shot a man in the head at point blank range with no warning and no prior resort to nonlethal deterrents, immediately after the suspect drove away with the officer in the car at a speed that may have been no faster than three to seven miles per hour. *See* 747 F.3d at 794–97. In *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), the officer shot a thirteen-year-old boy—who was holding a fake gun and displaying no signs of aggression—moments after arriving on the scene, "without knowing if [the boy's] finger was on the trigger, without having identified himself as a police officer, and without ever having warned [the boy] that deadly force would be used." *Id.* at 1010–11. And in *S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019), which was decided *after* the events of this case, the suspect was making no sudden movements when an officer fatally shot him from seventeen feet away, less than five seconds after the officer stepped out of his car, after making no attempt to use nonlethal force. *Id.* at 1130–32, 1137–38.

These cases bear none of the hallmarks of this case, in which the officers repeatedly and unsuccessfully tried to use nonlethal force and were engaged in a lengthy, violent struggle with a large assailant in a tightly enclosed area, who

was striking them and who had already gained control of an officer's taser. There is no possible sense in which the precedents the majority cites would have made it "clear to [Agdeppa] that his conduct was unlawful in the situation he confronted." *Wesby*, 138 S. Ct. at 590 (quotation omitted). Those precedents are light years away from this one. Agdeppa is entitled to qualified immunity because "neither the panel majority nor the [plaintiff has] identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation 'under similar circumstances.'" *Wesby*, 138 S. Ct. at 591 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)).

Nor does the rationale of our warning cases apply here, either. We have said that a warning must be given "whenever practicable" so that a suspect "who do[es] not pose an immediate threat" to officer safety "may end his resistance." *Harris*, 126 F.3d at 1204. Dorsey *did* pose an immediate threat to officer safety. And he was given numerous opportunities—through repeated verbal commands, attempted handcuffing, and taser deployments—to stop his aggression. This was not the case of a suspect who was shot before he had a chance to comply. By the officers' words and actions, Dorsey was warned throughout the encounter. He was given numerous opportunities to stand down, and he instead ramped up his violent resistance. A suspect in this situation either knows or should know what can happen next. At the very least, it is not clearly established that the logic of our warning rule applies when all past warnings have failed, and a violent situation has grown more dire.

I must lastly respond to the majority's assertion that Agdeppa has somehow conceded that he had the opportunity to issue a final warning before he shot Dorsey. The district

court, which said virtually nothing about Agdeppa's failure to warn (again, the plaintiff barely raised the issue below), made no such finding.  The majority instead seizes on the fact that Agdeppa stated in his deposition and in a declaration that he yelled "stop" before shooting.  From this, the majority asserts that "Agdeppa never claimed that it was not practicable to give a warning," and goes so far as to assert that Agdeppa in fact "*cannot argue* that it was not possible for Agdeppa to warn Dorsey." (emphasis added).   Once again, the majority seriously misconstrues the record.

Agdeppa has never conceded that it was practicable for him to give a warning for the simple reason that the warning he claims he gave obviously falls short of the more detailed warning the majority has in mind.  The majority of course does not tell us what Agdeppa was supposed to have said, but whatever it was, it was more extensive than "stop."  After setting up Agdeppa's own statements as the supposed basis for the practicability of a further warning, the majority then remarkably represents that "there is no conflicting evidence on this point."  But there is *extensive* undisputed evidence on this point, most notably the harrowing video and audio recordings showing this was not a situation in which quaint notions of "practicability" could have reasonably been at the forefront of the officers' minds.  Given the recordings and the BOPC report, the majority cannot feign that we somehow have no idea what happened in that locker room.   The majority claims that on the bodycam recordings, "there are only grunting and banging sounds," but that is demonstrably incorrect.  We know much more than enough to conclude that the warning obligation the majority imposes was not clearly established in the circumstances these officers confronted.

Instead, the majority opinion at times seems to imply that because our warning rule contains a practicability component, whether a warning was practicable will always be a question of fact.  But that would mean that qualified immunity should be denied in every case in which an officer fails to warn, contrary to our case law that "[t]he absence of a warning does not necessarily mean that [an officer's] use of deadly force was unreasonable." *Gonzalez*, 747 F.3d at 797.  The problem here is not Agdeppa supposedly conceding away his entire defense—he did no such thing— but the majority applying a legal rule that, as a matter of law, cannot serve as clearly established law.

All of this would be bad enough in any case erroneously denying qualified immunity, in which the unwarranted burdens of further litigation are added to the already burdensome responsibilities that law enforcement officers undertake in protecting the public.  But the dangers of today's decision are especially ominous.  At what micro-second interval in the final heated moments of this escalating confrontation was Agdeppa somehow legally required to hit the "pause button" and recite some yet-undisclosed, court-created warning script?  The uncertainty the majority opinion invites stands as a further condemnation of its holding.  And the rule of law it treats as clearly established on these facts could well make the difference in whether officers like Agdeppa and Rodriguez make it out of a violent altercation alive.  No clearly established law remotely requires officers who already put themselves in harm's way to do so as riskily as the majority opinion now demands.

Because these grave consequences result from the majority's manifest misapplication of the Supreme Court's clear directives on qualified immunity, I respectfully dissent.