FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAULETTE SMITH, individually and as Successor in Interest to Albert Dorsey, deceased, | No. 20-56254 |
| *Plaintiff-Appellee*, | D.C. No. 2:19-cv-05370-CAS-JC |
| v. | |
| EDWARD AGDEPPA, an individual, | OPINION |
| *Defendant-Appellant*, | |
| and | |
| CITY OF LOS ANGELES, a municipal entity; DOES, 1 through 10, | |
| *Defendants*. | |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted March 16, 2022
Submission Withdrawn April 11, 2023
Resubmitted May 4, 2023
San Francisco, California

Filed August 30, 2023

Before:  Consuelo M. Callahan, Morgan Christen, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Christen

## SUMMARY[*]

### Qualified Immunity/Deadly Force

The panel reversed the district court's denial of qualified immunity to police officer Edward Agdeppa in a 42 U.S.C. § 1983 action alleging that Agdeppa used unreasonable deadly force when he shot and killed Albert Dorsey.

The panel first held that it had jurisdiction over this interlocutory appeal because, notwithstanding the factual disputes, Agdeppa only contested the district court's legal conclusion that there was a violation of Dorsey's clearly established rights.

The panel held that because Agdeppa did not challenge the district court's determination that a reasonable juror could conclude that Agdeppa violated Dorsey's Fourth Amendment right to be free from excessive force, this appeal turned solely on the second step of the qualified immunity analysis—whether the claimed unlawfulness of Agdeppa's conduct was "clearly established."

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that Agdeppa's use of deadly force, including his failure to give a warning that he would be using such force, did not violate clearly established law given the specific circumstances he encountered. In evaluating whether Dorsey posed an immediate threat to safety that would justify the use of deadly force, the panel noted that it was undisputed that Agdeppa and another officer repeatedly warned Dorsey to stand down; unsuccessfully tried to use non-lethal force; and engaged in a lengthy, violent struggle in a confined space with Dorsey, who dominated the officers in size and stature and who had gained control of a taser. Because none of the court's prior cases involved similar circumstances, there was no basis to conclude that Agdeppa's use of force here was obviously constitutionally excessive. Moreover, past precedent would not have caused Agdeppa to believe that he was required to issue a further warning in the middle of an increasingly violent altercation.

Dissenting, Judge Christen stated that qualified immunity was improper because Agdeppa's characterization of the facts conflicted with physical evidence and witness statements, so much so that a reasonable jury could reject the officers' account of the shooting. This court has well-established precedent that an officer must give a deadly force warning if practicable, and a reasonable jury could conclude that Agdeppa had the opportunity to give a deadly force warning and failed to do so.

## COUNSEL

Kevin E. Gilbert (argued) and Carolyn M. Aguilar, Orbach
Huff Suarez & Henderson, Pleasanton, California; Susan E.
Coleman, Keiko J. Kojima, and Lisa W. Lee, Burke
Williams & Sorensen LLP, Los Angeles, California; for
Defendants-Appellant.

Edward M. Lyman III (argued), Family Legal APLC, Playa
Del Rey, California; Brian T. Dunn and James Bryant, The
Cochran Firm - California, Los Angeles, California; Megan
R. Gyongyos, Carpenter Zuckerman & Rowley LLP,
Beverly Hills, California; for Plaintiff-Appellee.

## OPINION

BRESS, Circuit Judge:

Two police officers were dispatched to a gym after a man
reportedly threatened gym patrons and assaulted a security
guard. The suspect then violently attacked the officers and
refused to stop after they repeatedly deployed their tasers.
One officer eventually resorted to lethal force to end the
aggression. We are asked to decide whether this officer is
entitled to qualified immunity. We hold that he is. The
officer's use of deadly force did not violate clearly
established law. For this sole reason, we reverse the district
court's decision.

I

A

We recite the facts in the light most favorable to the plaintiff, noting when facts are disputed or when the account of events is based principally on the officers' descriptions. When, as here, we have videotape of the events, we "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

Around 9:00 a.m. on the morning of October 29, 2018, Officers Edward Agdeppa and Perla Rodriguez were called to a 24-Hour Fitness gym on Sunset Boulevard in Hollywood to investigate an apparent trespasser who was causing a disturbance. Both officers activated their body cameras before entering the gym. Once inside, an employee immediately approached the officers and reported, "We have a gentleman who's a little bit irate, and he's not listening, and he's already threatened a few members, and he's assaulted security as well." The employee led the officers to the men's locker room where the suspect, later identified as Albert Dorsey, was located.

Once inside, the officers encountered Dorsey, who was standing naked near a shower area and playing music from his phone aloud. Dorsey was a very large man, approximately 6'1" tall and weighing 280 pounds. Agdeppa and Rodriguez were 5'1" and 5'5," respectively, and each weighed approximately 145 pounds. The officers repeatedly ordered Dorsey to turn off his music, put on his clothes, and leave the gym. Dorsey did not comply.

After two minutes had passed, Dorsey walked across the room, away from his clothes, to look at himself in the mirror. Both officers again instructed Dorsey to get dressed, but

Dorsey continued to refuse, appearing to taunt the officers.
As the officers waited, Dorsey began dancing to the music
while raising his middle finger in Agdeppa's direction.  At
various points in the videos, two private security guards are
seen in the locker room with the officers.

After more than four minutes had passed since the
officers first told Dorsey he needed to leave, Agdeppa
approached Dorsey to handcuff him from behind.  Dorsey
resisted Agdeppa's attempts to control his arms, at which
point Rodriguez stepped in to help.  Agdeppa eventually
managed to place a handcuff on Dorsey's right wrist while
Rodriguez attempted to control Dorsey's left wrist and
elbow.  Dorsey continued to struggle, so the officers tried
various tactical maneuvers to secure Dorsey's hands.  This
included attempting to secure Dorsey against the wall,
switching sides, and using arm, finger, and wrist locks.
Despite these efforts, the officers could not get Dorsey under
control.

During the struggle, Agdeppa and Rodriguez attempted
to use Rodriguez's handcuffs to form a "daisy chain," which
involves connecting two or more sets of handcuffs together
to restrain suspects who are too combative or large to be
restrained by a single set of cuffs.  As the officers attempted
to attach the handcuffs together, Dorsey forcefully pulled his
left arm away from Rodriguez and managed to break free of
her grip.  The officers directed Dorsey to calm down and stop
resisting, but he continued to defy them.  The officers then
maneuvered Dorsey against a wall while using their body
weight to force his hands behind his back.

After initially pinning Dorsey to the wall, Agdeppa was
able to broadcast a request for additional police units.  As
Dorsey became more combative, Agdeppa radioed in a

request for backup units, which is a more urgent call for assistance.  Approximately one minute after going "hands on" with Dorsey, Rodriguez's body camera was knocked to the ground in the struggle.  Agdeppa's camera was knocked to the ground shortly thereafter, and the cameras captured minimal video of the rest of the events in question.  But they continued to record audio, which included frequent bangs, crashes, shouts of pain, and other indicia of a violent confrontation.[1]

It is undisputed that a violent struggle ensued in the locker room.  Despite their further efforts, the officers were unable to control Dorsey, who became increasingly aggressive.  At multiple points during the audio recordings, the officers are repeatedly heard yelling at Dorsey to "Stop!" and "Stop resisting!"  Dorsey eventually managed to break free of the officers' grips, and, in response, Agdeppa unholstered his taser and held it to Dorsey's chest.  Agdeppa maintains that he warned Dorsey he would use the taser if Dorsey continued to resist.  When Dorsey refused to stop his violent struggling, Agdeppa cycled the taser twice into Dorsey's body.  After this failed to subdue Dorsey, Rodriguez fired her taser dart into Dorsey's back and activated it for approximately five seconds.  After the first attempt failed, Rodriguez activated her taser twice more without success.

---

[1] What transpired during the rest of the altercation is based largely on the officers' testimony and the bodycam audio.  But for purposes of our later legal analysis, the material aspects of the ensuing events are not genuinely disputed, such as Dorsey violently resisting arrest, the officers firing their tasers, and the fact that the violent struggle escalated in the moments leading up to the shooting.

The audio recordings confirm that the struggle escalated after the taser deployments. Rodriguez can be heard repeatedly demanding that Dorsey "turn around" after the tasers were cycled. The officers are then heard shouting, groaning, and crying out in pain as the sounds of banging and thrashing increase in volume and intensity. Just before Agdeppa fired the fatal shots, we hear the most intense shouts of pain from the officers amidst loud crashing noises.

The officers' accounts of this part of the story are consistent with each other. Agdeppa indicated that Dorsey did not attempt to flee but instead "advance[d] upon" the officers, "punching at [their] heads and faces while the handcuff attached to his wrist also swung around and struck" them. During the struggle, Dorsey landed blows on Agdeppa's head and face area. Agdeppa recalled that one blow was extremely forceful and knocked him backwards into a wall, momentarily disorienting him and causing him to drop his taser on the locker room floor. After Rodriguez fired her taser for the third time, Dorsey pivoted and struck her, knocking her to the ground. The officers claim that Dorsey then straddled Rodriguez, striking her repeatedly and gaining control of her taser.

Agdeppa               remembered              Dorsey "pummeling . . . Rodriguez with a flurry of punches" as she laid in the fetal position, trying to protect her face and head. Rodriguez believed that her life was at risk, and Agdeppa too feared that Dorsey would kill Rodriguez. It was at this point that Agdeppa fired the fatal shots. After he was shot, Dorsey was still holding one of the officers' tasers in his hand.

Agdeppa claimed he warned Dorsey before shooting him, but this part of the audio recording is chaotic. One can hear a man's voice shouting something just before the shots

were fired, though what is said is unclear. Whether a final warning was given is disputed and cannot be readily ascertained from the audio recordings. Immediately thereafter, Agdeppa announced over his police radio that shots had been fired and that an officer and suspect were down.

Agdeppa and Rodriguez were treated at the emergency room following the incident. Agdeppa was given sutures on the bridge of his nose and later reported being diagnosed with a concussion, which left him unable to work for six months and had further longer-lasting effects. Rodriguez recalled having a swollen left check and right jaw, abrasions on her ear and hands, and a pulled muscle behind her knee.

B

The Los Angeles Board of Police Commissioners (BOPC) reviewed the incident and issued written findings. The findings were based on various accounts, including from the two private security guards who are seen at different points in the bodycam videos. As the district court noted, "the course of events presented in the Findings largely conform to Agdeppa's account," with witnesses who were in the locker room substantiating key moments in the encounter. In particular, the BOPC report concluded that "available evidence supports that [Agdeppa's] belief that there was an imminent threat of death or serious bodily injury at the time of the [shooting] was objectively reasonable."

The witnesses' accounts in the BOPC findings corroborate the officers' descriptions of a violent, escalating struggle in which they faced a grave risk of serious injury, or worse. For example, as set forth in the BOPC report, Witness F, a security guard, recalled that after Dorsey was

tased, Dorsey punched Agdeppa "more than eight times" in the "face and head area with his fist that was handcuffed," with "the force of the punches knock[ing] [Agdeppa] into the lockers and walls."[2]  Witness F recalled that "[t]his caused [Agdeppa] to bounce back toward [Dorsey], who then struck [Agdeppa] in the face again."  Witness F further described that Dorsey was "striking [Rodriguez] in the face with his half-open hand" and "straddling" her, and that "[Rodriguez] was bleeding from []her mouth as [Dorsey] was hitting []her."

The BOPC report states that after Rodriguez was "knocked to the ground by [Dorsey] and was attempting to defend [herself]," Dorsey "grabbed the TASER with his left hand and began to push the TASER into [Rodriguez]'s face, simultaneously hitting [Rodriguez] with his right fist, which had the handcuffs attached."  Indeed, the BOPC report arguably describes a more desperate situation than even Agdeppa recalled: in Witness F's recollection, "moments prior" to the shooting, and "while [Dorsey] was straddling [Rodriguez], [Dorsey] grabbed [Agdeppa]'s gun and attempted to pull it out of its holster."

The BOPC report faulted the officers for poor planning and for failing to use de-escalation tactics earlier in the encounter.  Because of these "tactical decisions" earlier in the encounter that placed the officers at a "tactical disadvantage," the BOPC report on this basis found the ultimate use of force unreasonable and outside of department policy.  But the BOPC also found—relying on independent

---

[2] Although the BOPC report refers to Officers "A" and "B," it is apparent based on the bodycam video and audio and the rest of the record that "A" is Agdeppa and "B" is Rodriguez.

witnesses—that Agdeppa reasonably perceived a risk of death or serious injury to the officers:

> [Agdeppa] used deadly force at a time when, as supported by the accounts of two independent witnesses, he[] and [Rodriguez] were being assaulted by [Dorsey].  At that time, the violence of [Dorsey's] assault relative to the officers' capacities to defend themselves was such that it was objectively reasonable to believe that there was an imminent threat to the officers of death or serious bodily injury.

### C

Paulette Smith, Dorsey's mother, filed this lawsuit against Agdeppa and the City of Los Angeles.  Smith claimed a violation of 42 U.S.C. § 1983 based on Agdeppa's allegedly unreasonable use of deadly force.  She also sought to hold the City liable under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), for an assertedly unconstitutional policy or custom.  Smith further brought wrongful death actions against Agdeppa and the City under California law.  The parties later stipulated to the City's dismissal from the case.

Agdeppa moved for summary judgment.  He argued that his use of deadly force was objectively reasonable and that regardless, he was entitled to qualified immunity.  The district court found there was a genuine dispute over whether Dorsey posed an immediate threat to the officers sufficient to warrant the use of deadly force.  In particular, the district court found disputes of fact concerning whether the severity of the officers' injuries was consistent with a threat of death

or serious injury, whether (based on a bullet's reported trajectory) Dorsey was crouching over Rodriguez when Agdeppa discharged his weapon, and whether witnesses intervened in the altercation.  The district court also found that a reasonable jury could conclude that Agdeppa failed to warn Dorsey before firing the fatal shots.

The court then concluded that because a jury could find that a reasonable officer would not have believed Dorsey posed an immediate threat, Agdeppa was not entitled to qualified immunity.  The court denied Agdeppa's motion for summary judgment on the plaintiff's state law claims for similar reasons.  Agdeppa timely appeals.

## II

The denial of summary judgment is usually not an immediately appealable final decision, but "that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014).  "[B]ecause 'pretrial orders denying qualified immunity generally fall within the collateral order doctrine,'" in the qualified immunity context we "typically have jurisdiction over interlocutory appeals from the denial of summary judgment." *Estate of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021) (quoting *Plumhoff*, 572 U.S. at 772).  Nevertheless, our "interlocutory review jurisdiction is limited to resolving a defendant's 'purely legal contention that his or her conduct did not violate the Constitution and, in any event, did not violate clearly established law.'" *Id.* at 731 (alterations omitted) (quoting *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018)).

Smith contends that Agdeppa's appeal is based only on factual disputes that are not reviewable on interlocutory appeal.  That is not correct.  Agdeppa only contests the legal

conclusion that there was a violation of Dorsey's clearly established rights. We have jurisdiction "to the extent 'the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain facts showed a violation of clearly established law.'" *Foster*, 908 F.3d at 1210 (quoting *Johnson v. Jones*, 515 U.S. 304, 311 (1995)). The factual disputes that the district court highlighted therefore do not preclude our review because we "have jurisdiction to review an issue of law determining entitlement to qualified immunity—even if the district court's summary judgment ruling also contains an evidence-sufficiency determination." *Marsh*, 985 F.3d at 731; *see also Wilkins v. City of Oakland*, 350 F.3d 949, 951–52 (9th Cir. 2003).

We review de novo the district court's denial of summary judgment. *Tobias v. Arteaga*, 996 F.3d 571, 579 (9th Cir. 2021). We view the facts and draw reasonable inferences in the light most favorable to Smith, the nonmoving party. *District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.1 (2018). "Although we 'assum[e] that the version of material facts asserted by the [plaintiff] is correct,' we may consider facts offered by the defendant that are 'uncontradicted by any evidence in the record.'" *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (citations omitted) (first quoting *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001); and then quoting *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010)).

A

The doctrine of qualified immunity protects government officials from § 1983 liability unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the

time.'"  *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Because Agdeppa does not challenge the district court's determination that a reasonable juror could conclude that Agdeppa violated Dorsey's Fourth Amendment right to be free from excessive force, this appeal turns solely on the second step of the qualified immunity analysis—that is, whether the claimed unlawfulness of Agdeppa's conduct was "clearly established."

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (per curiam) (quoting *Reichle*, 566 U.S. at 664).  This is a high standard: "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  This means that "every 'reasonable official would understand that what he is doing' is unlawful."  *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741–42).  The "rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Wesby*, 138 S. Ct. at 589–90 (first quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam); then quoting *al-Kidd*, 563 U.S. at 735).  This "demanding" requirement "protects 'all but the plainly incompetent or those who knowingly violate the law'" and calls for "a high 'degree of specificity.'"  *Wesby*, 138 S. Ct. at 589–91 (first quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986); then quoting *Mullenix*, 577 U.S. at 13); *see also Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam).

The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of

generality.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff*, 572 U.S. at 779).   And this "specificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 577 U.S. at 12 (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  For us, then, "[t]he question . . . is whether 'clearly established law prohibited' [Agdeppa] from using the degree of force that he did in the specific circumstances that the officers confronted." *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam)).

The district court concluded that Agdeppa was not entitled to qualified immunity because "[a]t the time of the incident, it was 'clearly established' that '[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  This reasoning was insufficient because, outside of an obvious case, "[t]he general principle that deadly force requires a sufficient threat hardly settles th[e] matter." *Mullenix*, 577 U.S. at 14; *see also Rivas-Villegas*, 142 S. Ct. at 8.  As we have previously recognized, "[t]he standards from *Garner* . . . 'are cast at a high level of generality,' so they ordinarily do not clearly establish rights." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).   Instead, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"  *Id.* at 947 (emphasis in original) (quoting *Mullenix*, 577 U.S. at 12).

Applying these directives from the Supreme Court, we now analyze whether Agdeppa is entitled to qualified immunity.  We conclude that he is.

B

To assess the reasonableness of a particular use of force, "we balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'"  *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  To do so, "[w]e consider 'the type and amount of force inflicted'" in tandem with "'(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'"  *O'Doan*, 991 F.3d at 1037 (quoting *Miller*, 340 F.3d at 964).  Another factor "relevant to the reasonableness of force" is whether proper warnings were or could have been given.  *Isayeva*, 872 F.3d at 947.  In conducting this analysis, we do not "second-guess officers' real-time decisions from the standpoint of perfect hindsight," *O'Doan*, 991 F.3d at 1036, and recognize that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

The district court found that factual disputes existed as to whether the severity of the officers' injuries was consistent with a threat of death or serious injury, whether Dorsey remained standing over Rodriguez until the final shot was fired, whether other witnesses entered the locker room

during the struggle, and whether Agdeppa warned Dorsey before using lethal force.

In some instances, these asserted disputes of fact are not genuine. For example, Smith argued below that, based on reported bullet trajectories, an autopsy report "raise[d] questions as to whether, in fact, Dorsey was standing over Rodriguez until Agdeppa's final shot." This argument—which the district court noted the plaintiff had raised "for the first time" at the summary judgment hearing—is based not on expert analysis, but on the speculation of counsel. *See Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("[T]he arguments and statements of counsel 'are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.'" (quoting *Smith v. Mack Trucks,* 505 F.2d 1248, 1249 (9th Cir. 1974) (per curiam))). Indeed, the district court discounted this argument earlier in its decision, recognizing that "[b]ecause there is no evidence regarding the sequence of the gunshots, the court cannot draw any inference as to how Dorsey was positioned relative to each gunshot."

Similarly, the district court identified a potential factual dispute as to whether the BOPC report contradicted Agdeppa's assertion that he was several feet away from Dorsey when he fired the fatal shots, suggesting Agdeppa may have been much closer, which in turn could call into question Agdeppa's credibility. But the district court acknowledged that "plaintiff does not raise this argument." And the BOPC report does not identify any apparent contradiction on this point. Rather, the BOPC report specifically credits Agdeppa as having fired "from an approximate distance of 5–7 feet." And the report later concludes that the BOPC's "investigation revealed that

[Agdeppa] fired five rounds at [Dorsey], from an approximate distance of five to seven feet." The BOPC report at one point referenced Witness F's recollection that Dorsey was holding Agdeppa's wrist as the first shots were fired, as Witness F recalled that Dorsey had actually grabbed Agdeppa's gun and was attempting to pull it out of its holster. But we do not rely on that narrative, even as we note that it would strongly favor Agdeppa because it suggests a situation even more dire than the one Agdeppa recalled.[3]

In any event, even accepting the claimed factual disputes that the district court identified, Agdeppa is still entitled to qualified immunity. Stated differently, the asserted factual disputes do not take away from the core undisputed features of this case which, at a minimum, confirm that any constitutional violation was not clearly established. *See Isayeva*, 872 F.3d at 945. We do not resolve any factual disputes, nor are any of the factual disputes that the district court identified dispositive. We instead consider the disputed facts in the light most favorable to Smith, alongside the undisputed facts and the video and audio recordings, which provide more than sufficient basis for reaching the legal conclusion that qualified immunity is warranted under the second step of the qualified immunity analysis.

---

[3] Though it does not suggest he did not witness the events leading up to the shooting, the BOPC report also states that Witness F was no longer in the locker room at the moment shots were fired. If true, this would mean that Witness F's recollection could not legitimately conflict with Agdeppa's account of his positioning at the time of the shooting. And if the report was incorrect on this point and Witness F's testimony about Dorsey grasping for Agdeppa's gun was credited, then the situation would have been more dangerous than Agdeppa recalled. It is immaterial which is correct because either way, this favors Agdeppa.

The "most important" factor for evaluating Agdeppa's use of lethal force is "whether the suspect posed an immediate threat to the safety of the officers or others." *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)). In this case, it is undisputed that the officers were placed in a high-stress, rapidly developing situation involving a person who had reportedly assaulted a gym security officer and threatened others, and who was violently resisting the officers and assaulting them in an enclosed area. *See Ames v. King Cnty.*, 846 F.3d 340, 349 (9th Cir. 2017) (explaining that courts should "focus [their] inquiry . . . on the serious—indeed, life-threatening—situation that was unfolding at the time"). Dorsey weighed 280 pounds and stood at 6'1", dominating Agdeppa and Rodriguez in size and stature. *See Isayeva*, 872 F.3d at 950 (holding that a "disparity in size posed obvious risks of physical harm to the officers"). The recordings from the body cameras confirm that after officers repeatedly implored Dorsey to stop, Dorsey violently resisted and assaulted the officers, in a struggle that grew more intense as it wore on. That is the same account that the BOPC report conveys.

When the officers were unable to bring Dorsey under their physical control with their hands and bodies, they both tried to subdue him with their tasers, but to no avail. Throughout the encounter, the officers are repeatedly heard shouting at Dorsey to stop resisting. Just before the fatal shots were fired, the officers can be heard crying out in pain as crashing and thrashing noises intensify. And in the BOPC report, two independent witnesses corroborated the severity of Dorsey's attack on the officers. Only after the use of non-lethal force had proven ineffective, and only after the assault continued to intensify—with Dorsey having gained control

of Rodriguez's taser—did Agdeppa fire the fatal shots. *See Isayeva*, 872 F.3d at 952 (holding that officers were entitled to qualified immunity where non-lethal force "plainly did not work" and where "the officers were quickly losing in hand-to-hand combat").[4]

We are not persuaded that the extent of the officers' injuries changes the calculus here. Although the plaintiff focuses heavily on this issue (as did the district court), the officers' injuries cannot take away from what the bodycam recordings, Dorsey's taking of the taser, the BOPC report, and the other undisputed facts clearly demonstrate. Nothing about the officers' account required injuries more severe. The dissent suggests that the district court described Rodriguez as "unscathed" following the incident, but the portion of the district court decision the dissent cites merely recites this as an argument made by the plaintiff.

Nor, in any event, were the officers' injuries insubstantial. Agdeppa sustained a prominent facial laceration. He received sutures on his nose (as confirmed in post-incident photographs) and suffered a concussion that reportedly left him unable to work for months. Rodriguez reported swelling on her face and jaw, abrasions, and a pulled muscle. While it is true, as the district court noted, that neither officer appears to have suffered broken bones or more serious injuries, that fortuity does not alter the qualified immunity analysis. No clearly established law requires the

---

[4] The parties debate at length whether our decision in *Isayeva*, which reversed the denial of qualified immunity, is on all fours with this case, and the district court focused its analysis on that precedent. But the burden is not on the officers to prove they fit perfectly within the facts of a case granting qualified immunity; the burden is on the plaintiff to show a violation of a clearly established right in the specific circumstances at issue. *See Isayeva*, 872 F.3d at 946.

officers to have sustained more grievous injuries or worse before using lethal force in the particular situation they confronted.

The dissent relies on *Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir. 2016), and *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) (en banc), but contrary to the dissent, these cases did not involve "similar circumstances." In *Newmaker*, two officers provided conflicting testimony about the circumstances of the shooting and arrived at their version of events "[o]nly after receiving suggestions from [an investigator]." 842 F.3d at 1111–13. Even more significantly, the officers asserted that the suspect was standing and swinging a police baton at them, but the autopsy report and video evidence indicated that the man was shot in the back while lying on the ground. *See id.* at 1111–16. In *Gonzalez*, meanwhile, an officer shot a man in the head at point blank range with no warning and no prior resort to non-lethal force, and the officer's account, which turned on the speed of a moving vehicle, included as to that critical issue a "combination of facts [that] appear[ed] to be physically impossible." 747 F.3d at 794. These cases thus involved genuine disputes of highly material facts. There are no analogous disputes here, given the obvious import of the video and audio recordings and the rest of the record. Nor do *Newmaker* and *Gonzalez* clearly establish the unlawfulness of Agdeppa's conduct.

Smith argues that *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), clearly establishes that Agdeppa violated Dorsey's Fourth Amendment rights. In *Deorle*, officers were dispatched to Deorle's residence after he became suicidal and acted erratically, but Deorle "was physically compliant," "generally followed all the officers' instructions," and did "not . . . touch, let alone attack,

anyone." 272 F.3d at 1276–77. That is obviously not akin to what happened here. Indeed, as to the *Deorle* case in particular, the Supreme Court has already "instructed" us "not to read [our] decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (per curiam).

Smith also argues that qualified immunity should be denied based on the district court decisions in *Rose v. Cnty. of Sacramento*, 163 F. Supp. 3d 787 (E.D. Cal. 2016), *Berger v. Spokane Cnty.*, 2017 WL 579897 (E.D. Wash. Feb. 13, 2017), and *Lerma v. City of Nogales*, 2014 WL 4954421 (D. Ariz. Sept. 30, 2014). "We have been somewhat hesitant to rely on district court decisions" in the second prong of the qualified immunity analysis because "'district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards.'" *Evans v. Skolnik*, 997 F.3d 1060, 1067 (9th Cir. 2021) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). And in any event, the district court cases on which Smith relies dealt with factual circumstances materially distinct from those before us. Those cases therefore could not place the constitutional question here beyond debate, even assuming they had the precedential effect of appellate court decisions.

Finally, this case is "far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Brosseau*, 543 U.S. at 199. The "situations where a constitutional violation is 'obvious,' in the absence of any relevant case law, are 'rare.'" *O'Doan*, 991 F.3d at 1044 (quoting *Wesby*, 138 S. Ct. at 590). And application of the "obviousness" exception is "especially problematic in the Fourth-Amendment context" due to the often fact-specific nature of the varied situations officers confront. *Sharp v.*

*Cnty. of Orange*, 871 F.3d 901, 912 (9th Cir. 2017); *see also O'Doan*, 991 F.3d at 1044.  There is no basis on these facts to conclude that the use of force here was obviously constitutionally excessive, in the absence of any precedent bearing more closely on the specific circumstances presented.

C

Smith makes one additional argument that is somewhat different: she maintains that even if the degree of force here was permissible based on the threat the officers faced, Agdeppa was constitutionally required to warn Dorsey before using such deadly force.  For this, Smith relies on our observation in *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997), that "whenever practicable, a warning must be given before deadly force is employed." *Id.* at 1201.  We made a similar observation in *Gonzalez*.  There, we stated that "[i]n general, we have recognized that an officer must give a warning before using deadly force 'whenever practicable.'" *Gonzalez*, 747 F.3d at 794 (quoting *Harris*, 126 F.3d at 1201).

These general statements from our prior cases cannot carry the day here, whether Smith's argument is a standalone "warning" claim or part of the broader *Graham* analysis.  The difficulty we have with Smith's warning argument is that it purports to "define clearly established law at a high level of generality," which the Supreme Court has "repeatedly told courts" not to do. *Kisela*, 138 S. Ct. at 1152 (quoting *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015)).  The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201).  And Smith has not

identified any precedent or body of precedent suggesting, much less confirming, that Agdeppa's alleged failure to give a warning before using deadly force was obviously unlawful in the circumstances Agdeppa faced. *See Sharp*, 871 F.3d at 911 (noting that plaintiffs "must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful" (emphasis in original)).

Our very framing of the "warning" principle itself presupposes that it is not a one-size-fits-all proposition that applies in every case or context. We have stated only that the rule applies "[i]n general," "'whenever practicable.'" *Gonzalez*, 747 F.3d at 794 (quoting *Harris*, 126 F.3d at 1201). We have also specifically emphasized that "[t]he absence of a warning does *not* necessarily mean that [an officer's] use of deadly force was unreasonable." *Id.* at 797 (emphasis added). The flexibility built into our "warning" rule makes it more difficult for that rule, standing alone, to clearly establish a constitutional violation in any given case.

The origins of our "warning" rule only further confirm that it typically operates at a level of generality that is too elevated for qualified immunity purposes. We sourced our "warning" rule to the Supreme Court's decision in *Garner*. *See Harris*, 126 F.3d at 1201 (citing *Garner*, 471 U.S. at 11–12). But as we have already noted above, *Garner* set forth standards that are for the most part pitched at too high a level of generality to overcome a qualified immunity defense. *See, e.g.*, *Rivas-Villegas*, 142 S. Ct. at 8; *Brosseau*, 543 U.S. at 199.

The general warning principle we have articulated thus does not, on its own, invariably indicate when a warning is required. Existing precedent does not clearly establish in

every context when such a warning is "practicable," what form the warning must take, or how specific it must be. Nor does existing law clearly establish how the absence of a warning is to be balanced against the other *Graham* factors in the context of a case such as this. That officers may be constitutionally required to provide a warning before using deadly force in some cases does not mean it is clearly established that such a warning was required in this case.

As a result, Smith was required to come forward with "existing precedent" that "squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quotation omitted). She has not done so. The cases Smith identifies all involved officers who shot suspects almost immediately after encountering them, where the suspects presented no obvious threat to officer safety. In *Harris*, a police sniper in a hilltop position opened fire on suspects who were exhibiting no immediate signs of aggression, without even announcing that police were present. 126 F.3d at 1193–94, 1202–04. In *Gonzalez*, the officer shot a man in the head at point blank range with no warning and no prior resort to non-lethal deterrents, immediately after the suspect drove away with the officer in the car at a speed that may have been no faster than three to seven miles per hour. *See* 747 F.3d at 794–97. In *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), the officer shot a thirteen-year-old boy— who was holding a fake gun and displaying no signs of aggression—moments after arriving on the scene, "without knowing if [the boy's] finger was on the trigger, without having identified himself as a police officer, and without ever having warned [the boy] that deadly force would be used." *Id.* at 1010–11. And in *S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019), which was decided *after* the events of this case, the suspect was making no sudden

movements when an officer fatally shot him from seventeen feet away, less than five seconds after the officer stepped out of his car, after making no attempt to use non-lethal force. *Id.* at 1130–32, 1137–38.

These cases bear none of the hallmarks of this case, in which it is undisputed that the officers repeatedly and unsuccessfully tried to use non-lethal force and were engaged in a lengthy, violent struggle with a large assailant in a tightly enclosed area, who was striking them and who had already gained control of an officer's taser. Dorsey was given numerous opportunities—through repeated verbal commands, attempted handcuffing, and taser deployments—to stop his attack. By the officers' words and actions, Dorsey was warned throughout the encounter. He was given numerous opportunities to stand down, and he instead continued to fight. The past precedents we discussed above would not have caused Agdeppa to believe he was required to issue a further warning—to call a "time-out"—in the middle of an increasingly violent altercation.

The dissent's contention that a jury could find that Agdeppa gave no deadly force warning assumes that such a warning was constitutionally required here. As we have explained, no clearly established law required this in the circumstances Agdeppa confronted. Nor, as the dissent suggests, has Agdeppa conceded that it was practicable for him to give the more extensive warning that the dissent apparently envisions in the final moments of the escalating confrontation. Agdeppa is entitled to qualified immunity because Smith does not identify "a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation 'under similar circumstances.'" *Wesby*, 138 S. Ct. at 591 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)).

\*        \*        \*

For the foregoing reasons, we reverse the district court's decision denying Agdeppa qualified immunity and remand for proceedings consistent with this opinion.

**REVERSED and REMANDED.**

CHRISTEN, Circuit Judge, dissenting:

Officer Edward Agdeppa does not dispute that a reasonable jury could find that he violated Albert Dorsey's Fourth Amendment right to be free from excessive force. This appeal is limited to whether Agdeppa is entitled to qualified immunity. As the district court recognized, qualified immunity was improper because there were significant discrepancies between the officers' versions of their efforts to handcuff Dorsey in a locker room and other record evidence—so much so that a reasonable jury could reject the officers' account of the shooting.

Agdeppa claims that he yelled "stop" before shooting, but no such warning can be heard on either of the officers' body-cam recordings. The defense cannot argue that it was not possible for Agdeppa to give Dorsey a deadly force warning because Agdeppa's sworn statements admit that he had time to repeatedly tell Dorsey to "stop" during the four-minute locker room struggle. The officers tased Dorsey at least five times during this interval, yet Agdeppa never claimed to have warned Dorsey that he would switch from using his taser to using his firearm if Dorsey did not submit to being handcuffed.

The existence of Dorsey's constitutional rights is not in doubt: he had a right to be free from the use of excessive force, and police officers are certainly allowed to use deadly force if they face imminent risk of serious harm.[1]  We also have well-established precedent that an officer must give a deadly force warning if it is practicable to do so.  *See, e.g.*, *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc); *Harris v. Roderick*, 126 F.3d 1189, 1201, 1204 (9th Cir. 1997).  There is no room for disputing that Officer Agdeppa was on notice of both of these well-established constitutional rules.  Thus, as the district court correctly recognized, the only unresolved issues in this case are *factual*: (1) whether a reasonable officer in Agdeppa's position would have believed that Agdeppa's partner was in imminent danger; and (2) whether it was practicable for Agdeppa to warn Dorsey before using lethal force and he nevertheless failed to do so.

The majority mistakenly asserts that the district court denied summary judgment because "at the time of the incident it was 'clearly established' that 'where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" (alternations accepted).  That was the district court's recognition of the correct legal standard*, not the reason it denied qualified immunity.  The court denied qualified immunity because "a jury could find that a reasonable officer in Agdeeppa's position would not have believed that

---

[1] *See Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)) ("An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (emphasis removed) (quoting *Tennessee v. Garner*, 47 U.S. 1, 3 (1985)).

[Agdeppa's partner] or anyone else was in imminent danger and thus, would have understood that his use of deadly force violated plaintiff's Fourth Amendment rights."

Rather than construing disputed facts in the light most favorable to the non-moving party, the majority usurps the jury's role. It avoids Agdeppa's sworn statements, which leave little room to doubt that he had an opportunity to provide a deadly force warning, and sidesteps other evidence that would allow a jury to decide that the officers were not at imminent risk when Agdeppa shot Dorsey. We lack interlocutory jurisdiction to review a district court's order denying qualified immunity when the decision turns on factual disputes rather than legal ones. *Peck v. Montoya*, 51 F.4th 877, 885–86 (9th Cir. 2022). The majority errs by disregarding this jurisdictional limitation, re-weighing the evidence, and deciding that the factual disputes identified by the district court are not material. For all of these reasons, I respectfully dissent.

## I.

Our review of Agdeppa's interlocutory appeal is limited to the "purely legal . . . contention that [his] conduct 'did not violate the [Constitution], and in any event, did not violate clearly established law.'" *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014)). Those portions of the district court's order determining questions of "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial . . . [are] not appealable." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). This rule forecloses review of any "*fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Est. of*

*Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) (quoting *Foster*, 908 F.3d at 1210) (emphasis in original).

When a district court denies qualified immunity and "does not explicitly set out the facts that it relied upon, we undertake a review of the pretrial record only to the extent necessary to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1007–08 (9th Cir. 2017) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998)).

Deadly force cases present additional, unique challenges because defendant officers are often the only surviving eyewitnesses. *See, e.g.*, *Gonzalez*, 747 F.3d at 794; *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). For this reason, we have explained that summary judgment should be granted "sparingly" in deadly force cases and courts must take special care to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez*, 747 F.3d at 795 (quoting *Scott*, 39 F.3d at 915); *see Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016) (explaining that summary judgment is not appropriate in a deadly force case if the plaintiff's claim turns on an officer's credibility, and that credibility is genuinely in doubt).

The district court knew there was evidence in the record that contradicted the officers' statements. The court was obligated to leave it to the jury to consider that evidence and to decide whether it was persuaded by the officers' testimony. *See, e.g.*, *Bator v. State of Hawai'i*, 39 F.3d 1021, 1026 (9th Cir. 1994) ("At the summary judgment stage, . . .

the district court may not make credibility determinations or weigh conflicting evidence.").

To assemble its narrative of the events leading up to the locker room shooting, the majority relies heavily on the officers' testimony, the audio-only recordings from the officers' body-cams, and especially on select portions of an internal investigation report prepared by the Los Angeles Board of Police Commissioners. The record also includes statements from two security guards, an autopsy report, and photos of the officers' bruises and cuts. Considered together, the evidence is inconsistent; some of it supports Officer Agdeppa's account and some cannot be reconciled with his description of the last three minutes before the shooting. At the summary judgment stage, contested issues of fact must be construed in plaintiff's favor.

The majority correctly observes that when "we have videotape of the events, we 'view[] the facts in the light depicted by the videotape.'"[2] But in this case, the video does not depict the salient facts. There is no dispute about what happened when the officers initially made contact with Dorsey: he refused to comply with their instructions to get dressed, leave the locker room, and submit to being handcuffed. It is the final three minutes before the shooting that are in question, and there is no video of that part of the encounter because the officers' body-cams were knocked to the floor. From the audio-only portion of the body-cam recordings, the majority purports to find that the conflict escalated and that cries of pain came from the officers rather than Dorsey. But the audio is inconclusive. Banging sounds can be heard, along with the officers' warnings that they will

---

[2] Maj. 5 (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)) (alteration in original).

tase Dorsey if he does not comply, followed by the sound of
tasers deploying.  The audio recording sheds no light on
where Agdeppa and Dorsey were standing, or who was
doing what in the locker room, just before the shots were
fired.  Agdeppa claims that he yelled for Dorsey to "stop"
before escalating from his taser to his gun, but that cannot be
heard on the audio.  And contrary to the majority's
interpretation of the audio-only portion of the recording, the
district court decided that "a rational fact finder could find
that both officers' body-worn camera footage [is] consistent
with [plaintiff's] account, rather than Agdeppa's."

The majority relies heavily on the Police
Commissioners' factual finding that Agdeppa reasonably
believed Dorsey posed an imminent threat before Agdeppa
shot, but downplays the Commissioners' conclusions that:
(1) the officers' tactics warranted a finding of
Administrative Disapproval; and (2) Agdeppa's use of
deadly force was unreasonable.  The report concluded:

> When assessed in light of the series of
> substandard tactical decisions leading up to
> Officer [Agdeppa]'s [officer-involved
> shooting], and the nexus between those
> decisions and the circumstances under which
> Officer [Agdeppa] found [himself]
> compelled to fire [his] weapon, *the lethal use
> of force by Officer [Agdeppa] was
> unreasonable.*

(emphasis added).

Tellingly, though the majority relies heavily on it,
Officer Agdeppa objected to the admission of the Police

Commissioners' report.[3]  This is unsurprising because, at best, the report is a mixed bag for defendants.

The Commissioners' report only summarized the guards' statements, but its narrative makes clear that one of the guards told the Police Commissioners' investigators that Dorsey was holding Agdeppa's arm when the shots were fired.   This guard's account conflicts with Agdeppa's description that he was standing six to eight feet away from Dorsey when he fired, and that Dorsey was still straddling Rodriguez and pummeling her.  The district court recognized that "if introduced at trial, this evidence would impeach Agdeppa's credibility because, according to Agdeppa, he fired from six to eight feet away as Dorsey stood or hunched over Rodriguez."  The majority dismisses this contradiction as not "dispositive."  But the question is whether this factual dispute is *material*.  *See Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) ("A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law.").  Where Dorsey was standing and what he was doing before Agdeppa shot him are essential to determining whether a reasonable officer would have believed that Dorsey posed an imminent threat of death or serious bodily injury to Agdeppa's partner. The actions taken in the final few minutes before the shooting will determine whether Agdeppa is entitled to qualified immunity.

The majority describes the gym's security guards as "independent witnesses," but a gym employee reported that Dorsey assaulted one of the guards before the officers

---

[3] The district court overruled Agdeppa's objection and concluded that the information in the report could be presented in a form admissible at trial and as a public record.

arrived. More important, the majority decides that the statements the guards gave during the Police Commissioners' internal investigation corroborated Agdeppa's account, with no mention that some of the statements attributed to the guards sharply contradicted Agdeppa's declaration and the narrative he gave to investigators.

The majority recites a passage from the report that recounts one of the security guards recalling that he assisted in the locker room struggle and that Dorsey grabbed Agdeppa's gun but was unable to remove it from its holster, yet neither of the officers recalled the guards being involved and the report elsewhere states that the guards had left the locker room or were in the process of leaving before the shooting took place. The majority decides that whether one of the guards accurately described what occurred in the final moments is "immaterial," either because the guard could not impeach Agdeppa's testimony about the final moments before the shooting (because the guard was not there), or because the guard's narrative suggests that the situation in the locker room was "even more dire than the one Agdeppa recalled." The majority cannot have it both ways. We are not permitted to ignore the report's conclusion that Officer Agdeppa's use of lethal force was unreasonable, nor ignore that the guard provided statements that squarely contradicted Agdeppa's account.

In sum, the security guards' descriptions of the encounter differed from the officers' accounts in several respects, including the number of shots and volleys that Agdeppa fired, whether Dorsey reached for Agdeppa's firearm, whether Dorsey was holding Agdeppa's wrist when Agdeppa fired, and whether Dorsey remained hunched over Rodriguez when he was shot. To be sure, the guards

described a struggle between Dorsey and the officers, but given the conflicting record, it is for the fact finder to decide whether the officers were at imminent risk of harm prior to the shooting.

The Commissioners' report incorporated the framework for evaluating excessive force cases set out in *Graham v. Connor*, 490 U.S. 386 (1989), along with Departmental policies.[4] The most important *Graham* factor is whether the suspect posed an imminent threat to the safety of the officers or others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir.1994)).

Mapping the *Graham* factors onto the facts of this case: Dorsey resisted arrest, but nothing suggests that he had committed a serious crime before the officers physically engaged with him and tried to handcuff him; there was no danger Dorsey was concealing a weapon because he was not wearing any clothing; and Dorsey did not present a flight risk. Turning to the threat that Dorsey posed, the

---

[4] The Commissioners quoted a familiar passage from *Graham*:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather that with the 20/20 vision of hindsight. [. . .] The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation.

(quoting *Graham*, 490 U.S. at 396–97).

Commissioners concluded that Agdeppa's use of deadly force was unreasonable because:

> Once the officers had initiated physical contact with [Dorsey], it was readily apparent that [Dorsey's] greater size and strength, in concert with his noncompliant behavior, would make it difficult, if not impossible, for the officers to accomplish their goal of handcuffing him. *At that time during the incident, there was no exigency that required the officers to stay physically engaged with [Dorsey].* Nevertheless, the officers did not take the opportunity to disengage from their physical struggle and redeploy in order to allow for the assembly of sufficient resources. Rather, the officers stayed engaged as the situation continued to escalate, culminating in injurious assaults on both officers and the ultimate use of deadly force by Officer [Agdeppa].

(emphasis added).

The record also contains physical evidence that conflicts with Agdeppa's statements and declaration regarding the risk Dorsey presented to the officers. As explained, Agdeppa argued that it was necessary to shoot because Dorsey had "inflicted serious injuries on both officers" and he "was striking Rodriguez with his fist while turning her Taser on her." The order denying summary judgment observed that post-incident photographs showed an "unscathed" Rodriguez and that her medical records reflected only swelling, abrasions, and a pulled muscle—

minor injuries very different from the type one would expect
if Dorsey had been pummeling Rodriguez such that "the next
punch would likely kill her," as Agdeppa had described.  The
district court rejected Agdeppa's arguments that bruising
and additional injuries were not visible in the photos because
they constituted impermissible attacks on "the weight of the
evidence, which [was] not for the [c]ourt to consider on
summary judgment."  The majority, by contrast, weighs the
photos against other evidence and decides that the photos are
unpersuasive.

The autopsy report's description of the bullet trajectories
also undermines Agdeppa's account that Dorsey was
standing over Rodriguez as she lay on the floor, that he was
straddling and punching her, and that Agdeppa feared the
next blow might kill his partner.  This report states that
several bullets traveled through Dorsey's body from right to
left in a downward direction, and that one of the bullets
traveled through Dorsey's stomach from left to right in an
upward direction.  The bullet trajectories cannot be squared
with Agdeppa's testimony that, "Dorsey remained in the
same position . . . as each shot was fired," and that
immediately after the final shot, "Dorsey fell backward and
off Rodriguez and did not move."[5]

The majority improperly weighs the conflicting evidence
(e.g., finding that the officers' injuries were not
"insubstantial"); assesses the sufficiency of the evidence

---

[5] My colleagues mistakenly argue that the district court "discounted this
argument earlier in its decision."  In fact, the district court observed only
that it could not make a finding "as to how Dorsey was positioned
relative to each gunshot."  The district court recognized that a fact finder
*could* rely upon inconsistencies between Agdeppa's description and the
physical evidence to impeach Agdeppa's credibility.

(e.g., characterizing the bullet trajectory evidence as "speculative"); and makes credibility determinations (e.g., concluding that security guards' statements "corroborate the officers' descriptions" even though it is not clear the guards were present). Finally, it must be noted that the majority relies on *Hopson v. Alexander* for the proposition that "we may consider facts offered by the defendant that are 'uncontradicted by any evidence in the record.'" 71 F.4th 692, 697 (9th Cir. 2023) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010)). By invoking *Hopson*, the majority forgets that binding en banc authority requires that we take special care in fatality shooting cases to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez*, 747 F.3d at 795 (quoting *Scott*, 39 F.3d 915). The quote from *Hopson* is inapt because that case did not involve a fatality.[6] We are bound by our en banc decision in *Gonzalez*.

Agdeppa will no doubt prevail if a fact finder is ultimately persuaded by his description of the way the struggle in the locker room unfolded. But on interlocutory appeal, we are not permitted to review "whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Est. of Anderson*, 985 F.3d at 732; *see Peck*, 51 F.4th at 876 (declining to review a district court's determination "that there were genuine disputes of fact about whether [the suspect] posed an immediate threat"). We should affirm the district court's order denying qualified immunity.

---

[6] *Wilkinson*, on which *Hopson* relied, did involve a fatality, but it pre-dates *Gonzalez*.

## II.

Under similar circumstances, we have reversed orders granting qualified immunity. In *Newmaker*, we rejected a request for qualified immunity based on evidence that contradicted the officers' account of a fatal shooting. 842 F.3d at 1110. There, as here, the crux of the case turned on what the jury would decide about what happened in the moments before the shooting. The lead-up to the *Newmaker* shooting mirrors this case in pertinent respects: Newmaker was nearly naked when he was shot, he refused to comply with officer instructions, and he physically resisted officers after they tased him in both "drive" stun and "dart" modes. *Id.* at 1111–12. The officer who shot and killed Newmaker alleged that he had grabbed another officer's baton, stood up, and swung it "violently" and "aggressively" at the officer's head. *Id.* at 1112. The defendant claimed that he warned Newmaker to drop the baton before shooting him from a standing position. *Id.* According to the defendant officer, Newmaker was also standing, but he shot Newmaker a second time after he fell to the ground because Newmaker rose and began swinging the baton again. *Id.*

We reversed the district court's order granting summary judgment on qualified immunity grounds because the evidence conflicted with the officer's testimony. First, the officer had previously described shooting Newmaker twice in quick succession, failing to mention that Newmaker fell and got back up. *Id.* at 1113, 1116. Second, the autopsy report indicated that Newmaker was shot while he was bending over and low to the ground, not while he was standing. *Id.* at 1114–15, 1116. Third, though a car dashboard camera captured only bits and pieces of the scuffle and shooting, there was "nothing clearly visible in [Newmaker's] hands" when he was shot, and contrary to the

officer's statement, it appeared that Newmaker was shot after he fell to the ground. *Id.* at 1115. We concluded that summary judgment was inappropriate because it was disputed "when, why, and how [the officer] shot Newmaker." *Id.* at 1117.

The majority seems to reason that because Dorsey was larger than the officers, was resisting arrest, and presented some risk to officer safety, Agdeppa is entitled to qualified immunity. This overlooks that all resisting suspects pose some risk to officer safety, and yet our precedent provides that officers may use deadly force only if they have probable cause to believe a suspect poses an imminent risk of death or serious physical injury to the officer or others. *See, e.g.*, *id.* at 1116. My colleagues decide that Dorsey's indisputably larger size and the actions he took to resist render the disputed facts not "dispositive." But qualified immunity depends on what happened in the moments before Agdeppa shot Dorsey—and whether a reasonable officer would have believed that Dorsey posed an imminent threat to the officers. *See Simmons*, 47 F.4th at 932 (defining "material fact").

*Gonzalez* is also instructive. There, physical evidence conflicted with the officers' description of events preceding a police-officer fatality shooting. 747 F.3d at 791. The only testimony describing the actions leading up to Gonzalez's death came from the officers who stopped Gonzalez for a traffic violation. *Id.* at 792. They recalled that Gonzalez refused to exit his van or turn off its engine and that the officers, one standing on each side of the vehicle, reached in through the van's driver-side and passenger windows to open the van's doors. *Id.* They later testified that it appeared Gonzalez had something in his hands and that they struggled to restrain him as they were leaning in through the van's

windows. *Id.* The officers recounted that Gonzalez managed to shift the van into "drive" and that he "stomped" on the accelerator while one of the officers was still leaning into the van. *Id.* at 792–93 (alteration accepted). That officer stated that he yelled at Gonzalez to stop and then shot him in the head from less than six inches away, killing him. *Id.* at 793.

Our en banc court reasoned that the key issues were whether a jury could decide that an objectively reasonable officer would have perceived an immediate threat of death or serious bodily injury, and whether a jury could decide it was practicable for the defendants to have given Gonzalez a deadly force warning. *Id.* at 794. We reversed the district court's order granting summary judgment because the officers' statements could not be reconciled with other evidence in the record. By their mutual account, the van accelerated to fifty miles per hour after Gonzalez stomped on the accelerator and they both feared for the safety of the officer who had leaned into the van's passenger's side window and remained in the accelerating van. *Id.* at 794. But the defendants also said that the van traveled just fifty feet in five to ten seconds. If that had been the case, a jury could decide that the van was not traveling at a high speed and that it was practicable to provide a warning before using deadly force. *Id.* at 797 (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001) ("Shooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable [where] . . . the officer neither orders the individual to stop nor drop the can or bottle . . . .")).

Quite unlike the majority's cramped view that "existing precedent does not clearly establish *in every context*

when . . . a [deadly force] warning is 'practicable,'" our
en banc court in *Gonzalez* reversed the district court's order
granting summary judgment in favor of the officers because
the evidence would have allowed jurors to decide that a
deadly force warning had been practicable.

### III.

Application of our rule requiring a deadly force warning
is particularly straightforward in this case because Officer
Agdeppa never claimed that it was not practicable to give a
deadly force warning. Agdeppa's brief to this court recycles
a bald assertion that appeared for the first time in his
summary judgment brief, that he "warned [Dorsey] that he
would shoot." That assertion was flatly contradicted by
Agdeppa's own pretrial statements, in which he consistently
said that he only told Dorsey to "stop." Because counsel's
argument was not evidence, *see, e.g.*, *Gaines v. Relf*, 53 U.S.
472, 490 (1851), the district court properly ignored it.

When asked at his deposition if he warned Dorsey before
using deadly force, Agdeppa said, "I know I said
something. . . . I yelled something." And in his sworn
declaration submitted in support of his summary judgment
motion and in the statement of undisputed material facts
filed in the trial court, Agdeppa alleged that, before shooting,
he "gave Dorsey a verbal warning, stating words to the effect
that Dorsey needed to stop." The majority stops short of
deciding that no such warning can be heard on the audio
recording. It instead decides that the audio is "chaotic." But
if we view the facts in the light most favorable to plaintiff,
no warning was given. And we are not free to disregard
Agdeppa's sworn account: whatever happened in the locker
room after the body-cams were knocked off, Agdeppa has
been consistent in recounting that he yelled "stop" several

times before using his taser, and that he yelled "stop" before using his gun. Agdeppa's declaration is a sworn statement by a party opponent and there is no conflicting evidence on this point. *Cf.* Fed. R. Evid. 801(d)(2)(A).

Setting aside for the moment that no warning can be heard on the audio before the shooting starts, Agdeppa never claimed that he warned Dorsey he was going to switch from using his taser to using his firearm if Dorsey did not stop resisting. This is critical because the officers had repeatedly warned Dorsey that they would tase him if he did not stop resisting—and followed up by tasing Dorsey at least five times. Another command to "stop" would have done nothing to warn Dorsey that Agdeppa was preparing to ramp up to deadly force. *See, e.g.*, *Harris*, 126 F.3d at 1204 ("Whenever practicable, a warning must be given *so that the suspect may end his resistance*." (emphasis added)); *see also S.R. Nehad v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019) ("Even assuming Browder did command Nehad to 'Stop, drop it,' there is no dispute that Browder never warned Nehad that a failure to comply would result in the use of force, let alone deadly force.").[7] On this record, a reasonable jury could decide that it was practicable for Agdeppa to give Dorsey a deadly force warning, and that he did not provide one.

The majority argues that plaintiff failed to identify any precedent establishing that Agdeppa's failure to give a deadly force warning was "obviously unlawful in the circumstances Agdeppa faced," because Agdeppa posed a

---

[7] *Browder* was published in 2019, after the events at issue in this case, but we concluded the officer's Fourth Amendment violation in that case violated law that was clearly established as of April 2015. *See Browder*, 929 F.3d at 1130, 1141.

risk of danger to the officers. This is wrong for two reasons: (1) it repeats the error of assuming that the officers faced an imminent risk of serious injury based on conflicting evidence; and (2) it conflates the practicability of providing a deadly force warning—which depends on whether the risk of danger was imminent—with whether there was a risk of danger. Our en banc court's decision in *Gonzalez* clearly demonstrates these are two different inquiries.

Like the officers in this case, the officers in *Gonzalez* described an escalating and violent struggle to restrain a suspect. They recounted that Gonzalez accelerated the van he was driving while one officer was trapped inside. We concluded that factual discrepancies in *Gonzalez* would allow a reasonable jury to find that there was time to give a deadly force warning, despite the danger posed by the moving vehicle. Here, after hearing the conflicting evidence and deciding what happened in the locker room, a jury could find that Agdeppa had an opportunity to give Dorsey a deadly force warning, and failed to do so. Agdeppa provided several warnings before using intermediate force. Accepting Agdeppa's uncontested statements on this point, Agdeppa did not warn Dorsey that he was escalating to the use of his firearm.[8]

## IV.

We are not permitted to accept Agdeppa's characterization of the struggle in the locker room because physical evidence and witness statements conflict with it.

---

[8] The majority also argues that our precedent did not "clearly establish" "what form the warning must take, or how specific it must be." We have never required that level of specificity as a condition of applying this precedent. Nor is the issue implicated here, where a jury could find that Agdeppa gave no deadly force warning at all.

*See Peck*, 51 F.4th at 875–76; *Newmaker*, 842 F.3d at 1116; *Gonzalez*, 747 F.3d at 791.   The district court correctly recognized that a reasonable jury could conclude that Agdeppa did not provide a deadly force warning, and that it was practicable to do so.   For these reasons, we should affirm the district court's order denying qualified immunity. Accordingly, I respectfully dissent.